1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

          Plaintiff,          Case No. 3:19-cr-218-HES-JRK

-vs-                           May 13, 2021

ROMEO XAVIER LANGHORNE,         2:08 p.m.

          Defendant.           Courtroom 5D

_____

**DIGITALLY RECORDED CHANGE OF PLEA**
BEFORE THE HONORABLE JAMES R. KLINDT
UNITED STATES MAGISTRATE JUDGE


<u>A P P E A R A N C E S</u>

GOVERNMENT COUNSEL:

     **Laura Taylor, Esquire**
     U.S. Attorney's Office
     300 North Hogan Street, Suite 700
     Jacksonville, FL  32202


DEFENSE COUNSEL:

     **John Leombruno, Esquire**
     Arnold Law Firm, LLC
     3840 Crown Point Road, Suite B
     Jacksonville, FL  32257


OFFICIAL COURT REPORTER:

     Shelli Kozachenko, RPR, CRR, CRC
     221 North Hogan Street, #185
     Jacksonville, FL  32202
     Telephone:  (904) 301-6842

          (Proceedings recorded by electronic sound recording;
                    transcript produced by computer.)

## T A B L E   O F   C O N T E N T S

IN EVIDENCE:                                          Page No.

COURT'S EXHIBIT 1..............................          10

3

<u>P R O C E E D I N G S</u>

May 13, 2021                                        2:08 p.m.

- - -

COURT SECURITY OFFICER:  All rise.  United States District Court in and for the Middle District of Florida is now in session, the Honorable James R. Klindt presiding.

Please be seated.

THE COURT:  This is the case of the United States of America against Romeo Xavier Langhorne, Case No. 3:19-cr-218-HES-JRK.

Laura Taylor represents the United States.  John Leombruno represents Mr. Langhorne.  Mr. Langhorne is present in the courtroom.

We're set for a change of plea hearing in Mr. Langhorne's case.  I have been provided with a plea agreement that indicates Mr. Langhorne wishes to withdraw his previously entered plea of not guilty to Count One of the indictment and enter a plea of guilty to that count today, pursuant to a written plea agreement.

Mr. Leombruno, is that what Mr. Langhorne wishes to do today?

MR. LEOMBRUNO:  That is correct.  And just for the record, Your Honor, that was his desire at the last change of plea hearing, but obviously with the discovery issues, he still maintains that desire.  That's what he wants to do today.

THE COURT:  Yes.  All right.  Well, I think the -- I think the record in this case is clear that Mr. Langhorne previously, on two occasions, was present in court and intended to withdraw his previously entered plea of not guilty and plead guilty.

The first time we had to abort the hearing because of a question with respect to medication.  And then the second time I believe we were toward the end of the change of plea hearing, and Mr. Langhorne indicated that he hadn't had the opportunity that I think he wanted to have to -- or wished he had had to review the discovery because of the situation at the jail and the COVID complications.

And so we -- we again aborted the hearing, came up with a plan for Mr. Langhorne to review the discovery.

And then we had a status conference, I believe it was last week, and Mr. Langhorne indicated that he had had sufficient time to review the discovery and that he was ready to proceed on the same course that he was already on earlier, and that is to enter a guilty plea pursuant to this written plea agreement.

So, Mr. Langhorne, that is what you wish to do today, is withdraw your previously entered plea of not guilty to Count One of the indictment and enter a guilty plea pursuant to this written plea agreement?

THE DEFENDANT:  Yes, Your Honor.

THE COURT: All right. Would you -- would you state your full name for me, please.

THE DEFENDANT: Romeo Xavier Langhorne.

THE COURT: All right. And, Mr. Langhorne, I'm really going to start from the beginning, and we're just going to redo the -- the change of plea colloquy, because it's better to have a stand-alone colloquy and not try to piecemeal it from last time.

And I think that given that you've had an opportunity to review the discovery to your satisfaction, that it's important that we have a complete record of your -- your change of plea. So -- so we'll just take it from the beginning and -- and go through this again.

So -- so, Mr. Langhorne, it is your right to plead guilty to this charge, but before the Court can accept your guilty plea, the Court has to find that your guilty plea is made freely and voluntarily and that there is a factual basis for your guilty plea. And as I told you before, that means I have to find that you actually committed the crime you are pleading guilty to.

And to do all of that, I have to ask you a lot of questions, as you know, and I have to explain a lot of things to you. And as I told you before, the most important thing is that you understand all of the questions I ask and the things I have to explain to you.

So if you don't understand something, a question or an explanation, just let me know.  And if it's a question I'm asking, I'll try to do a better job asking the question.  If it's an explanation I'm giving that -- that's not clear to you, I'll try to do a -- try to explain more effectively whatever it is I'm trying to explain.

So if you don't understand something, will you let me know?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

And during the hearing, as you know, if you need to speak with Mr. Leombruno for any reason, if you need to ask him a question or if you want him to explain something to you, that's perfectly fine.  I think you know by now we're not in any hurry during these hearings, so if you need to speak to Mr. Leombruno for any reason, just let me know.

You can push back from the table and speak to him privately here.  If you need more privacy, there's a conference room downstairs where you could meet with him, and -- and of course, as you know, we could postpone these proceedings for another day.

So if you need to speak to Mr. Leombruno for any reason, will you let me know that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

All right.  And I think I -- I don't think I did this, but I need to swear you.  If you'd raise your right hand, please.

Do you solemnly swear that the statements you make during this hearing will be the truth, the whole truth, and nothing but the truth, so help you God?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Langhorne, you have been sworn to tell the truth. Should you knowingly lie about any fact material to these proceedings, you could be charged with perjury.  Perjury's a felony.

Also, if you knowingly omit or leave out material information, you could be charged with making a false statement.  That too is a felony.

Anything you say today can be used against you if you later challenge the taking of the plea, the conviction, the sentence, or the judgment in your case.

Do you understand all of that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Let's -- let's review this background information.  We've gone over this a number of times now, but of course, this is all part of establishing your competency to proceed.

You were born on July 12th, 1989?

THE DEFENDANT:  Yes, sir.

THE COURT:  So you're 31 years old today.

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  You graduated from high school?

THE DEFENDANT:  Yes, sir.

THE COURT:  I know I've asked you this before, but where did you go to high school?

THE DEFENDANT:  Franklin County High School.

THE COURT:  And -- and you also have an associate's degree.

THE DEFENDANT:  Yes, sir.

THE COURT:  And was that -- was that in computer-related education?

THE DEFENDANT:  No, sir, culinary arts.

THE COURT:  Culinary arts.  I don't know why I got that confused.

All right.  Now, you do read, write, and understand English.

THE DEFENDANT:  Yes, sir.

THE COURT:  Are you presently under the care of a physician or psychiatrist?

THE DEFENDANT:  No, sir.

THE COURT:  All right.  Are you seeing a psychiatrist at the jail?

THE DEFENDANT:  Nope.

THE COURT:  Are you seeing a doctor at the jail?

THE DEFENDANT:  No, sir.

THE COURT:  All right.  As you sit here today, are you under the influence of drugs, alcohol, or any intoxicant?

THE DEFENDANT:  No, sir.

THE COURT:  All right.  Now, I know that you're taking some medication.  I've gotten the record from the Baker County Jail and -- and have your medications.

I'm going to hand a copy to you, Mr. Leombruno and Mr. Langhorne, and let's make sure this is accurate.

Would you take a look at that please, Mr. Langhorne?

All right.  So let's -- let's walk through that.  The metoprolol is -- that's for blood pressure?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  And -- and you take 25 milligrams once a day?

THE DEFENDANT:  Yes, sir.  Yes, I do.

THE COURT:  Do you take that in the morning or at night?

THE DEFENDANT:  At night.

THE COURT:  All right.  Are you on schedule with that?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  And then Lamictal, 25

milligrams, is that once a day?

THE DEFENDANT:  Lamictal, yes, sir.

THE COURT:  And what is that for?

THE DEFENDANT:  Antianxiety.

THE COURT:  All right.  And you're on schedule with that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And then the Abilify, 300 milligrams, that's an injection.  And you had one on April 26th, 2021, and the next one is due May 26th, 2021.

Is that accurate?

THE DEFENDANT:  That is 100 percent accurate.

THE COURT:  All right.  Are you taking any other medications?

THE DEFENDANT:  No, sir.

THE COURT:  All right.  Then if there's no objection, what I'm going to do is mark the original that I have as Court's Exhibit 1, and I'll file it under seal.

MS. TAYLOR:  No objection, Your Honor.

MR. LEOMBRUNO:  No objections.

THE COURT:  All right.  Thank you.

(Court's Exhibit 1 was received in evidence.)

THE COURT:  All right.  Now, you told me in the past -- and I'm asking you because, as you already know, my notes aren't perfectly accurate here -- you've been treated in

the past for ADHD, depression, schizophrenia, and anxiety?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Anything else that you've been treated for?

THE DEFENDANT:  Paranoid schizophrenia, obsessive -- ODD, bipolar disorder, schizoaffective disorder.  I believe that's it.

THE COURT:  And -- and the medications that you're taking treat those conditions?

THE DEFENDANT:  Yes.  I feel perfectly fine, Your Honor.  It eliminates a lot of issues that I have normally.

THE COURT:  All right.  And then you also are being treated for high blood pressure.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you clearly understand where you are, what you are doing, and the importance of this proceeding?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Mr. Leombruno, do you have any doubt whatsoever about Mr. Langhorne's competency to proceed?

MR. LEOMBRUNO:  No, Your Honor.

THE COURT:  Ms. Taylor, do you want me to make any further inquiry in this area?

MS. TAYLOR:  No, Your Honor.

THE COURT:  All right.  Thank you.

All right.  Now, previously, Mr. Langhorne, we went

over this consent form, but we -- we need to do it again today.

It appears that you signed this notice regarding entry of a plea of guilty?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Is that your signature?

THE DEFENDANT:  Yes, sir, it is.

THE COURT:  All right.  And before you signed it, did Mr. Leombruno explain it to you?

THE DEFENDANT:  He did, Your Honor.

THE COURT:  And as you know, you have the right to have the district judge take your guilty plea, but you can agree or consent to me taking it today.

If you do that I'll ask you the same questions the district judge would ask you, and then I'll make a report to him recommending whether or not he accept your plea of guilty.

He will be the judge to decide whether to accept your guilty plea, and if he accepts it, he will be the judge to sentence you.

You understand all of that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Did you have a question?

THE DEFENDANT:  I -- I do.

THE COURT:  Do you want to ask Mr. Leombruno?

THE DEFENDANT:  I think so.

THE COURT:  Yes.  All right.

(Pause in proceedings.)

THE COURT:  All right.  Are you ready to proceed?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  All right.  So we were talking about this notice regarding entry of a plea of guilty, and I think I was asking you if Mr. Leombruno explained it to you.

Did he?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And you understood it?

THE DEFENDANT:  Fully.

THE COURT:  All right.  And so is that what you want, is for me to take your guilty plea today?

THE DEFENDANT:  I'd very much like that, Your Honor.

THE COURT:  All right.  Has anyone threatened you, forced you, coerced you, or intimidated you in any way to get you to waive your right to have the district judge take your guilty plea?

THE DEFENDANT:  No, sir.

THE COURT:  Has anyone promised you anything in exchange for your waiver?

THE DEFENDANT:  No, sir.

THE COURT:  Is it your own independent decision?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Then I do find Mr. Langhorne has knowingly, intelligently, freely, and voluntarily waived

his right to have the district judge take his guilty plea and has agreed or consented to me taking it today.

Now, Mr. Langhorne, I know, of course, that you've indicated on a number of occasions that you intend to plead guilty to Count One of the indictment.  But at this point in the proceedings, I have to advise you that you have the right to plead not guilty, as you have previously done, and you have the right to persist in that not guilty plea.

If you were to maintain your plea of not guilty, you have the following rights under the Constitution and laws of the United States:

You have the right to a speedy and public trial and to be tried by a jury of 12 or by a judge if you waive a jury trial.  If you are tried by a jury, all 12 of the jurors must unanimously agree on your guilt before you can be convicted.

You are presumed innocent, and before you could be found guilty, the burden of proof is on the United States to prove your guilt by competent and sufficient evidence beyond a reasonable doubt.  You do not have to prove that you are innocent.

You have the right to be represented by an attorney at the trial and at every stage of these criminal proceedings, so if you were to maintain your not guilty plea and proceed to trial, Mr. Leombruno would represent you at your trial and at all other hearings in the case.

Of course, if you do enter your guilty plea here today, he will represent you throughout the sentencing phase of the case.

So, Mr. Langhorne, if you were to maintain your not guilty plea and proceed to trial, at your trial the witnesses for the Government would have to come into court and testify in your presence. You would have the right to confront these witnesses against you, that is, to see, hear, question, and cross-examine the witnesses.

Mr. Leombruno, your attorney, could object to evidence offered by the Government, and he could offer evidence on your behalf.

At your trial you could present witnesses in your own defense, and if they would not come to court voluntarily, I could issue orders to make them come to the trial.

At the trial you would not have to make any statement about the charge; that is, you could not be compelled to incriminate yourself or forced to testify at your trial.

On the other hand, if you wanted to testify at your trial, you could do so. In other words, the choice whether or not to testify would be entirely up to you.

If you plead guilty there will be no trial of any kind, and on your plea the Court will find you guilty and convict you.

A plea of guilty admits the truth of the charge, but

a plea of not guilty denies the charge.

Has Mr. Leombruno explained this to you?

THE DEFENDANT:  He has, Your Honor.

THE COURT:  Mr. Langhorne, if you decide to plead guilty, you have to give up the right not to incriminate yourself that I just told you that you have, because in a few minutes I have to ask you questions about the crime to which you are pleading guilty to satisfy myself that you actually committed that crime.  That's what I referred to earlier as a factual basis for your guilty plea.

By pleading guilty you also waive and give up your right to trial, to confrontation and cross-examination of Government witnesses, and to compulsory process for attendance of defense witnesses at trial.

So the bottom line is this.  If you plead guilty, there is no trial, and the next hearing in your case is the sentencing hearing before the district judge.

Mr. Langhorne -- excuse me -- you may have defenses to this charge, but if you plead guilty, you waive and give up your right to assert these defenses.

Has Mr. Leombruno explained the defenses that might be available to you?

THE DEFENDANT:  He -- may I have a moment?

THE COURT:  Yes, of course.

(Pause in proceedings.)

THE COURT:  Have you had enough time?

THE DEFENDANT:  Yes.  Thank you, Your Honor.  I'm sorry about that.

THE COURT:  No, don't --

THE DEFENDANT:  I wanted to make sure it was completely -- we were on the same page, and I understood everything fully.  I didn't want to make any -- I'm really trying not to make any mistakes at all.  I want to make sure that this is, you know, perfect.

THE COURT:  No.  I understand, and you don't need to apologize.  When I said we have as much time as you need, we do, so no need to apologize.

Let me just ask the question again.

Has Mr. Leombruno explained the defenses that might be available to you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Mr. Langhorne, by pleading guilty you also waive and give up your right to challenge the way the Government obtained any evidence, statement, or confession.

Also, by pleading guilty you lose the right to challenge on appeal any rulings the Court has made in your case.

By pleading guilty to this felony, you may lose certain civil rights, such as your right to vote, to hold public office, to serve on juries, and to own and possess

firearms.

A felony conviction may also prevent you from obtaining or keeping certain occupational licenses.

Mr. Langhorne, do you fully understand all of the rights that you have and the rights that you waive and give up by pleading guilty?

THE DEFENDANT:  Yes, Your Honor.  I'd like to ask you a question.

THE COURT:  Well, why don't you ask him first before you ask me.

(Pause in proceedings.)

THE COURT:  Did Mr. Leombruno answer your question?

THE DEFENDANT:  He did.

THE COURT:  All right.  So let me ask you this question again though.

Do you fully understand all of the rights that you have and the rights that you waive and give up by pleading guilty?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And do you have any questions for me up to this point?

THE DEFENDANT:  No.  He answered my question.

THE COURT:  All right.  Let's turn now to the Federal Sentencing Guidelines.  The sentencing guidelines are a set of rules that assist the district judge in arriving at the

appropriate sentence in your case.

THE DEFENDANT:  Let me ask you, Mr. Langhorne, has Mr. Leombruno explained the sentencing guidelines to you?

THE DEFENDANT:  We have been over that very extensively.

THE COURT:  All right.  Then I'll just cover what I have to cover.

The district judge will not be able to determine your guideline sentence until after the presentence report has been completed by the probation office.

After it has been determined what guidelines apply to your case, the district judge has the authority to impose a sentence that is more severe or less severe than the sentence called for by the guidelines.

The district judge, under certain circumstances, has the authority to depart or vary from the guidelines and sentence you either to a lower sentence or a higher sentence than the one called for by the guidelines.

The district judge is required to consider the guidelines but has the authority to impose any sentence up to and including the maximum penalty permitted by law.  This means that the district judge is not bound by the guidelines when you are sentenced.  Instead, the guidelines are only advisory.

Under some circumstances the Government may have the right to appeal any sentence that the district judge imposes.

This means the Government could ask a higher court to impose a more severe sentence than the one actually imposed by the district judge.

Parole has been abolished, so whatever term of imprisonment you receive, you will not be released on parole.

The sentence imposed in your case may be different than any estimated sentence that Mr. Leombruno or anyone else has given you.  In fact, your sentence could be more severe than you expect.

If that happens you will still be bound by your guilty plea, and you will not have a right to withdraw it.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand all of the things I've just explained about sentencing?

THE DEFENDANT:  I do.

THE COURT:  Do you have any questions about the guidelines?

THE DEFENDANT:  No, sir.

THE COURT:  Let's now look at the indictment in your case.  I know I've asked you this a number of times, but I'll ask you again.

Did you get a copy of the indictment, Mr. Langhorne?

THE DEFENDANT:  Yes, sir.  I have a copy right here.

THE COURT:  All right.  And Mr. Leombruno has

reviewed it with you and explained it to you?

THE DEFENDANT:  He has.

THE COURT:  All right.  So Count One charges beginning no later than December of 2018 through on or about November 15th, 2019, in the Middle District of Florida and elsewhere, it's alleged that you knowingly attempted to provide material support and resources, namely services, to a foreign terrorist organization, namely, the Islamic State of Iraq and al-Sham, which is referred to as ISIS, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization pursuant to Section 19 [verbatim] of the Immigration and Nationality Act, knowing that ISIS was a designated foreign terrorist organization and that ISIS has engaged and was engaging in terrorist activity and terrorism.

This is all in violation of Title 18, United States Code, Section 2339B(a)(1).

Do you fully understand the charge?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Do you have any questions about the charge?

THE DEFENDANT:  No.

THE COURT:  All right.  Now, in order to convict you of this charge, the Government has to prove two essential elements beyond a reasonable doubt.  These are listed on page 2, paragraph A.3 of your plea agreement.

The Government has to first prove that you knowingly attempted to provide material support or resources to ISIS, a designated foreign terrorist organization, and second, that you did so knowing that the organization was a designated foreign terrorist organization or that the organization had engaged in or was engaging in terrorist activity or terrorism.

Do you fully understand the two elements the Government must prove beyond a reasonable doubt to convict you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions about the elements?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Now, the penalties that you face are set out in paragraph A.2 on pages 1 and 2 of your plea agreement.

You face a maximum term of imprisonment of 20 years, a maximum fine of $250,000, or you could receive both the term of imprisonment and the fine.  There is a term of supervised release of up to life, a mandatory special assessment of $100 due on the date of sentencing.

And a violation of the terms and conditions of supervised release could result in you being sent back to prison for up to two years and receiving an additional term of supervised release.

Do you fully understand the maximum penalties that you face upon conviction?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  And -- and do you understand, Mr. Langhorne, by entering a guilty plea to a charge that carries these penalties, the logical consequence is that you face the possibility of those penalties?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  All right.  Now, I've mentioned your plea agreement a number of times.  I'm going to hand it down to you and ask you to look through it, make sure these are your initials on each page.

And then once you've done that, if you would just hold the original agreement in front of you because I have to ask you some questions with you holding the plea agreement in front of you.

I'm handing the original to you now.  If you'd just look through that, please.

Mr. Langhorne, is that the original plea agreement in your case?

THE DEFENDANT:  It looks like it, sir.  I believe it is.

THE COURT:  All right.  And is that -- are those your initials on each page?

THE DEFENDANT:  Yes, sir.

THE COURT:  And is that your signature on page 13?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Before you signed the plea agreement, did you read it in its entirety, or did Mr. Leombruno read it to you?

THE DEFENDANT:  I read it in its entirety.

THE COURT:  All right.  And did Mr. Leombruno discuss it with you and explain it to you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Did he answer all of the questions that you had?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you understand the plea agreement?

THE DEFENDANT:  I do.

THE COURT:  All right.  If you'd hand it to Mr. Leombruno.

And, Mr. Leombruno, is that the original plea agreement that you negotiated on Mr. Langhorne's behalf?

MR. LEOMBRUNO:  This -- this is the original plea agreement -- or the final plea agreement, I should say, the original that was executed by the parties.

And I can attest to my signature and my client's signature on page 13 and his initials throughout.

THE COURT:  All right.  If you could hand it, then, to Ms. Taylor so she can authenticate the government officials' signatures.

MS. TAYLOR:  Yes, Your Honor.  I recognize, on page

13 of the original plea agreement, my own signature, as well as the signature of Frank Talbot.

And Mr. Talbot also signed for Ms. Krigsman, who is an assistant United States attorney and the chief of the National Security and Cybercrime Section.

And I additionally signed for Mr. Sigler, who is with the Counterterrorism Section in Washington, D.C.

And additionally, Bonnie Glober, our asset forfeiture AUSA, initialled the first page of the plea agreement.

THE COURT:  All right.  Thank you.

If you'd pass the original back to me, please.

All right.  I have the original plea agreement.

Mr. Langhorne, I -- as you know, I have to review certain paragraphs with you.  I'm not going to review the entire agreement with you.  I'll review what I have to review, and then if you want me to review anything else, I'll be glad to do it.

We've covered A.1, the count to which you are pleading; A.2, the maximum penalties; A.3, elements of offense.

A.4 is titled No Further Charges.  It states that if the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge you with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement related to conduct

giving rise to this plea agreement.

In that -- in that regard, I have to advise you that the district judge can only accept a plea agreement that involves an agreement not to pursue other charges if the district court, district judge, finds that the charge that you are pleading guilty to adequately reflects the seriousness of your actual offense behavior and that accepting the agreement will not undermine the statutory purpose of sentencing.

And if the Government agrees to forgo charges, under some circumstances, a defendant can still be held accountable under the sentencing guidelines for that conduct, even though a charge or charge has not been -- a charge or charges have not been brought.

Do you understand all of that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Now let's go to paragraph A.5, acceptance of responsibility.  The Government is agreeing to recommend to the district judge that you receive up to a three-level downward adjustment of your sentencing guidelines.

The main thing I want to make sure you understand is if the district judge denies any motion filed pursuant to this paragraph or rejects any Government recommendation, you'll still be bound by your guilty plea, and you will have no right to withdraw it.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.

MR. LEOMBRUNO:  Judge, may I -- may I have a moment with my client briefly?

THE COURT:  Yes, of course.

MR. LEOMBRUNO:  He -- he handed me a question that I think needs answering before we --

THE COURT:  Yes, of course.  Go ahead.

(Pause in proceedings.)

MR. LEOMBRUNO:  We're ready to proceed, Your Honor.

THE COURT:  All right.  Thank you.

I think I was asking you about the acceptance of responsibility, paragraph A.5, so let me just ask you again.

As I told you, the recommendation by the Government in paragraph A.5 and any motion filed by the Government is nonbinding.  In other words, it doesn't require the district judge to follow the recommendation.

If the district judge rejects the recommendation or denies any motion filed pursuant to paragraph A.5, you'll still be bound by your guilty plea and have no right to withdraw it.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, paragraph A.6 is forfeiture of assets.

Is there any specific asset listed, Ms. Taylor?

MS. TAYLOR:  No, Your Honor.

THE COURT:  All right.  Then as to paragraph A.6 on pages 3, 4, 5, and 6, do you agree to those terms?

THE DEFENDANT:  Yes, sir, I agree.

THE COURT:  All right.  Now, let's turn to the last paragraph that I have to cover with you -- well, no.  Let's go back one more.

I think we've established this.  I do need to ask you -- this is in regard to paragraph B.3, immigration consequences of pleading guilty.

You are a United States citizen?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  So then we go to paragraph B.7, defendant's waiver of right to appeal the sentence.

Normally, Mr. Langhorne, you would have the right to appeal your sentence on any ground that you think is appropriate, including an incorrect application of the sentencing guidelines.

But in paragraph B.7 of your plea agreement, you are waiving and giving up your right to appeal your sentence except under certain specific circumstances.  And these circumstances are set out in paragraph B.7, so I'll just read from B.7.

So you're waiving and giving up your right to appeal your sentence except:

(A) on the ground that the sentence exceeds the

defendant's applicable guidelines range as determined by the Court pursuant to the guidelines;

(B) on the ground that the sentence exceeds the statutory maximum penalty; or

(C) on the ground that the sentence violates the Eighth Amendment to the Constitution.

And then there's one other exception.  If the Government exercises its right to appeal, then you are released from this waiver, and you can appeal in accordance with the law.

Mr. Langhorne, do you understand what you're waiving and giving up in paragraph B.7?

THE DEFENDANT:  Yes.  To my knowledge, I'm --

THE COURT:  Pardon?

THE DEFENDANT:  I wasn't sure if you wanted me to explain what I believe.

THE COURT:  Well, you can, but I do need to ask you if you're making this waiver freely and voluntarily.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Did you want to say something in that regard?

THE DEFENDANT:  I believe that I'm giving up the ability to appeal on any ground whatsoever.  So whatever the judge sentences me to, I'm entirely bound by that, and there's nothing I can do about it at any point.

THE COURT:  Except under the -- except under the specific circumstances that I just read to you.

THE DEFENDANT:  Yeah, except for (b) and (c) and -- and (a).  If it's an illegal sentence or if it violates the Eighth Amendment or if it exceeds the statutory maximum.

THE COURT:  Yes.  Well, (a) wouldn't necessarily be an illegal sentence.  It would be, for instance -- an example would be like an upward departure.

Let's say your guidelines were -- and I'm just making this up, but let's say your guidelines were 20 -- 120 months to 150 months.  If that was the guideline range -- and, again, I'm just making this up; I have no idea what they are -- and if you were sentenced above the 150 to 200, then you could appeal that because it's above the guideline range.

THE DEFENDANT:  Oh, okay.

THE COURT:  Have I explained that correctly, Mr. Leombruno?

MR. LEOMBRUNO:  You have, Your Honor.

If I could just have a moment with him.

THE COURT:  All right.

(Pause in proceedings.)

MR. LEOMBRUNO:  He's ready.

THE DEFENDANT:  Yeah.  Yeah.  I -- I -- I -- I -- that's great.  Thank you.

THE COURT:  All right.  Well, I want to make sure

that I'm explaining that right because what will happen is the district judge will determine -- after taking into account all of the things the guidelines require, he'll determine a final range.

And as I told you before, that he'll have the discretion to sentence you to a lower sentence than the range calls for or a higher sentence, under certain specific circumstances.  He can vary or depart from the guidelines under certain circumstances.

And the point is that if he varies or departs upward greater than the guidelines that are set, then you would have the right to appeal that, in addition to if he sentenced you -- if the maximum's 20 years and he sentenced you to 30 years, or if for some reason the -- the sentence violated the Eighth Amendment to the Constitution.  And as I told you, if the Government appeals, then you'd be able to appeal.

But do you understand that first example?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Ms. Taylor, did I explain that accurately, or do you want to add anything to it?

MS. TAYLOR:  Your Honor, the only thing I think might be worth adding is just that Mr. Langhorne would not be able to dispute the Court's determination of the guidelines --

THE COURT:  Yeah.  That's --

MS. TAYLOR:  -- which I think is clear from --

THE COURT:  Yeah.  Well --

MS. TAYLOR:  -- the face of the --

THE COURT:  -- that's what -- you're waiving the dispute -- you're waiving everything up to the point of the determination of the guidelines.  So you're waiving and giving up whatever the judge -- whatever rulings --

THE DEFENDANT:  Used to determine what the guidelines are.

THE COURT:  Yes.  But if -- but then once those are determined and that's in place, if he goes above those guidelines, then you'd have the right to appeal.

THE DEFENDANT:  Yes, Your Honor.  I understand that.

THE COURT:  All right.  Mr. Leombruno, are you satisfied with that?

MR. LEOMBRUNO:  I am, Your Honor.

THE COURT:  And, Ms. Taylor, are you satisfied now?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

All right.  All right.  Let me just -- I'm going to reask you these questions because I want to -- I'm -- I've got -- I'm having a short-term memory problem here.

THE DEFENDANT:  You're on B.7.

THE COURT:  Yes, I'm on B.7.  Just one -- one second.

Do you understand what you are waiving and giving up in this portion of your plea agreement?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And do you make that waiver freely and voluntarily?

THE DEFENDANT:  I do.

THE COURT:  All right.  Thank you.

All right.  Now, that's all I have to cover.

Ms. Taylor, do you want me to cover anything else?

MS. TAYLOR:  No, Your Honor.

THE COURT:  Mr. Leombruno?

MR. LEOMBRUNO:  No, Your Honor.

THE COURT:  Mr. Langhorne, do you -- would you like me to cover any other paragraphs?

(Pause in proceedings.)

MR. LEOMBRUNO:  We're ready, Your Honor.

THE DEFENDANT:  (Unintelligible.)

THE COURT:  All right.  Let me -- I'll ask the question again.

Do you want me to cover any other paragraphs with you?

THE DEFENDANT:  No, Your Honor.  Everything's -- everything's great.

THE COURT:  All right.  And have you understood everything to this point?

THE DEFENDANT:  Yes.  Yes, Your Honor.  Thank you for your patience.

THE COURT:  Oh, it's not a problem.  It's what I get paid to do, so don't feel like you're testing my patience, because you're not.

THE DEFENDANT:  Thank you.

THE COURT:  Do you have any questions about anything at all that we've covered?

THE DEFENDANT:  No, Your Honor.

THE COURT:  And you've understood everything?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  So then it's time for me to ask you, Mr. Langhorne, how do you plead to Count One of the indictment, guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  Are you pleading guilty because you are guilty?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you now admit that you committed the acts set forth in the charge?

THE DEFENDANT:  I did.

THE COURT:  Do you understand that a plea of guilty admits the truth of the charge against you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And you understand what you're doing here today entering this plea of guilty?

THE DEFENDANT:  I do.

THE COURT:  All right.  I'll now hear a proffer of facts from Ms. Taylor that the Government would expect to prove beyond a reasonable doubt if this case were to proceed to trial.

Mr. Langhorne, Ms. Taylor will be reading from the factual basis attached to your plea agreement, and then, as you know, when she's done, I'll be asking you if this is what you did.

Ms. Taylor?

MS. TAYLOR:  Yes, Your Honor.  The factual basis is as follows:

On May 15th, 2014, the Secretary of State for the United States designated the Islamic State of Iraq and al-Sham, that is, ISIS, as a foreign terrorist organization under Section 219 of the Immigration and Nationality Act.  ISIS remains a designated foreign terrorist organization.

At some time in 2014, Romeo Xavier Langhorne pledged his allegiance to ISIS.  Langhorne was aware that ISIS was a designated foreign terrorist organization and engaged in acts of terrorism.

In 2016 Langhorne relocated to St. Johns County, Florida, within the Middle District of Florida, where he resided until moving to Roanoke, Virginia, in April 2019.

During 2018 and 2019, Langhorne expressed his continued support for ISIS through postings on his social media

accounts, including the Twitter accounts @YoRHaJihadi, @Yorha17E, @YoRHaJihadi17E, his Facebook accounts, and his Google/YouTube account.

During 2018 and 2019, Langhorne uploaded multiple ISIS-produced or otherwise terrorism-related videos to his YouTube account, which used the moniker "Takbir Jihadi." During 2018 and 2019, Langhorne also participated in multiple online chat rooms hosted on a secure messaging platform in which he discussed his support for ISIS with like-minded individuals.

In December of 2018 and January of 2019, Langhorne expressed in one of those chat rooms an interest in creating a video that would improve on existing videos demonstrating the making and use of triacetone triperoxide, referred to as TATP. TATP is an explosive material that can be made using readily available ingredients and has been used in multiple terrorist attacks.

On February 14th, 2019, Langhorne and a person who had been described to Langhorne as being a member of ISIS, but who was actually an undercover special agent, referred to as the UCE, working with the FBI -- excuse me, working with the Federal Bureau of Investigation, referred to as the FBI, began exchanging messages through the secure messaging platform.

During his initial discussions with the UCE, Langhorne expressed an interest in creating videos to post on

YouTube for particular target audiences, including, quote, "better videos on how and why jihad is needed," end quote.

On February 17th, 2019, Langhorne engaged in further discussion with the UCE via the secure messaging platform. In these messages, Langhorne said that he wanted to produce two videos, including, quote, "first and foremost an explosive video."

Langhorne instructed the UCE that the video needed to say that, quote, "it's for scientific purposes only and not to be used in any crimes," end quote, in order to avoid attracting the attention of law enforcement. Langhorne stated, quote, "now the creation of such a video and sending it knowing it will be used for crime in any way is, of course, illegal," end quote.

Langhorne specified that the video would need to, quote, "show proper yield to explosive equipment gained," end quote, including, quote, "example, X amount will destroy a car, x amount 1 story building, x amount 2 story if placed properly, and x amount for a 3 story building," end quote.

Langhorne also specified that the video needed to show, quote, "how to obtain the catalyst needed," end quote, and that as a possible cover story for purchasing the ingredients for TATP, a person could, quote, "claim to be a science teacher there and pay for said equipment with an old burner Visa card," end quote.

On February 21st, 2019, Langhorne called the Jacksonville office of the Bureau of Alcohol, Tobacco, Firearms and Explosives, referred to as ATF.  On February 22nd, 2019, an ATF special agent returned Langhorne's call.

During the phone call Langhorne asked the special agent how to get an explosive license, whether someone who was on a terrorist watch list could obtain such a license, and what background checks were required -- were conducted on someone who was trying to become an ATF agent.

The FBI created a minute-long video clip based on Langhorne's instructions to the UCE, referred to as TATP Video 1.  TATP Video 1 began with a disclaimer stating that the video was being made for scientific and educational purposes.  It then introduced the topic, quote, "TATP Triacetone Triperoxide," end quote, along with the following topics that would be covered:  quote, "What You'll Need and Where and How to Purchase, TATP Production Step By Step and Safety, and Volume and Yield," end quote.

TATP Video 1 then ended with a statement, quote, "More to Come," end quote.

On April 3rd, 2019, the UCE transmitted TATP Video 1 to Langhorne using the secure messaging platform.  After receiving TATP Video 1, Langhorne responded, quote, "Perfect. This should be able to be uploaded to YouTube legally as well," end quote.

Langhorne noted that, quote, "because it isn't inherently used for crimes, it should pass off fine," end quote.  Langhorne then provided further instructions for what he would like to see in the next version of the video.

On May 12th, 2019, the UCE transmitted to Langhorne a second version of the TATP video, referred to as TATP Video 2, which had been expanded to contain additional information Langhorne had asked to be included.

After receiving TATP Video 2, Langhorne responded, quote, "Perfect thus far.  The volume and yield specifically has a ratio of good importance.  The tips for safety are also outstanding.  As those are the most realistic ways to purchase items required, avoid digital tripwires and maintain a low profile," end quote.

Langhorne also described several disguises that could be suggested in the final video and the need for safety apparel when creating TATP.  He also speculated about ways to increase the yield of TATP by making improvements to the process for creating TATP and suggested various ways of explaining away evidence of criminal intent.

Langhorne then stated, quote, "This initial video is basically how to safely create and use TATP without setting off any federal alarms.  Its purpose is not to harm but simply to educate," end quote.

He continued, quote, "A follow-up video on high-value

targets, understanding contemporary warfare in comparison to classical Islamic warfare, how to scout locations and people, mental and religious preparation, use of disguises, basic legal information required to appropriately scout without being detected or raising alarm, when to strike and how, as well as tactical analysis of active shooting scenarios, law enforcement response, and how to successfully leave an area without being caught are all things for a separate video.  One video being the primer, while the second being the catalyst or detonator," end quote.

Langhorne opined that if the final video were published in the public domain, quote, "the Islamic world will have a better grasp on how to defend itself with the usage of explosives in a reasonable and safe manner," end quote, and that, quote, "everyone who sees, uploads, reuploads, and shares this video will be aware of how to safely and accurately create and use explosives," end quote.

Langhorne further opined that this would mean that, quote, "the list of potentially dangerous people escalate from being small and well managed to being completely useless as everyone becomes a tier 1 threat," end quote.

On May 26, 2019, Langhorne uploaded multiple ISIS- and jihad-related videos to his YouTube account as a test to determine whether the videos would be allowed to remain on YouTube.  Langhorne's YouTube account was suspended the same

day.

On June 24th, 2019, the UCE provided Langhorne with a third version of the TATP video, referred to as TATP Video 3, which included additional information that Langhorne had requested.

After receiving TATP Video 3, Langhorne responded approvingly.  Langhorne suggested that the UCE scale the TATP recipe to provide the appropriate amounts of explosive required to detonate targets, including a building.

Between June 28th and July 2nd, 2019, Langhorne sent multiple messages to the UCE regarding a nasheed that Langhorne wanted to be made.  A nasheed is a work of vocal music that carries with it an Islamic belief, practice, etiquette, or lesson.

Langhorne stated that he wanted, quote, "a nasheed that uses the sounds of the battlefield as music, since that isn't haram, which means forbidden by Islamic law," end quote.

Langhorne then stated, quote, "First" -- "Firstly, I need a handful of sounds and one in particularly" -- "one in particular I have only ever seen once.  During a prison break, dawlah said there is a main" -- "there was a man recording" -- let me say that sentence again.

"During the prison break dawlah did, there was a man recording, and he gives a loud takbir at the second explosion. I want that specific takbir and a few other takbirs that are

good as well."

Dawlah translates to dynasty or state and commonly is used to refer to ISIS.  The takbir is the expression in Arabic of Allahu Akbar, which means "God is great" and is commonly used as a battle cry by Islamic extremists.

Langhorne further sent the UCE multiple links to videos on YouTube, including specifying that he wanted to include a clip of, quote, "just the children saying kill them all," end quote, and a particular recording of a bomb exploding.

Langhorne then told the UCE, quote, "I want" -- "I have the lyrics down," end quote, and, quote, "In short, the song is about retaliation, Fatuluhum or kill them all.  The chorus is kill them all, and it repeats five times in between the lyrics, amidst gunfire, bombs, recitations, and kill counts done to Muslims.  We list a country then the amount of Muslims killed as a result of U.S., quote, 'intervention,' end quote, or war.  I'll explain in further detail a bit later.  But the premise of the nasheed is to encourage justified retaliation.  Hence, kill them all," end quote.

On August 1st, 2019, the UCE messaged Langhorne and stated that he needed to travel for an urgent project for Dawlah al Islamiyah, a term Langhorne understood to refer to ISIS.  Langhorne responded, quote, "Be careful," end quote.

On November 5th, 2019, the UCE messaged Langhorne to

let him know he was back from dawlah and would have the final video completed shortly.

On November 7th, 2019, the UCE sent Langhorne three versions of the final video, referred to as TATP Video 4.  TATP Video 4 included what was represented to be a recipe for TATP. The recipe, however, had been altered so that it would only result in the creation of an inert product.

TATP Video 4 also included yield multipliers purporting to be sufficient to destroy specific targets, and it featured demonstrations of a tree, car, and barn being blown up.  The UCE provided Langhorne with three versions of TATP Video 4, one without music and two containing existing nasheeds that Langhorne had previously suggested the UCE should use as background music.

After sending the first version of TATP Video 4 without music, Langhorne responded with praise noting, quote, "the video appears to be legal, well scripted, shows proper yield, creation, and where to obtain supplies," end quote.

After sending the other two versions of TATP Video 4, Langhorne inquired whether the UCE was familiar with BitChute, which Langhorne described as, quote, "a video streaming platform like YouTube," end quote, except, quote, "it's more wild west out there," end quote.

BitChute is a peer-to-peer video-sharing website that is publicly viewable on the World Wide Web.  Instead of using

centralized servers, BitChute uses -- utilizes a BitTorrent client that runs in the web browser.

As a video shared to BitChute is downloaded by other users, the other users become hosts for the video, meaning that future users can obtain portions of the video content from numerous other users. By operating in this way, BitChute decentralizes the locations at which its content is posted. BitChute is favored by extremists because of its permissive environment.

Langhorne stated -- Langhorne said that he had previously uploaded the video Flames of War II to BitChute and that BitChute had not removed it. Flames of War II is an ISIS-produced propaganda video in which ISIS claims responsibility for various terrorist attacks and threatens further attacks against the United States.

A confirmation email located in Langhorne's Google account showed that he had uploaded Flames of War II to BitChute on October 1st, 2019.

On October 24th, 2019, Langhorne sent an email to an address associated with BitChute in which he stated that he was, quote, "having trouble uploading videos, and I have a decent number of videos I'd like to upload and can't seem to continue uploading. Yes, they are ISIS videos. The reasoning for this is that the media is snuffing and suppressing this information heavily, and I feel that journalistic integrity

demands that people have free and open access to the information without being put on a list for having viewed the videos in question or scrutinized for atypical curiosity," end quote.

On November 11th, 2019, an FBI intelligence analyst located in Jacksonville, Florida, within the Middle District of Florida, observed that Langhorne had uploaded to BitChute one of the versions of TATP Video 4 containing a nasheed. Langhorne entitled the video: "TATP or: How You Learned to Stop Worrying and Love the Bomb."

Langhorne included a summary of the video in which he stated that it was, quote, "simply to be utilized for recreational and landscaping purposes," end quote, and that it would provide, quote, "instructions in the yield," unquote, needed to, quote, "destroy tree stumps, junkyard cars, or perhaps an old moldy born of some sort," end quote.

Langhorne also posted a comment on the video describing the nasheed as follows, quote, "Basically it's about how Islamic leadership is failing and questionable at best in comparison to past leadership," end quote.

Approximately 28 minutes after uploading the video to BitChute, Langhorne posted to his Twitter account, quote, "It's alarming to hear sirens in the distance now," end quote.  A few hours later, Langhorne deleted the video from BitChute.

Later on November 11th, 2019, Langhorne uploaded the

version of TATP Video 4 that did not contain a nasheed which he entitled, quote, "How to Make Bombs/Explosive Material: TATP Edition," end quote.  Langhorne included a significantly shortened description of the video that did not make reference to blowing up any particular targets.

On November 15th, 2019, FBI special agents and other law enforcement officers arrested Langhorne at his residence in Roanoke, Virginia.  After being arrested Langhorne was transported to the Roanoke FBI office for an interview. Langhorne was advised of his *Miranda* rights, and he agreed to speak with two agents without an attorney.

During the interview Langhorne admitted that he had, quote, "probably at some point," end quote, pledged allegiance to ISIS and Abu Bakr al-Baghdadi, who was the leader of ISIS from 2014 until his death on October 26, 2019.

Langhorne claimed that he had later broken his allegiance, but he stated it was, quote, "very probable," end quote, that he later reaffirmed his vow.

Langhorne was shown a printout of his communications with the UCE, and Langhorne admitted they were his communications.  Langhorne also admitted ownership and control of the social media accounts discussed herein and that he had uploaded TATP Video 4 to BitChute.

Langhorne's phone was seized from him at the time of his arrest, and agents later searched it pursuant to a federal

search warrant.  Stored on the phone were 287 ISIS or other Islamic extremist propaganda videos, as well as the TATP videos that the UCE had sent to Langhorne.

The video -- or, excuse me, the phone was also logged into the account that Langhorne had used on the secure messaging platform to communicate with the UCE and contained some of the messages exchanged between them.

THE COURT:  Thank you.

Mr. Langhorne, is that what you did?

THE DEFENDANT:  Yes, Your Honor.  It's -- that is an accurate reflection of exactly what happened during the timeline of events.

THE COURT:  All right.  So do you admit the truth of the factual basis and that all the elements thereof are true and correct as they pertain to you?

THE DEFENDANT:  I believe that is entirely correct, Your Honor.

THE COURT:  All right.  So let me ask you these questions.  I'll be reading from the personalization of elements attached to your plea agreement.

Mr. Langhorne, beginning no later than December of 2018 through on or about November 15th, 2019, in St. Johns County, within the Middle District of Florida and elsewhere, did you knowingly attempt to provide material support and resources to a designated foreign terrorist organization, that

is, the Islamic State of Iraq and al-Sham, referred to as ISIS?

Specifically, did you attempt to do so through the creation and distribution of an instructional video intended to teach followers of ISIS how to obtain materials for explosives without arousing suspicion and combine those materials to make an explosive sufficient to destroy specific types of targets?

THE DEFENDANT:  Yes, Your Honor.  That is correct.

THE COURT:  Did you do so knowing that ISIS was a designated foreign terrorist organization, had engaged in terrorism, and was engaging in terrorism?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Did you engage in conduct that constituted a substantial step toward the commission of the crime and that strongly corroborated your criminal intent, specifically, by uploading the instructional video to a publicly viewable site on the World Wide Web, that is, BitChute?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  I do find a factual basis for Mr. Langhorne's guilty plea and that all of the essential elements thereof have been met.  I make that finding based on my own review of the factual basis and on Mr. Langhorne's answers to my questions about the factual basis and the personalization of elements.

Mr. Langhorne, is your guilty plea entered here today

freely and voluntarily?

THE DEFENDANT:  Yes, Your Honor, it is.

THE COURT:  Is your plea of guilty your own independent decision?

THE DEFENDANT:  It is, Your Honor.

THE COURT:  Has anyone threatened you, forced you, coerced you, or intimidated you in any way regarding your decision to plead guilty?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Has anyone made any promises or assurances to you of any kind to induce you to plead guilty, other than those stated in your plea agreement?

THE DEFENDANT:  No, Your Honor.

THE COURT:  At this time, Mr. Langhorne, do you know specifically what sentence you will receive when you are sentenced?

THE DEFENDANT:  I -- I believe that's impossible.

THE COURT:  All right.  Well, it's --

THE DEFENDANT:  No, Your Honor --

THE COURT:  All right.

THE DEFENDANT:  -- I do not.

THE COURT:  All right.  Thank you.

Has anyone promised you that you will receive a light sentence or be otherwise rewarded for pleading guilty, other than what is stated in the plea agreement?

THE DEFENDANT:  No, not other than what's -- no, Your Honor.

THE COURT:  Ms. Taylor, as counsel for the United States, and, Mr. Leombruno, as counsel for Mr. Langhorne, do you assure the Court that as far as you know, no assurances, promises, or understandings have been given to Mr. Langhorne as to a disposition of his case that are different or contrary to what is in the plea agreement?

Ms. Taylor?

MS. TAYLOR:  I do make that assurance, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Leombruno?

MR. LEOMBRUNO:  I make the same assurance, Your Honor.

THE COURT:  Thank you.

All right.  Mr. Langhorne, you are represented by Mr. Leombruno.  Have you discussed your case fully with him and explained everything you know about it to him?

THE DEFENDANT:  Everything that I know about, Your Honor.

THE COURT:  Is that a yes?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you had enough time to talk to Mr. Leombruno or anyone else you care to about your case?

THE DEFENDANT:  I -- I believe so, Your Honor.

THE COURT:  All right.  Well, have you had enough time to talk to Mr. Leombruno?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And I -- sometimes people want to talk to other people about their case.  Have -- not everyone, though.

So I just want to make sure you're comfortable having discussed your case fully with Mr. Leombruno.  You know, sometimes people want to talk to their parents, or sometimes people want to talk to --

THE DEFENDANT:  Oh, yeah.  Several of my conversations were recorded with my mother and parent -- and my brother, so I've talked to everyone.

THE COURT:  All right.  So you have had enough time to talk to Mr. Leombruno and anyone else you care to about the case.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Are you satisfied with Mr. Leombruno and the way he has represented you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any complaints about his representation?

THE DEFENDANT:  No.

THE COURT:  Do you have any complaints about the way you have been treated by the Court or anyone else that is

52

causing you to plead guilty?

THE DEFENDANT:  No.  I believe the Court's been extremely fair.

THE COURT:  Has anyone coached you or suggested that you answer untruthfully any of the questions I've asked you today?

THE DEFENDANT:  No.

THE COURT:  And have you told the truth today?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  All right.  And you do fully understand all of the rights and procedures that you're waiving and giving up by pleading guilty?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, I said at the beginning of the hearing, Mr. Langhorne, that I wanted to make sure you understood everything, all of the questions I've had to ask you and explanations I've had to give you.

Have you understood everything?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions about anything we've covered?

THE DEFENDANT:  I -- I don't believe so, no.

THE COURT:  Having heard everything I've said, is it your final desire to plead guilty to Count One pursuant to the terms of your plea agreement?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Ms. Taylor, are you satisfied with the colloquy?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Mr. Leombruno, are you?

MR. LEOMBRUNO:  I am.

THE COURT:  And, Mr. Leombruno, are you satisfied that Mr. Langhorne knows what he's charged with, and you've had sufficient time to counsel him, and that he is pleading guilty freely and voluntarily, with full knowledge of the consequences of his guilty plea?

MR. LEOMBRUNO:  I can attest to that, yes.

THE COURT:  Thank you.

All right.  I do find that you, Romeo Xavier Langhorne, are now alert and intelligent, that you understand the nature of the charge against you and the possible penalties, and you appreciate the consequences of pleading guilty.

I also find the facts that the Government is prepared to prove and that by your plea of guilty you admit state all of the essential elements of the offense to which you have pleaded guilty.

I further find that your decision to plead guilty is freely, voluntarily, knowingly, and intelligently made and that you've had the advice and counsel of a competent lawyer with

whom you say you are satisfied.

Mr. Langhorne, do you agree with these findings?

THE DEFENDANT:  Yes, Your Honor, I agree with that. I believe all that's correct.

THE COURT:  So I will make a written report to the district judge recommending that he accept your plea of guilty.

The parties have 14 days to object to the report and recommendation, or that time period can be waived.

Mr. Leombruno?

MR. LEOMBRUNO:  May I just have one second with my client?

THE COURT:  Yes.

(Pause in proceedings.)

MR. LEOMBRUNO:  After discussing that with my client, we are willing to waive.

THE COURT:  All right.  Ms. Taylor?

MS. TAYLOR:  The United States will waive.

THE COURT:  All right.  That will be so noted in the report and recommendation.

I meant earlier to also -- to make note of the competency examination that Mr. Langhorne had on February -- on February 13th, 2020.  A report was written on February 24th, 2020, in which Dr. Demery opined that Mr. Langhorne is competent to proceed.

And there was a hearing in that regard on February

27th, 2020, and an order finding Mr. Langhorne competent on February 28th, 2020.  I think that was mentioned at an earlier hearing, and I meant to mention it earlier today.

All right.  So Mr. Langhorne will remain in the marshals' custody pending sentencing.

Is there anything else, Ms. Taylor?

MS. TAYLOR:  No, Your Honor.

THE COURT:  Mr. Leombruno?

MR. LEOMBRUNO:  No, Your Honor.

THE COURT:  All right.  Then we're in recess.

COURT SECURITY OFFICER:  All rise.

(The proceedings were concluded at 3:18 p.m.)

- - -

CERTIFICATE OF OFFICIAL COURT REPORTER


UNITED STATES DISTRICT COURT )

MIDDLE DISTRICT OF FLORIDA   )


        I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


        DATED this 14th day of September, 2022.


                        s/Shelli Kozachenko_____
                        Shelli Kozachenko, RPR, CRR, CRC
                        Official Court Reporter