1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,        Jacksonville, Florida

          Plaintiff,             Case No. 3:19-cr-218-HES-LLL

-vs-                             July 7, 2022

ROMEO XAVIER LANGHORNE,           9:35 a.m.

          Defendant.             Courtroom 10C

_____

**TRANSCRIPT OF SENTENCING**
BEFORE THE HONORABLE HARVEY E. SCHLESINGER
UNITED STATES DISTRICT JUDGE

OFFICIAL COURT REPORTER:

     Shelli Kozachenko, RPR, CRR, CRC
     221 North Hogan Street, #185
     Jacksonville, FL  32202
     Telephone:  (904) 301-6842

                    (Proceedings reported by stenography;
                     transcript produced by computer.)

<u>A P P E A R A N C E S</u>

GOVERNMENT COUNSEL:

    **Laura Taylor, Esquire**
    United States Attorney's Office
    300 North Hogan Street, Suite 700
    Jacksonville, FL  32202

    **D. Andrew Sigler, Esquire**
    U.S. Department of Justice
    950 Pennsylvania Avenue, N.W.
    Washington, DC  20530


DEFENSE COUNSEL:

    **John Leombruno, Esquire**
    Arnold Law Firm, LLC
    3840 Crown Point Road, Suite B
    Jacksonville, FL  32257

# T A B L E   O F   C O N T E N T S

COMMENTS IN ALLOCUTION:                                  Page No.

 DENISE SANDBERG.................................    111

 DEFENDANT LANGHORNE............................    120


DEFENSE WITNESSES:                                       Page No.

  DR. STEPHEN BLOOMFIELD

     DIRECT EXAMINATION BY MR. LEOMBRUNO.......     77

     CROSS-EXAMINATION BY MS. TAYLOR...........     93

     REDIRECT EXAMINATION BY MR. LEOMBRUNO.....    105


  DENISE SANDBERG

     DIRECT EXAMINATION BY MR. LEOMBRUNO.......    114

     CROSS-EXAMINATION BY MS. TAYLOR...........    117


# E X H I B I T S   R E C E I V E D

COURT'S EXHIBITS:                                        Page No.

 COURT'S EXHIBIT 1..............................      6

P R O C E E D I N G S

July 7, 2022                                          9:35 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  United States District Court in and for the Middle District of Florida is now in session, the Honorable Harvey E. Schlesinger presiding.

Please be seated.

THE COURT:  Call the next case.

COURTROOM DEPUTY:  Case No. 3:19-cr-218-HES-LLL, United States of America versus Romeo Xavier Langhorne.

Counsel, please state your presence for the record.

MR. LEOMBRUNO:  Good morning, Your Honor.  John Leombruno appearing on behalf of Mr. Langhorne, who's seated to my right.

MS. TAYLOR:  Good morning, Your Honor.  Laura Cofer Taylor on behalf of the United States.  Seated with me is Task Force Officer William J. Berry of the FBI, Trial Attorney Andrew Sigler of the Counterterrorism Section, and then at the rear table is Border Patrol Agent Armando Martinez and Task Force Officer Matthew Bellamy of the FBI.

THE COURT:  Does anybody plan on putting on any evidence today, or are we only going to consider the paper that's been filed?

MS. TAYLOR:  Your Honor, it's my anticipation that I don't intend on having any witnesses to testify.  I think that

the facts are undisputed at this point, and we will just be arguing those facts and the law.  So that's -- I'm 90 percent sure that that's the direction that we're going, Your Honor.

THE COURT:  Okay.  How about other than Dr. Bloomfield?

MR. LEOMBRUNO:  As the Court has just pointed out, obviously we have Dr. Bloomfield ready to testify.  My understanding is he's on the line.  So whenever the need arises, we do intend to offer him and his opinion regarding some mental health evaluations that he conducted of my client.

THE COURT:  All right.  And you submitted that information to the Court.

MR. LEOMBRUNO:  That's correct.  I wanted to provide it with the other written materials ahead of time, Your Honor.

THE COURT:  Well, that -- that letter is -- from Dr. Bloomfield is dated the 23rd of June, and I don't know whether that was filed as an exhibit or not in any of the documents.

So how about if we mark -- do you want this sealed because of the nature of the information in it?

MR. LEOMBRUNO:  That's correct, and when we reached out to the Court --

THE COURT:  I'll have that marked as Court Exhibit No. 1.

Any objections to it being sealed and admitted?

MS. TAYLOR:  No, Your Honor.

THE COURT:  Okay.

(Court's Exhibit 1 was received in evidence.)

THE COURT:  And I've read that, just for your information.

MR. LEOMBRUNO:  Yes, sir.

THE COURT:  I don't know if you had talked to Dr. Bloomfield.  I've known him longer than the two of us want to admit and we're old men, and he's testified numerous times in front of me.

Before we get into the formalities, I did -- in addition to the presentence report that was filed in April, I did go back over docket entry No. 91, which was Judge Klindt's report and recommendation concerning the guilty plea.

I did go over the order of detention, which is docket entry No. 12.

I've gone over a docket sheet recently.  I believe the name of the case is *Concepcion versus the United States* that was decided by the Supreme Court on the 27th of June, which deals with what the Court may consider in sentencing or resentencing.

Do either of you plan on arguing anything about the material that I -- that I have, whether it is or isn't appropriate under *Concepcion*?  That's the one that talks about considering what took place on a resentencing after the

original sentence with respect to rehabilitation, does the inmate have any disciplinary infractions, like that.

Do you plan on putting anything on like that?

MS. TAYLOR:  No, Your Honor.

THE COURT:  How about the defendant?

MR. LEOMBRUNO:  Not regarding any disciplinaries.

THE COURT:  Okay.

MR. LEOMBRUNO:  No, Your Honor.

THE COURT:  We can discuss -- and I think it's been cited in the addendum or in the Government's response to some of the objections, paragraph 2 of the addendum, the case of *United States versus Ramirez*, which is at 16 F.4th 844.  It's a 2021 decision.  If you want to cite anything in there, I'll get to that in just a second.

That's where the Eleventh Circuit said that Judge Martinez didn't make the proper calculations with respect to the big enhancement that we're all worried about.

I have also reviewed document No. 90, which is the plea agreement that was filed in this case, particularly the personalization of elements and the factual basis which the defendant admitted; the sentencing memorandum, which is docket entry No. 122 that was filed in June; and then -- and I don't know if you people have looked at all of this.  I've tried to send it out periodically.

There's a pile of letters from the defendant's mother

that I've received over the last few years, one on the 29th of April, I think; one on the 9th of May.  She sent that one to the clerk and also to me, notwithstanding the fact that we keep sending her letters saying, "You don't communicate with the Court that way"; a whole bunch of stuff on the 29th of April of this year.

And I recall receiving stuff over the years.  I think every time I did, I had my law clerk or my courtroom deputy send a copy to each of you.

There is also a pile of material that you people have not seen that I have, under the national security problem.  I always get a kick out of this case.  I had two national security cases going at one time.  One was so sensitive, I had to go to the FBI to even look at the material.  This one wasn't as sensitive.

But I thought it rather humorous when the lady from the Justice Department told me I could have the material brought to my house if I could read it in a room that didn't have windows and if I swore to her that if I went to the bathroom, I would put all the papers back in the sealed pouch, put the lock on the sealed pouch, carry the pouch into the bathroom with me, even though I assured her I was the only person at home.  My wife decided it was better to leave. But -- so we had a little humor during this.

Okay.  Come on up, Mr. Langhorne.  Come on up here a

minute.  Let me ask you a few questions.

How old are you today?

THE DEFENDANT:  32.

THE COURT:  No.  You don't have to bend down.  It's pretty sensitive.

THE DEFENDANT:  Oh.

THE COURT:  And how far did you go in school?

THE DEFENDANT:  College.

THE COURT:  Can you read, write, and understand English?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And have you had any alcoholic beverages, drugs, or narcotics in the last 48 hours?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Okay.  When was the last time you had any medication for your mental health?

THE DEFENDANT:  The 20th-ish.

THE COURT:  Of June?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  And you're taking stuff like once a month?

THE DEFENDANT:  Once a month.

THE COURT:  Okay.  Have you had an opportunity to read and discuss the presentence report that was dated April 25th of this year, along with the addendum that was filed at

the same time?

THE DEFENDANT:  I believe so, Your Honor.

THE COURT:  Okay.  You've had an adequate opportunity to discuss that with your lawyer?

THE DEFENDANT:  Yes, sir, Your Honor.

THE COURT:  Okay.  When you say I believe so, does that mean you're sure or you're not sure?

THE DEFENDANT:  Do you have the addendum on hand?

THE COURT:  Excuse me?

THE DEFENDANT:  Do you have it on hand?

THE COURT:  Do I have the addendum?

THE DEFENDANT:  I'm not sure if I read it.  The PSR was --

THE COURT:  Yes.

THE DEFENDANT:  -- plenty.

THE COURT:  Oh, yes.  This is it.  I've got mine.

Do you want -- do you want your counsel to show you what he showed you and ...

THE DEFENDANT:  No, the addendum.

Oh, yes.  Yes, I did read this.

THE COURT:  Okay.  Now, the addendum has objections to paragraph 40 and to paragraph 42 of the presentence report.

Other than those objections, does the defendant have any other objections either to the factual accuracy of the report or the probation officer's calculation of the

guidelines?

MR. LEOMBRUNO:  Judge, we don't have any objections to the information that's contained in the PSR other than to note that we feel -- and we've raised this in our objection letter, as the Court's had the chance to review -- that the way the information is listed in the PSR, although it may be factually accurate as it was gleaned from the, you know, plea agreement, the factual basis of the plea agreement, that the way that sometimes things were worded or the phraseology that were used sometimes put those things out of context.

So we don't have any dispute as far as the information contained therein, but we do dispute essentially its meaning, which is probably more sufficient for argument.

THE COURT:  Right.  Well, when we get to it after I hear your argument, I'll be happy to rule.

On the personalization of elements and the factual basis, if I remember correctly, I probably will do some reading into the record so you know how I arrived at my calculations from pages 19, 20, and 21, but we'll get to that in just a second.

Okay.  Are there any other objections either to the factual accuracy of the report or the probation officer's calculation of the guidelines from the Government?

MR. LEOMBRUNO:  Nothing, then, other than what the Court noted, our objection to the terrorism enhancement and the

additional plus two regarding the information regarding a weapon.

THE COURT:  All right.  Now, I do have one question for the Government.

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  If you would take a look at -- let me see where it is.

You wrote a letter to the probation officer.  I believe it's January 31st of 2022?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  And you have -- for some reason your signature on that is then followed by a whole bunch of documents that appear to me to be taken off of Internet sites and maybe some from either computer or telephones.

Where did all of that come from?

MS. TAYLOR:  Your Honor, the first document that begins at page 42 of the PSR and states "NokiaX - Public" at the top?

THE COURT:  Right.  That's the one Friday, January 18th of 2019?

MS. TAYLOR:  Yes, Your Honor.  That document is -- it was an exhibit to my letter, and it is a document that was essentially collected by a confidential source at the FBI from an Internet chat room in which Mr. Langhorne participated.  And I don't think that that's disputed by -- by Mr. Leombruno.

THE COURT:  And this -- this is the material that you had disclosed to them.

MS. TAYLOR:  Yes, Your Honor.  It was part --

THE COURT:  Okay.

MS. TAYLOR:  -- of the discovery.

THE COURT:  Yes.

MS. TAYLOR:  And Mr. Langhorne's part -- the names of all the participants in the chat were redacted, with the exception of Faris Bin Malhama, which is Mr. Langhorne.

THE COURT:  Okay.  And just so that you people know, it's probably been quite a while since I had done the review that I needed to with respect to whether any of the national security material that had been collected should be disclosed.  And it's been a long time ago that I did that.

You've been in custody almost three years now, right?

THE DEFENDANT:  Two years, seven months, sir.

THE COURT:  Yeah.  And I probably don't even remember much of it, if anything.

So if there's a need to go into any of that, please let me know, because the courtroom's packed with people, and I'd have to clear the courtroom.  The court reporter did have a national security clearance.  I don't think my courtroom deputy did.  My law clerk did.  So let me know if we have to go into that.

Okay.  So why don't you have a seat and let me go

into the first objection.

MS. TAYLOR:  Your Honor, could I note a couple of things before we --

THE COURT:  Sure.

MS. TAYLOR:  So when I was preparing for today and looking at paragraph 76 of the PSR, it talks about the --

THE COURT:  Okay.

MS. TAYLOR:  -- competency hearing --

THE COURT:  Wait one second.  Let me find paragraph 76.

I got you.  On page 16?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Yes.

MS. TAYLOR:  And my thought was that this paragraph should be supplemented to reflect the additional competency evaluation and determination of competency that occurred a month or so ago.

THE COURT:  By Dr. Bloomfield?

MS. TAYLOR:  Yes, Your --

THE COURT:  That's the one that's marked Court Exhibit 1.

MS. TAYLOR:  It was actually by Dr. Meadows, Your Honor.  Dr. Meadows performed a competency evaluation --

THE COURT:  Yes.

MS. TAYLOR:  -- and Judge Lambert --

THE COURT:  Found him competent.

MS. TAYLOR:  -- received the report and found him competent.

THE COURT:  Yeah.  Right.  I have looked at that.

MS. TAYLOR:  Yes.  And I just thought the PSR should reflect that, just for completeness.

THE COURT:  Okay.  Okay.  So let's do -- the first objection is to 2M5.3(b)(1)(E); objects to the two-level enhancement.

So I'll listen to what you have to say.

MS. TAYLOR:  Your Honor, if I could note one more thing.

THE COURT:  Sure.

MS. TAYLOR:  There were three -- I think three documents that were -- that were declassified by the FBI, and they were produced in redacted form in discovery to Mr. Leombruno, including that one that we just talked about that's appended to the PSR.

There is a protective order that governs disclosure and control of those documents, and Mr. Leombruno had raised to me just a concern earlier about whether we could talk about the documents in court.

And I think we should just treat it as we do the PSR, where we don't disclose the actual document on the docket or to the public, but we -- we can talk about the contents, to the

extent that they're relevant to the sentencing --

THE COURT:  Sure.

MS. TAYLOR:  -- and I think that's fine, Your Honor.

THE COURT:  Go ahead, Mr. Leombruno.

MR. LEOMBRUNO:  Thank you, Your Honor.  And before I begin on the argument on that specific objection, Judge, you had asked earlier, at the start of your colloquy with us, about additional evidence.  I do have one friend of the family that's here --

THE COURT:  Sure.

MR. LEOMBRUNO:  -- that may want to make a statement at the appropriate time, and then obviously my client may want to allocute as well, so --

THE COURT:  Well, of course.  He has that right, and I'll be glad to listen to anybody.  I think I have a pretty clear picture of, you know, what went on and his contention about -- that all along he thought that he was dealing with an agent and just playing a game and what his intent may be or what it wasn't.

And, of course, there's a big issue, I think, with respect to the next objection, which is the objection to the 12-level enhancement -- the one that we're talking about now, I think, is a 2-level enhancement -- and whether or not, in order to do the calculation on that one, you can address the issue of whether it's -- has to be a personal intent of the defendant or

just a general intent as to how it's perceived by a reasonable person.

Go ahead.

MR. LEOMBRUNO:  That's correct, Judge.  You're doing a great job summarizing my arguments before I'm even making them.

THE COURT:  Well, I, you know, hate to tell you how much time it's taken to read all this stuff.

MR. LEOMBRUNO:  Yes, sir.

Judge, for purposes of addressing the Court, does the Court still want us to wear the mask when we talk?

THE COURT:  It's up to you.  I think it's better if we all do.

MR. LEOMBRUNO:  Okay.

THE COURT:  You know, we had a -- call it a two-week halt to a trial recently because nine people who were in the court one day all came down with COVID.

MR. LEOMBRUNO:  Certainly a necessary precaution.

Judge, as the Court pointed out, one of our objections deals with paragraph 40 of the PSR, which is titled Specific Offense Characteristics.

And it talks about applying a 2-level enhancement under the sentencing guidelines Section 2M5.3(b)(1)(E), which talks about, "If the offense involved the provision of," and subsection (E) -- I'm skipping forward there -- "involved funds

or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act."

We make this objection essentially in two different ways.  One is that we don't think there is record evidence to support that the information that was conveyed by Mr. Langhorne when he uploaded the video that had been produced by the FBI to BitChute, which is a social media platform like YouTube, that when that was done, there was intent there for anyone to commit a violent act.

And, of course, I recognize the fact that we are talking about a video that provides information on the production of TATP, which is an explosive element.  And so I can understand how the Court may look at this objection and say, "Well, wait a minute.  What are we talking about?  If there's a video that discusses how to produce this type of thing and it's published, how is that not to promote a violent act?"

The answer to that question, Judge, factually, lies in the information that's contained already in the documents that you've had a chance to review.  When the Court looks at the exchanges between the undercover agent in this situation and my client, that exchange, which took place essentially over ten months in various stages, provides a lot of information to help the Court understand this and dissect this appropriately.

The first fact that I think is really important to understand is that the video that was produced does not work, that the FBI wasn't going to produce a video that explained how to make an explosive device, put that into the hands of somebody that they suspected to be a terrorist, and allow them to upload it. In fact, I think the video is still on the platform if I -- it was, at least, when I first got involved in this case. It still may be there now.

The reason that's important is, is that essentially if we're producing a video and my client is posting that for the world to see, or those that would view it on BitChute, and it is inert; it doesn't work, then it begs the question how could that have ever been used to support a violent act?

What I suspect the Government may attempt to say is, "Well, look, what we're looking at here is 'or reason to believe' language that they are used to commit or assist in the commission of a violent act," and that that material was used with the intent that that happen.

So then we have to start looking at, well, what was my client's intent? And as I took some liberties and -- or as I took some efforts to point out in the sentencing memorandum, the exchange, as the Court can probably recall, between Mr. Langhorne and this undercover is unusual.

It's unusual in the sense that it's a lot of prodding -- these are my words -- you know, by the undercover

agent to get my client to say certain things, to comment on certain things that he's saying.

I think I mentioned in the -- in the sentencing memorandum that the entire production felt like a, you know, prosecutorial checklist.  You know, "We need the defendant to say this word."

And since he wouldn't say the word "ISIS," then you have the undercover agent basically saying, "Well, I'm going to go off for a couple months and support this group, the dawlah."  And since my client doesn't respond to that, deny it, they say, "Oh, therefore he's supporting ISIS."

Now, yes, in the factual basis my client does stipulate, you know, that he realizes that what he was doing could benefit ISIS, and we're not retracting from that.  But with regard to the specific enhancement, it requires intent on his part.

Also, in that exchange you have my client repeatedly making comments, over and over and over again, about he doesn't want the video to be used for anything other than information purposes.

And my client actually provides a very specific example, when pressed, about a specific type of group that might be able to use this video.  In other words, how could somebody that's armed not with explosives but armed with information, you know, potentially use this video to their

advantage?

And my client talks about a group in Yemen, I believe, off the top of my head, and talking about, you know, if other ethnic groups or other entities were going in to kind of attack this particular group, that they could use this information to either clear houses or let the other people attacking them say, "Hey, look, we may not want to attack these individuals.  They may be armed with this information.  They may have knowledge of how to defend themselves."

So in -- there -- that's one instance.  There are multiple times in that exchange where my client talks about it's the value of information, not the value of an explosive device that he is essentially trying to put out there.

So in that exchange there's no intent on my client that a violent act occur.  There is no specific intent on his part.  And that, combined with the fact that the video essentially doesn't work, now you have the recipe for nothing.

And so when I look at the enhancement, I understand how probation is looking at this.  And they're saying, "Well, gosh, it's a video regarding TATP, and, you know, he's pleading to a -- you know, a terrorism support charge under 2339B(a)."  And so we're looking at this and saying, "Well, it probably needs to be increased because it was talking about explosives."

But that analysis doesn't go deep enough, we would submit to the Court, to argue about whether or not -- or

provide sufficient evidence about whether or not that the enhancement should apply specifically to the facts of this case.

So if there's any dispute as to what my client intended the video to do, it's contained within that exchange. And I point that out because I suspect that the Government will attempt, in their counterargument, to point to certain types of sentences or phrases or comments in that exchange to support their position.

But they can't ignore my client's repeated comments over and over again that this is for information purposes, not for any violent act.

So you have, factually, evidence that supports actually the opposite, that there was no -- as the -- as the enhancement requires, other material -- let's see.  Hang on -- funds or other material support with the intent, knowledge, or reason to believe that they are to be used to commit or assist in the commission of a violent act.

The sole purpose of uploading was for nonviolence or to prevent violence.  That's what my client commented on in the exchange; that combined, again, with the viability of the video essentially not working.

So I don't think there's enough in the record, Judge, to support the application of this enhancement.

A lot of this argument that I'm making now underpins

our other argument for the objection against the terrorism enhancement, but we'll save that for now.

THE COURT:  Thank you.

Ms. Taylor?

MS. TAYLOR:  Yes, Your Honor.

According to the -- to the -- the specific offense characteristic as it's laid out in the guidelines, the criteria that has to be reached is that the material support or resources have to be provided with the intent, knowledge, or reason to believe that they may -- are to be used to commit or assist in the commission of a violent act.

So what's relevant here is what is Mr. Langhorne's intent in distributing the video.  Not whether the video actually could be used for that, but what was he intending to do when he sent it out into the world?

And his intent is frankly pretty clear here.  He, first off, talks in -- in some of these chats with the undercover -- and this is quoted in the PSR, paragraph 20.  He states -- he's talking about what video's going to come after this first video that the FBI was creating for him at the time, which he thought was ISIS.

"A follow-up video on high-value targets, understanding contemporary warfare in comparison to classical Islamic warfare, how to scout locations and people, mental and religious preparation, use of disguises, basic legal

information required to appropriately scout without being detected or raising alarm.  When to strike and how, as well as tactical analysis of active shooting scenarios, law enforcement response, and how to successfully leave an area without being caught are all things for a separate video, one video being the primer" -- and here he's referring to the TATP video that was being created during the course of his communications with the UCE -- "while the second being the catalyst for the detonator."

So it's very clear, just from this one statement that he makes to the UCE, what his intent is in making the video. His intent is he's providing -- he's providing information to the public, and specifically to potential terrorists, for how to -- how to conduct a terrorist attack, how to -- a video that would contain a formula for making an explosive, tell you how to get all of the materials that you need to create the explosive, provide the recipe for the explosive, and give you tips and tricks for how to not get caught as you're making -- as you're buying the things, making the explosive, and figuring out where to deploy it.

THE COURT:  You mean there in paragraph 20 it states, "and explaining any evidence of criminal intent" -- that he's trying to do away with the ability to show that "by making improvements to the process for creating TATP and suggested various ways of explaining away evidence of criminal intent."

MS. TAYLOR:  Correct, Your Honor.

And in addition, Mr. Langhorne -- and this is reflected in paragraph 14 of the PSR.  This -- in this paragraph it's talking about some of the -- some of these other chats that Mr. Langhorne was engaging in in the chat room.  This is the one that's -- that we were referring to earlier that was attached to my letter and is now attached to the PSR.

But essentially it's the -- you know, it's the birth of this idea that Mr. Langhorne has for creating the TATP video.  And as he's explaining this idea in this chat room with other ISIS supporters, he states what his intent is.

And in paragraph 14, which is -- it's undisputed fact at this point.  In December 2018 and January 2019 -- so about two months before Mr. Langhorne gets introduced to the UCE -- he's in a chat room expressing an interest in creating a video that would improve existing videos demonstrating the making and use of TATP.

And then it states that he made some practical suggestions and -- including, "Sure, we might now know how to manufacture explosives, but how much do we need?  We were only given the recipe (which is found on Wikipedia) and told how to make them but not how much is needed for certain types of building or where to place them."

And if the Court -- I'm sure the Court has read through both the PSR and the chats which show that that's -- that's what's in this video.  It's this idea that Mr. Langhorne

provided in this previous chat, before he ever met the UCE, that, "We're going to teach how to manufacture it, how much you need, and scale it to be able to deploy against particular types of targets."

And then that paragraph continues on page 6 with a quote from Mr. Langhorne in which he stated, "There's no point in fighting if you die killing people for no reason or using explosives in a marketplace against people who have nothing to do with war.  Killing civilians is entirely pointless and a waste of life.  Now, blowing up a power plant, on the other hand, or perhaps a bank when no one is there, that is far more effective.  Just as much fear, less death, and just as much coverage and cost to economic infrastructure."

The defendant also -- and then this is -- that was the end of the quote.  And then it states he also discusses conducting attacks on post offices at night and then to destroy infrastructure, specifically government buildings, as well as discussing targeting military personnel.

And there's a quote there where he talks about wanting to -- wanting a specific list of military personnel who have -- who would be considered enemies because they had, quote, "actively engaged against dawlah," which is another word for ISIS.

So it's clear what his intent was and what he was trying to accomplish in creating the video.  And frankly, if he

thought it was a fake video that wouldn't accomplish his ends, there's no reason why he would have uploaded it to the Internet and tried to distribute it.

And moreover, there's also -- if he genuinely just knew this whole time that he was dealing with an undercover agent with a fake video that wasn't going to accomplish his means, why would he have pleaded guilty to a material support charge?  He had to admit, in pleading guilty to the material support charge, what he was attempting to do in making and distributing the video, which was to provide material support to ISIS.

And, Your Honor, for those reasons I would submit that it is -- it's crystal clear that Mr. Langhorne had the intent to believe that this video would be used to commit or assist the commission of a violent act, that is, attacks by other supporters of terrorist groups, including ISIS, and that this -- this offense characteristic absolutely applies in this case.

THE COURT:  According to the record in this case, on the personalization of elements, the defendant admitted that he knowingly attempted to provide material support and resources to a designated foreign terrorist organization, that is, the Islamic State of Iraq and al-Sham, referred to as ISIS.

The question was specifically, "Did you attempt to do so through the creation and distribution of instructional video

intended to teach followers of ISIS how to obtain materials for explosives without arousing suspicion and combine those materials to make an explosive sufficient to destroy specific types of targets?"

His answer is yes.

"Did you do so knowing that ISIS was a designated foreign terrorist organization, had engaged in terrorism, and was engaging in terrorism?"

His answer to that was yes.

"Did you engage in conduct that constituted the substantial step towards the commission of a crime and that strongly corroborated your criminal intent, specifically, by uploading the instructional video to a publicly" -- excuse me -- yeah, "a publicly viewable site on the World Wide Web, that is, BitChute?"

And his answer to that was yes also.

So do you want to respond to her contention that that first enhancement in paragraph 40 should not be applied in this case?

MR. LEOMBRUNO:  Just briefly, Your Honor, if I may, Judge.

THE COURT:  Sure.

MR. LEOMBRUNO:  2339B is a separate -- it's its own offense.  As the Court's aware, we're dealing with the enhancement, which requires an intent requirement that is not

the same as what's required by 2339B.

So the analysis -- although there may be some overlap, and I concede that, it still is slightly different. In one of the objections that I made to the PSR -- and as we were going over this with the Court at the beginning, it's about context.

It's about -- although everything in paragraph 14, that the Government just read to the Court, of the PSR is accurate -- those things were produced in discovery.  Those are essentially quotations from chat exchanges, you know, between Mr. Langhorne and other individuals, but they aren't exchanges between him and the undercover agent.  Those are comments that are made inside a chat room to different people.

There's a lot of discussions, the Court's probably aware, about all sorts of videos being produced.  In fact, the exchange between the undercover and Mr. Langhorne first starts out about talking -- when the undercover's pressing Mr. Langhorne for what types of videos, he starts talking about educating his sisters in the ummah, which is the Muslim world at large.

So there's a lot of ideas, I would submit to the Court, that are kind of going around in my client's head as the things that he may want to participate in or help produce or information that he may want to put out there for his own various reasons.

But what the Government is doing is they're taking information that was exchanged with a different source and saying, "Look, that is evidence of his intent in this exchange with the undercover," which is essentially the basis for the charge.

Now, I understand that it may be relevant, but I don't think it's conclusive of my client's intent because those conversations take place months before his undercover -- his communication with the undercover.

And so the Government is basically saying he's not allowed to change his mind or he's not allowed to, you know, offer any other reason or explanation as to why he may want to do these things.  But what we have is we have actual statements from Mr. Langhorne, in the exchange with the undercover, about what the use of the video was for.

Now, with regard to that specific section that the Government pointed out that talks about one video being the primer and the other video being -- that deals with specific tactics and things like that, that other video was never produced, was never made, was never -- I don't believe it --

THE COURT:  But wasn't there supposed to be three?

MR. LEOMBRUNO:  Correct.  Well, there was multiple videos.  So, yes, there was one with music, one without music. There was -- there was a lot of videos that were discussed, one about educating, you know, members of the Muslim community that

are living in -- in the United States, essentially, in the eastern coast versus the western coast and how he can educate them about, you know, politics and different -- living in kuffar lands, all this stuff.  There's a lot of information that's contained in there.  There's a lot of ideas.

But with specific intent for this specific video, the Government is attempting to use conversations with other individuals that took place months prior and say, "Look, this proves exactly what his mindset was when he had the conversation with the undercover."

And I think that's worth exploring and notating to the Court because my client tells you exactly what his intent is with regards to these videos.  It's for information.

Now, that one phrase that he put out, with this one being the primer and the second one being essentially the detonator, I guess, for lack of a better term, that video is not produced.

As far as him commenting on it at that point, I don't believe it's even discussed further than that in any, you know, great detail because shortly after uploading this first video, you know, my client is apprehended.

So, you know, you have the scenario where the Government is saying, "Look.  Look at conversations that took place months before.  They justify the interpretation of his intent for the -- you know, his participation with the

undercover."  And they're saying that proves one or the other. I don't think that it does, and I would submit to the Court that it doesn't.

And the other issue is -- is that they're saying, "Ignore the comments that he's making to the undercover about specifically what he wants that video to be and what it's to be used for."  So you have more recent information about what his specific intent was for that video.

And the Government's also saying, "Look, by the way, punish him for the second video that has never been produced or made."

I know of no basis in law or the guidelines that would say, even though he may have speculated about a second video that could lead to violent acts, that the first video which doesn't somehow warrants this type of increase for two levels.

THE COURT:  Well, don't you have this dilemma trying to convince me that somebody who may be smart enough to theorize, "Oh, I may be talking to an undercover agent now so I have to be very careful of what I say.  Although I had told somebody else that's exactly what I'm going to do, I'm going to try to deny any responsibility when I talk to" -- we'll call undercover "undercover," when he told somebody else several months before, more than one person, and put stuff out on these social media platforms what he really wanted to do that showed

his intent?  So you have to think of that also.

I -- it's just like any other case.  Put a witness on the stand who said, "John never told me he wanted to hurt anybody.  He said he loved Bill."

And you put somebody on who's going to testify, "Three days before he made that statement, he told me he was going to kill Bill."

That's what we pay those people that sit in the jury box to determine, which was the intent.

Go ahead.  I think I understand your argument.

MR. LEOMBRUNO:  Judge, and the only response I have to that is, again, the specific language of the enhancement.

THE COURT:  Yes.  I -- I understand what you're talking about.

MR. LEOMBRUNO:  The conduct in question is not --

THE COURT:  With respect to the underlying offense itself and the enhancement having two different things.

MR. LEOMBRUNO:  Yes.

THE COURT:  Yes.  I understand.

MR. LEOMBRUNO:  And not just two different things, as I point out and the Court acknowledges, but factually we're talking about does this enhancement apply to the video that was uploaded.  That's my argument.  Not videos that may have been uploaded or videos that he commented on, because it's what is the affirmative act that he did here.

The affirmative act is participating in the production of this video by offering commentary or advice and then posting it when it's delivered to him by the Government, you know, to a site, not commenting on future videos.

So I understand the Government's position when they say, "Well, look, he talked about this other video, you know, indirectly as being, you know, something else that may need to be produced, and therefore that's evidence of his intent on this one."

But you can dissect that scenario a little bit further because it's what was his intent when he put the first video up.  There is no second video.  There is no follow-up act.  So they're -- they're using speculation of what his intent would have been for the second video, or they're using the words that he used to say, "Well, look, that was his intent for the first video."

His intent for the first video is stated very clearly in his interactions with the undercover that it's for information purposes.

THE COURT:  Do you want to get into the argument with respect to paragraph 42?

MR. LEOMBRUNO:  Since we're on it, yes, sir.

Judge, this is a -- this is a much more difficult analysis in some respects.  The information's not going to change because a lot of the -- as I alluded to earlier, a lot

of my argument with regard to the application of the terrorism enhancement is the same because we're talking about intent in the sense of, as the Court pointed out in *Ramirez* -- and I do agree with the Court; *Ramirez* is the case on point.  That's the most recent case from the Eleventh Circuit.

THE COURT:  That's it, unfortunately or fortunately. I've known Judge Martinez for 50 years.

MR. LEOMBRUNO:  Yes, sir.

THE COURT:  Yeah.  Little-known fact.  In 1972 he worked in the Department of Justice, and we had a very difficult drug case that I had here in Jacksonville, and they sent him down to teach me something.

MR. LEOMBRUNO:  Well, then the Court is very familiar with that --

THE COURT:  And he happens to be Dominican, not Cuban, because I never could understand why it took him so long to get confirmed with a name like Jose Martinez.

That's when I was told two stories.  One was that he was Dominican and not Cuban.

And the other one was he was a sole practitioner, and his wife set a deadline and said, "You've sent a letter to all of your clients -- so you don't have any clients -- telling them you're becoming a judge; they should find another lawyer. And meanwhile you're languishing here while someone in Congress is holding up your vote.  We're going to starve to death.  So X

is the date.  If you don't get confirmed, you just pull your name and go back and make some money."

His daughter actually worked in Jacksonville in the State Attorney's Office.

MR. LEOMBRUNO:  Oh, wow.  I was not aware of that.

THE COURT:  Yes.

MR. LEOMBRUNO:  Well, Judge, you know, as you pointed out, again, *Ramirez* is a pretty solid analysis, in my opinion, as to what is required by the court in looking at whether or not this enhancement applies.

And I'm not going to argue that 2339B is not an enumerated offense for the first prong in that analysis.  It is.

The issue then, as the Court pointed out earlier, is the word "calculated."  And as I had pointed out in the *Alhaggagi* case in my sentencing memorandum and then as the Government pointed out in *Ramirez*, they're all talking about the same thing.

Now, courts have interpreted that a little bit differently, depending on what jurisdiction you're in, but in the Eleventh Circuit, we're dealing specifically with *Ramirez*. And there are some quotes from *Ramirez*, or sections, that I think are important, the first of which is it notes that Section 3A1.4(a) provides the --

THE COURT:  I've got the opinion here.

MR. LEOMBRUNO:  Yes, sir.

THE COURT:  What page or what footnote are you on?

MR. LEOMBRUNO:  Judge, I just pulled it.

THE COURT:  Okay.

MR. LEOMBRUNO:  I would have to ...

If the Court would just bear with me for a second.

THE COURT:  No problem.  Take your time.

(Pause in proceedings.)

THE COURT:  You're talking about calculated --

MR. LEOMBRUNO:  Yeah.  Judge, I apolo- --

THE COURT:  I'm looking at, "We begin with the statutory term 'calculated.'  See 18 U.S.C. 2332b(g)(5)(A)."

MR. LEOMBRUNO:  Yeah.

THE COURT:  "The ordinary, plain meaning of 'calculated' is planned to accomplish a purpose or intended."

MR. LEOMBRUNO:  Yeah.  And the --

THE COURT:  "'Calculated' means 'planned -- for whatever reason or motive -- to achieve the stated object.'"

MR. LEOMBRUNO:  And I think the quote that I want to go to is towards the end here.

THE COURT:  Okay.

MR. LEOMBRUNO:  It starts on Heading 4, Westlaw Heading 4, and then it's page 854 kind of at the bottom.  It says, "We agree with *Awan* and our other sister circuits that 'calculated' imposes an intent requirement.  For USSG 3A1.4 to

apply, the Government must satisfy the 'calculated' prong of 2332b(g)(5)(A).  To do that, the Government must show that the defendant's offense was planned to influence, affect, or retaliate against Government conduct, even if that was not the defendant's personal motive."

And that is significant to this analysis because what we're talking about is, I think, there's two ways, according to *Ramirez*, for them to kind of get at this.

You know, they can say, "Well, look, how do we prove up what his intent and motive was?  And can we use that if he's stating it out loud to show that this was calculated to do these types of things, to influence or, you know, disrupt Government conduct?"

On the other hand, in those scenarios where a defendant doesn't blurt out his stated intent, you know, their -- in either scenario, the Government has a burden to prove, okay, that there are sufficient facts here to support that this was the calculation, okay?

And what's important about *Ramirez* is -- and there's a litany of cases that talk about this, that his subjective intent isn't necessarily the be-all or end-all for the analysis because he may have this -- let's say, well, the $300 that I'm going to provide, you know, this particular terrorist group.  I never intended that it do this or that.  But the analysis is basically, okay, looking at it, is it reasonable or can you

assume -- or can you prove, I should say, that it's calculated?

So his subjective intent isn't always the end-all. It's is there sufficient evidence to show that it would lead to this result, regardless of what his intent was.

This is where I think the fact that the video not working is insanely significant to this analysis.  How can a video that does not work affect Government conduct or disrupt government as the enhancement requires?  To get there, the Government's going to have to show, again, that what he did would have done that.

So unlike the enhancement that we were talking about before with the -- the other one, with the level 2, about -- you know, with his specific intent that these things be used, here the analysis isn't necessarily his specific intent.  It's is it calculated to reach that goal.

So in this scenario, you know, we -- you have a situation where we have both.  You have him talking about what the use of this video is to be for.  He provides examples of what should be used or how it should be used and in what scenarios -- and, again, I'm referring to the situation where he talks about the group in Yemen, in protecting themselves.

And at no point does he mention a specific government.  At no point does he say, "So those people can protect themselves from the United States government," or this particular government or this particular government.

So what we have here is a higher level of proof factually that the Government has to meet here to say, "Well, look, if it's calculated to affect, okay, what was done, what was said, and what is the likely result?"

So you can't look to his subjective intent because he stated exactly what the purpose was for, again, not to -- not to kill civilians but to put information out there so people can protect themselves.  I think at one point he even talks about, you know, the fact that somebody may be armed, you know, somebody may think twice about -- if I'm remembering correctly -- you know, about attacking that person.  So it's the information, okay, that's important.

And the specific example that he provides, again, in this conversation -- because I suspect the Government will get up here and they'll say, "Well, look, in prior conversations months before in these chat rooms, he talked about other videos, and that means exactly what he meant in this scenario."

And quite frankly, that is speculation, and speculation is not a substitute for evidence.  And I kind of alluded to this in the *Alhaggagi* case, that the Government just can't say, "Well, look, every act that supports a 2339B charge eventually would inure to the benefit of the terrorist organization, so therefore it's always calculated to support, you know, government disruption," or something like that.

They don't get to do that.  The Government doesn't

get to stand here and say, "Ah, you pled to 2339B," because if that was the case, then there would no other analysis required, but we know that the guidelines require that second prong regarding calculation.

So there has to be sufficient evidence, not conjecture, not speculation, not, "Oh, we think this over here means this and we think what he said here supports this contention there."  That's not evidence; that's argument.

So what we have here, again, with these two particular scenarios is that, you know, the intent, the subjective intent, was to arm people with information.

Now, the Court raised a good question before about, well, how do you -- how do you correlate?  How do you, you know, deal with the fact that he pled to a 2339 charge, that you know he has the personalization of elements when he's, you know, responding to the Court during the plea dialogue and the -- pursuant to his plea agreement.

It's the information that's posted that helps, potentially, ISIS.  You know, what's interesting about this case is that my client never actually uses the word "ISIS" ever.

You know, in his exchange with the undercover -- and I pointed this out in the sentencing memorandum -- again, it's like a prosecutorial checklist.  You know, the conversation had been going on for months, and although they were talking about

producing a video, you know, they're -- it's kind of this -- I think I mentioned it this way, that it's like the undercover tries to push things on to my client, and my client's like, "No, I'm not doing that.  That's on you."

So specifically, "You can make these videos, right?"

"No.  I'm not making anything."  He pushes it back to the Government.  You know, he makes comments about, "Well, I can't be around.  I've got to go, you know, support, you know, my other brothers, and I've got to go on this mission for the dawlah."

And my client's like, "Okay."

You know, not once does he affirm that they're specifically talking about a specific group.

And why is that important?  Because although there's no specific acknowledgment of ISIS in that exchange -- and we're talking about this -- in the context of this enhancement, what is calculated there, okay?  The Government doesn't get to bootstrap everything that was said to other arguments, to other comments, and they don't get to supply evidence -- or fill evidence or substitute evidence with conjecture.

So he's making these comments, and he's saying very specific things, which the Court will probably recall.  "We're not going to talk about anything that could even support a 2339B charge."  He actually says it in the exchange.

And I would suspect and -- well, I do make this

argument, and my client might talk about this at some point. But him calling out the undercover as an undercover agent, I think, is a part of the larger issue here regarding my client's intent.

He knows he's dealing with an agent.  It's implicit and explicit from the conversation.  It's explicit in the sense that he uses the Steve and Bob analogy when he's talking with the undercover.  "Let's say Steve has an idea, then he gets in touch with Bob, and Bob's an undercover agent."  You know, he goes through this whole analysis, clearly creating a record, "I know who you are.  I know you're an undercover.  I know you're the Government."

So why does he keep engaging in that conduct?  Well, that's the subject of further argument when we get to the 3553 factors and the testimony of Dr. Bloomfield.  But I think there's some -- some mental health reasons as to why he wants to engage in that type of conduct, of seeking approval or being wanted by other people and having information.

But -- but in that process, you know -- and I allude to this, and I don't think it's disputed.  It's in the PSR as well -- that he makes a phone call to the ATF about getting a firearms license.

In my client's mind, this is him playing games with the Government.  This is him saying, "I know -- I know who you with are.  I know where the line is."  I used that phraseology

in my sentencing memorandum.  Unfortunately, he thought he knew where the line was, but he was incorrect about that.

But he's saying to the undercover agent, "I know where this line is, and I can walk up to it.  I can dance on it, but it's not illegal because I'm not doing anything that would subject me to a federal charge."  And so he calls the undercover agent out.

He makes the phone call to the ATF agent on a recorded line, you know, using his name, saying, "Hey, here I am.  I'm on your radar."  You know, it's essentially going up to a government building and knocking on the door, saying, "I'm Romeo.  Here I am.  I know you guys know who I am."

So you have this kind of process, and -- and why is that important?  Because I feel there's enough evidence -- not feel.  I would suggest to the Court that there's enough evidence that that is highly significant of his intent.  That's substantial evidence showing what his intent was here, and that's to give information.

"I'm going to use the Government to produce this video.  Whether it works or not, I don't really care.  I'm going to upload it."

Because does it matter to Mr. Langhorne if the video works?  Not really.  It's the perception of information.  "I'm going to load this up so that brothers and sisters in the ummah, the Muslim world at large, can have this information,

and they can protect themselves."

That's not specific enough to say, "I'm going to upload this information because I know it's going to arm members of ISIS or other terrorist groups to specifically disrupt government action or conduct or government conduct of any other nation or any other government.

He doesn't use that terminology.  He doesn't mention government.  It's like, again, the only specific group that he mentions is the group in Yemen, and that has nothing to do with, you know, government conduct.

So no government is identified.  He states very specifically what his intent is in the actual exchange.  And then we have sufficient evidence to support that, again, this was information to -- to put out there, and he thought he was playing a bit of a cat-and-mouse game with the Government.

So combine with that the fact that -- again, that the video doesn't work and is still probably up somewhere on BitChute, you have the scenario where how could that ever be calculated, either by his subjective intent or the actual facts of the case, to actually disrupt government conduct.

THE COURT:  Isn't that really the ultimate question --

MR. LEOMBRUNO:  Yes.

THE COURT:  -- because I read before to you from the personalization of elements.

"Beginning no later than December 2018 through on or about November 15, 2019, in St. Johns County, within the Middle District of Florida and elsewhere, did you knowingly attempt to provide material support and resources to a designated foreign terrorist organization, that is, the Islamic State of Iraq, also al-Sham, referred to as ISIS?"

And his answer was yes.

"Specifically, did you attempt to do so through the creation and distribution of an instructional video intended to teach followers of ISIS how to obtain materials for explosives without arousing suspicion and combine those materials to make an explosive sufficient to destroy specific types of targets?"

His answer again was yes.

So we're really dealing with the ultimate question that was in *Ramirez*:  Was it calculated to the government issue?

MR. LEOMBRUNO:  Correct.

THE COURT:  Right.

MR. LEOMBRUNO:  Correct.  And all this information that I'm pointing out, in addition to the plea agreement, as the Court notes, goes to that issue.  It's not a -- if we didn't have that second layer of analysis, as these, you know, stream of cases point out, then the fact that he just entered a plea to a 2339B charge would be sufficient for the terrorism enhancement.

You know, this is a scenario where -- and we'll get into this more later, Judge, when we start talking about, you know, mitigation and variances and departures and things of that nature.  But, you know, the terrorism enhancement predates *Booker* and its line of decisions.

So, you know, when *Booker* came out we have essentially this enhancement that's 12 levels, you know, exposes somebody to almost, you know, four or five times the exposure of what the underlying offense is.

You know, and the analysis here is -- particularly in light of *Booker*, saying, "Hey, look, courts really have to take into account all these things, but the actual enhancement itself has to be specific in nature," because it wouldn't apply if there wasn't some higher level of analysis, as the court points out.

So it's not enough to just say, well, look, the plea colloquy or the -- you know, the factual basis, the personalization of elements, that is enough to support this extra layer of analysis, this heightened, you know, burden on the Government that it was calculated to influence government, because that's not enough.

There's nothing in those exchanges that say that's enough to warrant the application of this enhancement.  So we have to go to the record.  We have to go look at these other things and say, well, what's in there?

And, again, the Government, I suspect, is going to point to those other conversations in other chat rooms.  But there is enough time difference and conversation variance between those conversations that he has with those individuals in those chat rooms versus the actual specific conversation that he has with the undercover.

There's lots of different things that are discussed with the undercover that aren't discussed in the other -- in the other chat rooms.  And quite frankly, those conversations, as far as the record produces, stop in January of 2019.  This video isn't uploaded until, top of my head, November, mid November, of 2019.  So it's almost nine, ten months later, you know, that we're dealing with, you know, the conduct that's at issue here.

And within that exchange, which is where I think the Government has to go for its burden of proof, the exchange with the undercover, there's not sufficient evidence to say, "I want this information" -- or, "This information can be reasonably calculated to say it's going to affect this government in this way."

Because they can't do that, they're going to try to fill that gap in the evidence with argument and speculation.  That's not sufficient to meet their burden, and that doesn't satisfy the requirements of this enhancement.

THE COURT:  Thank you.

MS. TAYLOR:  Your Honor, first, these continued contentions that Mr. Langhorne really knew that he was dealing with the Government all along and that he -- that we still don't know whether he supported ISIS or not, it really, frankly, walks up and dances on the line of lack of acceptance of responsibility.

Because if he truly knew and believed that he was dealing with a government agent, then he shouldn't have pleaded guilty to the offense and admitted the things that he did in his plea agreement and in his guilty colloquy, which clearly show that he admitted he was a member of ISIS and that he was attempting to support ISIS.

If he thought he was trying to play with a government agent and waste their time, then we would not be here right now.  But he has admitted those things already, so why we're still arguing about them is unclear.

With regard to the argument that there's -- there's a critical flaw here in that there was a video with a fake recipe and therefore it can't possibly have been intended to influence government conduct, my colleague, Mr. Sigler, is familiar with a case, and I unfortunately don't have it in front of me, but it's an Eleventh Circuit case called *Suarez*.  And I know that he has the Eleventh Circuit case number to it.

But as he has described it to me, it dealt with a defendant who delivered essentially an inert bomb, and the

terrorism enhancement was upheld as to him in the Eleventh Circuit as well.

And he's happy to elaborate on the *Suarez* case and provide that information to the Court --

THE COURT:  Okay.

MS. TAYLOR:  -- if the Court would like.

THE COURT:  Be glad to listen to him.

MR. SIGLER:  Briefly, Your Honor, I was not able to pull up Westlaw, but I was able to pull up the slip opinion, *United States versus Harlem Suarez*, S-u-a-r-e-z, No. 17-11906 from the Eleventh Circuit.

THE COURT:  Do you have a date?

MR. SIGLER:  Yes.  It was decided June 27, 2018.

THE COURT:  June 27th, 2018?

MR. SIGLER:  That's correct.

THE COURT:  Okay.

MR. SIGLER:  And in that case, a panel of Chief Judge Carnes, Judge Wilson, and Judge Jordan -- Judge Wilson wrote the opinion, and the facts are -- I would just submit that they're analogous here.

Mr. Suarez went to trial and was convicted in Key West, Florida.  He had a sustained interaction with the FBI where he suggested that what he wanted to do was build a bomb and bury it in the sand on a crowded beach and have it go off so that it would kill people or affect businesses.

And the FBI delivered him an inert device and arrested him immediately thereafter.  When he took possession of the device, he was taken into custody.

Admittedly, the appeal was on the sufficiency of the evidence and then a double-counting issue under weapons of mass destruction sentencing enhancements and the terrorism enhancement, so it's not dead on point.  However, the mere fact that the bomb could not explode was no bar to conviction or to the -- to the application of 3A1.4 in that case.

And I would submit that in principle we're on the same ground here, where the defendant spoke, in the course of the offense conduct, of wanting to blow up post offices and also other critical infrastructure so that he could advance the goals of ISIS, a foreign terrorist organization.

MS. TAYLOR:  And, Your Honor, with regard to this contention that the Government's just drawing things out of thin air, speculating, not presenting evidence to the Court, that Mr. Langhorne has to have said in UC chats that he was intending to influence the government and that's the only thing sufficient, I would dispute that.

The chats that we have been talking about that predated the introduction to the UCE, and specifically his statements about wanting to blow up power plants, blow up post offices at night, and impact infrastructure, specifically government buildings, which are quotes from Mr. Langhorne --

THE COURT:  Yeah.  That's on page 6 in paragraph 14 of the pre- --

MS. TAYLOR:  Yes, Your Honor.  And those -- that actual discussion occurred in January of 2019 and -- and was specifically related to where he first formulates this idea for the video that he wants to create, which ends up being the video that the FBI assists him with.  And he specifically is asking, in an ISIS chat room, for help to make this video.

So that's in January -- mid January 2019, and then it's approximately just under a month later that he is introduced to the UCE in February of 2019.

So we're not talking about totally unrelated, unconnected discussions that have nothing to do with one another.  We're talking about him expressing and articulating what he wants to do with this video and then, a month later, being introduced to the person who is told to him to be a member of ISIS who's going to help him do that.

But even if you set aside what he said in these chat rooms when he thought no one was watching from the Government, he says it directly to the UCE too, what his intent was and what he's hoping to accomplish with this video.  And that's reflected in paragraph 21 of the PSR.

He states to the UCE, after transmission of the second -- the second version of the TATP video -- and, Your Honor, I know the Court knows this, but it was kind of done in

chunks. So there was a first video that just had some introductory stuff, and then they made a second video. And in total there were four videos that were made, building on each other, until they got to the final product that was uploaded to the Internet.

So these were sort of drafts, I guess you could say. They weren't different videos. They were building all on each other until we got to TATP Video 4 in November, which was the one that he uploaded.

But after the -- the second iteration or the second draft of the video was sent to him in May of 2012 [verbatim], Mr. Langhorne stated that -- to the UCE that, "If the final video were published in the public domain, the Islamic" -- quote, "the Islamic world will have a better grasp on how to defend itself through the usage of explosives in a reasonable and safe manner," end quote.

And then he stated, quote, "Everyone who sees, uploads, reuploads, and shares this video will be aware of how to safely and accurately create and use explosives," end quote.

Mr. Langhorne then opined this will mean, quote, "the list of potentially dangerous people escalate from being small and well managed to being completely useless as everyone becomes a tier 1 threat."

So when we're talking about being a tier 1 threat, we're not talking about self-defense, nor am I aware of any use

for TATP as a -- as a measure for self-defense.

And then Mr. Langhorne stated that he thought the result of the publication of the video would be, quote, "people of interest within the Islamic field will be taken with more precaution and treated better as the result of upsetting a suspected terrorist will only exacerbate any hostilities they already have, thus endangering others as a result," and, quote, "the information provided in the video can and would assist the general population against the corrupt or oppressive people."

And then Mr. Langhorne stated, once he thought the video was finished, quote, "this deed will live on forever as the information becoming public knowledge will only be a good thing as it evens things into a more balanced state between civilians and governments."

So he stated it right there in black and white to the UCE that his expectation was that the publication of this video, as he envisioned it, was going to influence the government and influence government conduct by essentially creating so many terrorists that the government couldn't respond to them.

So, again, it's crystal clear what the offense was calculated to do. It was calculated to retaliate against the government and to influence government's conduct. And he stated it at the time that he first articulated what his idea for the video was to fellow ISIS supporters in an ISIS chat

room, and he said it directly to the UCE too.

This generic contention that the purpose -- or his intent was to give information, well, yeah, his intent was to give information to people who want to engage in terrorism about how to make bombs, how to not get caught, and how to influence the government.

I mean, simply saying that it was just to provide information really doesn't tell the whole story of what he was attempting to do.  And moreover, his cover story throughout his -- throughout his chats with the UCE, he refers to landscaping.

And then also when he -- after he uploads the video initially, he states -- he talks about that you might be able to use it to destroy tree stumps.  But Mr. Leombruno isn't even arguing that this was a landscaping video.

Mr. Langhorne knew what the video was for.  He's clearly a very careful person.  You know, he did -- he did confront the UCE and accuse him of being an undercover very early in the conversation.

He talks in the chats about, you know, not ever agreeing with anyone so that -- so that they can't charge him with conspiracy.  He -- he talks about not wanting to know the UCE's name or what he does, because Mr. Langhorne didn't want to get caught.

So to the extent that he never says ISIS, it's

because, you know, he's trying to protect himself by using coded language in order to -- to shield himself from prosecution, which obviously did not work, but that's the reason why.

But, again, in the chats he clearly -- well, he's admitted that he was in an ISIS chat room when he asked for help with this video.  He clearly knew what dawlah means, which is another name for ISIS and which is used throughout these chats.

So, Your Honor, I would submit that the terrorism enhancement is properly applied here.  These arguments that -- that it shouldn't be are not compelling, and, in fact, are -- are refuted by what's in the PSR and -- and the actual evidence in this case, which shows exactly what Mr. Langhorne intended to do and what his offense was intended to do, and that was to influence government and retaliate against government.

THE COURT:  Anything else from the defendant?

MR. LEOMBRUNO:  Judge, just a response.

I have to admit to the Court that there was a point during my representation of Mr. Langhorne that I looked at a lot of case law.  A lot of hours have gone into looking at this case, the discovery, case law that went before.  I believe I've seen and read *Suarez* before.  The reason why I didn't bring it up or it doesn't come to mind is because I don't think it applies, essentially, for what the Government has just

contended that it does.

When I look at that case, what they're talking about is whether or not the attempted use of a weapon of mass destruction, you know, had the requisite effect on interstate commerce to justify the application of that charge.

And there was an argument, I believe -- and I will limit to this, that I'm having to go back and pull that case on my phone and try to read that in real time, that -- and we can certainly take the time to look at it if we need to, Judge.

But the discussion about, you know, whether there was substantial or minimal effect on interstate commerce goes probably to what the Government was talking about, whether it was a fake bomb or not.

And in that court the -- in that decision, if I'm reading it correctly, the court's saying, "Look, it's enough" -- and they had a witness there that said, "Look, in Key West if there's any disruption to our tourism, you know, activity, it's going to have an impact on our -- on our interstate commerce."

And so the court says, "Yeah, okay.  The burden's been met then."  It doesn't really matter if the bomb was real or not.  You know, they were discussing those types of things.

The only thing -- and, again, if I'm reading the correct opinion, the only thing that I saw that dealt with the terrorism enhancement was whether or not it was appropriate in

the terms, as the defendant was arguing it, as essentially double-counting conduct.  You know, are we double-dipping somebody in this sentencing, you know, for the same type of issue.

So I don't know that that is exactly -- I understand why the Government may bring it up, because it's another case involving a terrorism charge or use of a bomb that didn't work. But I don't know that that's entirely applicable here, specifically in the way that we're trying to analyze this particular enhancement and how it applies to the case.

Some things that the Government notated is, you know, the Government's up here saying, "Well, he knew this.  He knew that.  He knew this."

They're saying that in the context like they know for sure.  And they're saying, "Well, look, you know, he never disavowed this," or, "He never used this term," or, "He didn't, you know, object to someone using it."

They're looking at these other things and saying specifically, "This is what he knew."  But that is the point of what I was arguing to the Court, that that appears to be more about speculation about my client's mindset and not actual evidence to support that his activities were specifically calculated to disrupt government actions.

With regard to the plea agreement, Judge, my client entered a plea -- the way that the factual basis was written,

the way that the personalization of elements were stated there -- because my client knows and admitted his guilt that when he uploaded the video, he knew that that action could support ISIS.  There's no disputing it.  That's in the plea agreement.

But that's not the end of the conversation with regard to this specific enhancement.  If supporting ISIS was the end of the discussion, then we would never have again, as I pointed out, this second layer of analysis to determine whether or not that support was calculated to influence.

THE COURT:  That's the issue.

MR. LEOMBRUNO:  And so I --

THE COURT:  You know --

MR. LEOMBRUNO:  And I understand that the Government points to the factual basis, and the Court is asking questions about that -- well, how does this mean -- how does this -- what does this mean in the context of this calculation?

My argument back to the Court -- or my -- you know, my response is that that alone doesn't meet it.  There has to be something else that says okay.  So he supported ISIS.  He's accepted responsibility for that.  He engaged in a dialogue with somebody that he suspected to be an agent of the Government.

And whether he suspected it, knew it, disregarded it, it doesn't matter.  He took steps to upload a video that he

agreed could be helpful and support ISIS.  So there's no denying responsibility there.  There's acceptance of responsibility.

But the Court can't -- and the Government shouldn't be able to get up here and say, "Ah, well, he accepted responsibility.  Therefore, everything that he did" -- well, that's not the analysis.  It -- it just ignores, you know, the -- you know, it ignores all the details that go into this specific calculation or the analysis of whether or not it's calculated.

And so we have to look again at the evidence, and the evidence, I think, without rehashing everything, Judge, shows that, yes, he intended to support, but not all support cases have that extra layer of, okay, is this -- what he did now calculated?

There's talk about specific targets that he made to other individuals in another chat room before the video was even produced that happened a month if not longer before he even engaged with the undercover.

So, again, that is not sufficient evidence to say, "Okay.  Well, what he was talking about there is exactly what he was talking about here and exactly what his motives were," in support of what he did, regardless of whatever his subjective motive was, right?  Because we know from *Ramirez* his subjective motive is not the analysis.  It's what is reasonably

calculated.

So although we spent a lot of time talking about what he meant by this video and what his intentions were, that's a little bit of a red herring.  Was it calculated?  In other words, take out the subjective intent.  What happened?  Was it calculated?

Or when he intended to do this conduct, regardless of what his intent was, was it calculated to disrupt government action?

THE COURT:  That's the issue.

MR. LEOMBRUNO:  Yes.  And in this case, Judge --

THE COURT:  Well, there's another -- if you look on page 8 of --

MR. LEOMBRUNO:  The PSR?

THE COURT:  No, of Ms. Taylor's letter to the probation officer of January 31st.  In the middle of the page -- forget about the first two paragraphs talking about *Ramirez* and how it fits in.

"Thus the remaining question is whether the offense committed by Mr. Langhorne involved or was intended to promote a crime that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  And it goes on, "The Eleventh Circuit precedent," blah, blah, blah, blah, blah.

And if you look at the last phrase in the paragraph:

"The defendant's personal motive is not relevant," as you just said.  "The pertinent question is what is his -- what is his activity calculated to accomplish?"

So my trusted law clerk is copying *Suarez* for us, and he's going to bring that down so you have a chance to look at your telephone or -- I hope he brings maybe enough for everybody.  I need to take a look at that because I don't think that was cited before.

MR. LEOMBRUNO:  And, Judge, you're absolutely right.  We're all saying the same thing, you know.

THE COURT:  Yeah.  Well --

MR. LEOMBRUNO:  Subjective intent is not the end of the analysis.

THE COURT:  Yes.

MR. LEOMBRUNO:  It's what his conduct was and was it calculated -- you know, is it something that we can point to, to put our finger on it, and say by a preponderance of the evidence, there's evidence to support that this activity was calculated to effect a certain outcome.

So if his intent is irrelevant, okay, then it draws into question again does the video work?  You know, it -- and if -- that's just one issue that I'm pointing out.

But in addition to that, factually, we do have to look at the things he said, because we're trying to figure out was it calculated.  Not just could it conceptually have

disrupted government action or conduct, but was it calculated to.

THE COURT:  Well, you have to convince me, if you can.  On paragraph 14, page 6 of the presentence report, "The defendant also discussed the idea of conducting attacks on post offices at night to destroy infrastructure, specifically government buildings, and an apparent interest in targeting military personnel."

How many copies of *Suarez*?

LAW CLERK:  (Indicating.)

THE COURT:  Oh, my law clerk has one for everybody.

MR. LEOMBRUNO:  Your Honor, you said paragraph 16, correct?

THE COURT:  Paragraph 14.

MR. LEOMBRUNO:  14.  I'm sorry.

THE COURT:  Yeah.  Okay.  Let's do this.  Why don't we take -- this is not that long of an opinion.

MR. LEOMBRUNO:  Judge, if I can review it and then I'll make my comments.

THE COURT:  No, I'm going to take -- let's take a little ten-minute break --

MR. LEOMBRUNO:  Yes.

THE COURT:  -- so we all can read *Suarez*, and then we'll come back to this.

COURT SECURITY OFFICER:  All rise.

64

(Recess from 11:02 a.m. until 11:10 a.m.; all parties present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in session.

Please be seated.

THE COURT:  Have you had an opportunity to read it?

MR. LEOMBRUNO:  I have, Your Honor.  Thank you.

So, Judge, if I can comment, then, on the case.

THE COURT:  Sure.

MR. LEOMBRUNO:  I think I stand by -- I think what I found on my phone and was quickly able to read is the same opinion that was provided by Your Honor.

Again, when I read this opinion, there's -- there's nothing in the analysis --

THE COURT:  I agree.  You can go on to something else.

MR. LEOMBRUNO:  So, Judge, then the other -- the other issue -- and I think you were talking about paragraph 14, and I want to address that to summarize my rebuttal or to finish my rebuttal.

Paragraph 14 starts out:  "In December of 2018 and January of 2019."  Again, what we're talking about is conversations that took place with other individuals months, if not almost a year before the conduct in question that supports the charge, and that the Government's attempting to support the

enhancement, actually occurs.

I'm not going to sit here and suggest that there's not some similarities there because he is talking about making videos. He's talking about a number of things in that paragraph. But, again, those are pulled, you know, from multiple conversations --

THE COURT: And if we were trying this case and the Government was trying to introduce that evidence, I would allow it in.

MR. LEOMBRUNO: And I understand, and particularly in a sentencing context, I understand that's certainly relevant. But my concern here is, is that it's being used to support their contention that this offense was calculated.

Now, as we already know from *Ramirez*, his subjective intent is not the analysis. So on one hand they're pulling information that predates his interaction with the undercover agent to say, "Well, look, this was his intent. This was his intent. This was ..."

But his intent is not the analysis, which is why I keep coming back to the fact that if the video -- which is why we got on *Suarez* to begin with, because the Government was suggesting that there may be other case law out there where, you know, an inert bomb doesn't make a hill of beans for purposes of the terrorism enhancement, but that's not what the case law said.

So we're left with this fact that there's a video that he was asked to consult on, so he posted in these chat rooms, "Hey, I've got these ideas," not just about this, about a bunch of things, you know.

That information is handed over to an undercover agent, who then contacts him.  They engaged in this discussion, and over many, many, many, many months, we finally have the video that's produced by the Government that he uploads to BitChute.

And I think what's interesting, Judge, is -- and this is in the back of the plea agreement -- if you'd give me just a brief second here to pull this.

THE COURT:  Are you talking about document No. 90?

MR. LEOMBRUNO:  Judge, I'm looking at the factual basis --

THE COURT:  Okay.

MR. LEOMBRUNO:  -- specifically page 22 -- I'm sorry, page 23.

THE COURT:  Got it.

MR. LEOMBRUNO:  "On November 11th, 2019, an FBI intelligence analyst located in Jacksonville, Florida, with the Middle District of Florida" (unintelligible) --

COURT REPORTER:  I'm sorry.  You can't read that fast.  I can't understand you.

MR. LEOMBRUNO:  I'm sorry.  I'll slow down, Madam

Court Reporter.

"On November 11th, 2019, an FBI intelligence analyst located in Jacksonville, Florida, within the Middle District of Florida, observed that Langhorne had uploaded to BitChute one of the versions of the TATP Video 4 containing a nasheed. Langhorne titled the video 'TATP or: How You Learned to Stop Worrying and Love the Bomb.'

"Langhorne included a summary of the video which he said was to be -- simply to be utilized for recreational and landscaping purposes and that it would provide instructions and the yield needed to destroy tree stumps, junkyard cars, or perhaps an old moldy barn of some sort, etc."

Then what's -- what I wanted the Court to note is that second to last paragraph on there.  He uploads that first video, Judge.  It's up there for a matter of moments, then it's taken down, and he uploads the second video.

As the plea agreement notes, that video included a significantly short description of the video that did not make reference to blowing up any particular targets.  So, again, we have my client's actions.  We have what he said, which might be relevant to whether his conduct was calculated as required under this analysis.

But this whole debate about what his subjective intent was is not, again, the end-all.  It's you have a situation where a video that did not work was posted to the

Internet.  I don't know how the Government gets around the fact -- that fact to suggest that it was calculated, then, to affect government because it can't.

If they rely, then, on his subjective intent and they say, "Well, wait a minute.  His subjective intent here was -- it doesn't matter whether the video didn't work or not.  His intent was either to tell people how to blow up targets or provide them information."  But that's not what the case law says we have to look at.  It's was it calculated to do those things.

Now, I suppose they can try to argue, well, if his intent was greed, you know, "I wanted to make money off this, not actually blow up targets," then that intent -- what he intended it to do versus what -- the general intent, what it was calculated to do, I guess, you know, there could be a difference in analysis there.

But even if we start to dive into those situations, do that analysis -- "Okay.  Well, what did he mean by his actions?  What was his intent?  Whether it was wrong or not, is what he did calculated to affect?"  So if you're looking at his words, again, the answer to that is no.  There is no second video that's produced.

In conversations that took place almost a year prior in a separate chat room, in different context, with different individuals is not sufficient evidence to meet their burden to

suggest that the enhancement is satisfied.

Thank you, Your Honor.

THE COURT:  Thank you.

MS. TAYLOR:  May I respond very briefly, Your Honor?

THE COURT:  Sure.

MS. TAYLOR:  Your Honor, I would first note that the charge in this case is that the attempt occurred starting in December of 2018 and continuing until he uploaded the video on November 15th of 2019.  It's not on November 15th, 2019, he attempted to provide material support.

It's throughout this whole period, starting when he's in the ISIS chat room formulating this idea and asking for ISIS's help for the first time, all throughout the time that he's working with the UCE and these different videos are being created, and then up until the point that he gets the final video and it's uploaded to the Internet, that that is the attempt and that it is an attempt that occurred over nearly a year's period of time.

Your Honor, and then the other thing I would note is I think we've gone a little bit too far in this whole "his intent is irrelevant and his words are irrelevant."

Looking again at the *Ramirez* case -- and it's on the very -- the very last page of my version of the case, right before the conclusion, there's a paragraph that starts, "To be sure," and they're talking about what kind of evidence would

they look at to see whether the offense is calculated to influence government conduct.

And they say -- the Eleventh Circuit said, "To be sure, whether a defendant's offense is calculated (i.e., intended) to influence, affect, or retaliate against government conduct is a highly fact-specific inquiry that requires examining the record as a whole.  Sometimes, as in ..." and then they cite two cases, and I'm probably going to butcher the names, but Jayyousi, J-a --

THE COURT:  All right.  That's the one that talks about reasonableness.

MS. TAYLOR:  Yes.  I'm going to spell it for the court reporter, J-a-y-y-o-u-s-i, and Mandhai, M-a-n-d-h-a-i, "... the record will contain statements by the defendant expressing an intent to influence, affect, or retaliate against government conduct."

And then they -- and then they go on to state, "However, because a defendant often will not admit his knowledge or intentions, the district court may find the requisite calculation or intent existed based on circumstantial evidence and reasonable inferences drawn from the facts."

Here -- so, I mean, the court is not saying his intent's irrelevant.  They're saying, what did he intend to accomplish?  And here he stated what he intended to accomplish. He stated it to the ISIS chat room.  He stated it to the UCE.

I won't go over those statements again.

But that's what the court -- what the Eleventh Circuit says we are to look at to determine whether it was calculated to retaliate against government conduct. And he explicitly stated that it was.

Your Honor, I just have one point to make about *Suarez* briefly. And while, yes, as Mr. Sigler said, it doesn't directly address this question, but one thing that the *Suarez* court did say was they talk about the fact that there was an attempt. This is at Headnote 14 in the Westlaw -- well, I guess it's the version we're all looking at, so it's on page 7 at the bottom of the left-hand column.

It says, "Section 2M6.1 addresses the attempted use of dangerous materials and the intent to enter the United States or to aid a foreign nation or a foreign terrorist organization."

And then it states, "Section 3A1.4 enhances the sentence for an offense that involved or is intended to promote a federal crime of terrorism," and it describes what that is.

And then the Eleventh Circuit stated, "These are conceptually distinct considerations that account for different harms. It is irrelevant that these adjustments will often be triggered by the same conduct. Indeed, Congress and the Sentencing Commission intended the terrorism enhancement to apply to *Suarez*'s crime."

And I think this is -- this does at least inferentially support that the fact that it's an attempt crime is no bar to the terrorism enhancement being applied because the Eleventh Circuit says Congress and the Sentencing Commission applied -- intended for the terrorism enhancement to be applied here, right after acknowledging that it is -- that in *Suarez*'s case it was an attempted crime.

And of course, as Mr. Sigler noted, it involved, similarly to here, an inert -- an inert bomb.  Here we've got an inert recipe.

Those are my points, Your Honor.

THE COURT:  That was the one that was supposed to be buried in the sand.

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Yeah.  Okay.

Anything else?

MS. TAYLOR:  No, Your Honor.

MR. LEOMBRUNO:  (Shakes head from side to side.)

THE COURT:  I adopt the undisputed factual statements contained in the presentence report and the guideline calculations contained in that report.

As to the controverted factual statements and the guidelines and whether or not that enhancement should apply in this case with respect to *Ramirez* and making the calculation, I think the facts that we have recited, particularly as noted by

the probation officer and also found in the essential elements when the defendant pled guilty and admitted the elements of the offense and the factual basis contained in the plea agreement, plus all of the evidence that supported what went on during the period that we're speaking of -- and that is from December of 2018 through November 15th of 2019 -- that the calculation requirement under *Ramirez* has been met by the Government.

I'm going to overrule the objections and adopt the position that the probation officer has stated in the addendum and what I have read into the record and found here today.

So I determine that the advisory guidelines are as follows:  The total offense level is a 37.  The criminal history category is a VI.  I believe the guideline range far exceeds the statutory maximum of the statute that the defendant has been convicted of, which is 240 months, two years -- I mean, 20 years.  So the guideline calculation would have to be 240 months' imprisonment.

With respect to supervised release, the statute provides up to life.  There's no restitution.  The fine range is 40 to 200,000, and there's a $100 special assessment.

Does anybody know of any reason why we should not now proceed with the imposition of sentence?

Anything from the Government?

MS. TAYLOR:  No, Your Honor.

THE COURT:  Anything --

MS. TAYLOR:  I'm ready to go forward with our argument.

THE COURT:  -- from the defendant?

MR. LEOMBRUNO:  Just arguments and --

THE COURT:  Yes, and you have -- your client wants to make a statement, and also you said you had one witness?

MR. LEOMBRUNO:  Correct, and then just arguments about the 3553.

THE COURT:  Yeah.  That's the most important part of today.

MR. LEOMBRUNO:  Well, a couple things, Judge.  In our sentencing memorandum, as noted in the -- or I'm sorry.  In our objection to the PSR, you know, the probation office has identified a couple different things regarding my client's mental health that may provide a basis for departure. Obviously those things still have to be discussed --

THE COURT:  Right.

MR. LEOMBRUNO:  -- but I think we can do those things in the context of the argument.

THE COURT:  Sure.

MR. LEOMBRUNO:  Yeah.

THE COURT:  Go ahead.  Do you want to -- do you want to start?

MR. LEOMBRUNO:  I can, Judge, if we're -- if we're at that point.

Judge, I think before we do the argument, though, I --

THE COURT:  Yeah.  You want -- you want me to hear from your client and also the other witnesses?

MR. LEOMBRUNO:  Yeah.  I think it makes sense to start with Dr. Bloomfield, if the Court would be willing to take his testimony now.

THE COURT:  If you want to put him on.  I've read the report.  I'll listen to whatever he has to say.

MR. LEOMBRUNO:  Yes, sir.

THE COURT:  I understand what he said.

MR. LEOMBRUNO:  I think he's got some additional commentary, then, that would help.

THE COURT:  Okay.

COURTROOM DEPUTY:  Dr. Bloomfield, are you there?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Please raise your right hand.

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Do you solemnly swear that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

COURTROOM DEPUTY:  Please state your name and spell your last name for the record.

THE WITNESS:  Stephen I. Bloomfield,

B-l-o-o-m-f-i-e-l-d.

MR. LEOMBRUNO:  And, Judge, before I begin my questioning of Dr. Bloomfield, I don't know that there's a dispute with regard to his expertise.  There may obviously be questions, argument about his specific opinion, but --

THE COURT:  I don't know.  I'll ask the Government.  They sure use him enough.

MS. TAYLOR:  Your Honor, Mr. Leombruno was not speculating there.  He did ask me beforehand, and I told him that we would not object to Dr. Bloomfield --

THE COURT:  Okay.

MS. TAYLOR:  -- being recognized --

THE COURT:  So we'll let him testify as an expert?

MS. TAYLOR:  Yes, Your Honor.

MR. LEOMBRUNO:  Thank you, Your Honor.

THE COURT:  Let me just ask you this one question too.

MR. LEOMBRUNO:  Yes, sir.

THE COURT:  All of this material that his mother sent to the Court, do you want that included in the presentence report so the Bureau of Prisons gets ahold of it, or I could have the probation officer not include it in the report but send it to them, or you don't want any of that in there?

MR. LEOMBRUNO:  If I can just confer with my client briefly.

THE COURT:  Sure.

(Pause in proceedings.)

MR. LEOMBRUNO:  Judge, I think our position is that it doesn't need to be included anywhere.

THE COURT:  Okay.  Good enough, then.

MR. LEOMBRUNO:  May I proceed, Your Honor?

THE COURT:  Uh-huh.

DR. STEPHEN BLOOMFIELD, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LEOMBRUNO:

Q.    Dr. Bloomfield, can you hear me okay?

A.    I can.  Can you hear me good -- well?

Q.    Yes, I can.

Good morning, sir.

A.    Good morning.

Q.    Obviously you're here to provide information and opinion about some interactions and evaluations that you've done with Mr. Langhorne.

Just so you're aware, the Court has had the benefit of reviewing your report so they're aware of your general opinion, but I have specific questions regarding your -- your interactions and ultimately what you think about him.

Could you just briefly tell the Court how many times you had the opportunity to meet with Mr. Langhorne?

A.    Yes.  I met with Mr. Langhorne twice, on 4/8 and 4/15, for

about an hour and a half each time.  He was at the Bradford County Jail, who, just parenthetically, were very cooperative in setting up a Zoom evaluation remotely.

I do Zoom evaluations throughout the state.  I have to say that Bradford County Jail was one of the most cooperative and facilitative jails, for a small jail, that I've worked with.  So I just wanted to get that on the record, because they were great.

Q.   And during your interactions with Mr. Langhorne, were you able to develop an opinion about his mental health and how his mental health conditions may have affected his conduct in this case?

A.   I did.  Mr. Langhorne is somewhat complex.  There's previous evaluations.  I think I can -- if you want me to, I think I can summarize what I -- my thoughts in a fairly consistent, logical manner fairly quickly.

Would you like me to just do that?

Q.   That's fine with me.

MR. LEOMBRUNO:  If that's okay with the Court --

THE COURT:  That's fine.

MR. LEOMBRUNO:  -- in the interests of time.

BY MR. LEOMBRUNO:

Q.   Go ahead, Doctor.

A.   So I concur with the other evaluators that I think Mr. Langhorne is competent to proceed.  I don't think that the

issue of sanity at the time of the offense is something that should be taken into account.

During the course of my interview, he was interactive.  He was cooperative.  His mental status and mental control were within normal limits.  He didn't -- wasn't responding to internal stimuli, not hearing voices, not delusional.

The PSI, as well as several other places, have discussed his mental health and listed a host of possible disorders, including oppositional defiant disorder, paranoid schizophrenia, schizoaffective disorder, attention deficit disorder, bipolar disorder, depression, and anxiety.

In my opinion, there are too many diagnoses, and it was Medusa's head kind of thing.  People were seeing him at a particular time.  And, as clinicians, even forensic clinicians, when we see people at a particular time, we see a certain range of behaviors.

He exhibited no behaviors in my interaction with him that would indicate schizophrenia or a schizoaffective disorder.  As a matter of fact, the diagnosis came from a program that also stated clearly in their examination report that he showed no hallucinations or delusions.  So I -- I -- it's hard for me to see how schizophrenia was a factor, or schizoaffective disorder.

I also reviewed Dr. Demery's report, who described

him as having odd behaviors, which I agree with, and there are some neuropsychological evaluations.

So I think, from a mental health perspective, he suffers from probably ADHD.  And I would place him on the autism spectrum disorder and most likely, because of his age, as an adult, Asperger's syndrome, which is part of the autism spectrum disorder.  It's not -- it's not a cause for consideration of sanity at the time of the offense, but it's certainly an impairing factor.

And I can go on to, depending on how you want to proceed, explaining Asperger's and how it might have impacted his behavior and his responses during the offense that's -- but that's kind of a summary of my work and where I was at with -- with him directly, as well as reviewing whatever medical and mental health records we had.

Q.   And just for clarification, in your report you list the quite voluminous amount of documents that you reviewed prior and subsequent to your evaluation of Mr. Langhorne; is that accurate?

A.   Yes.

Q.   Okay.  And within those -- within those materials, it also included portions of exchanges between Mr. Langhorne and other individuals that were part of the Government's response to the PSR, the presentence report objections?

A.   Yes.

Q.   So you've had a chance not only to interact with Mr. Langhorne but observe, by way of reading that documentation, how he interacted with other people, specifically individuals in this case.

A.   Yes.

Q.   Okay.  So you had mentioned Asperger's and him falling somewhere on the autism spectrum disorder, in your opinion.

I want to ask you a little bit more, and you were alluding to this, about that particular syndrome, and let's just start with it being general in nature.

Could you kind of update the Court or provide some information to the Court as to how somebody with Asperger's would, you know, show symptoms or characteristics of that syndrome?

A.   Sure.  Asperger's, it is -- it still remains an underdiagnosed condition because of basically a clinical unfamiliarity with the adult presentation, but we're seeing more and more of it.

And we see presentation of Asperger's often in forensic cases, whether they're family or personal injury or criminal settings.  There are unique features of Asperger's that heighten people's risk for engaging in criminal behavior.

There's the theory of the mind deficits and a predilection for intense narrow interests, coupled with deficient social awareness, interpersonal skills, and ability

to read other people.

It's very important for me, as a forensic evaluator, to caution that Asperger's provides risk factors, and there's -- I don't want to be -- I don't want to say that Asperger's/autism spectrum disorder is a direct link to terrorism or terrorist activities.

However, there are specific risk factors that could increase the risk of offending among people with Asperger's. The way they fantasize, their obsessiveness and the compulsiveness, the need for routine and predictability, social and communication difficulties all increase the vulnerability of a person with Asperger's for going down the route towards criminal behavior, in this case terrorism.

There's an internal searching of what we call a need to matter.  They want to make -- they want to matter in the world, and they want to have social connection.

And the problem is, particularly in this case, the social connection came from chat rooms and list serves and talking with someone who he talked about making videos.  And at the same time he's alienated and socially isolated from real people, but he -- so he lives in a virtual world.

They need -- often people with Asperger's are drawn into increasingly more involved commitments.  And they favor very concrete -- although they're not -- although they're intelligent, as he is, they favor concreteness.  So they can be

drawn into fundamentalist beliefs, whether it's ISIS or some other issues that we see currently.

And they tend to hyperfocus on their fascinations and interests at the expense of really making attachments with real live people.  So they become, either knowingly or unknowingly, a primary target for recruitment, training, and involvement in both criminal -- sometimes criminal activity, sometimes terrorist activity.

The big issues in Asperger's are the underdevelopment of social skills, difficulty with nonverbal behavior, fixation on rituals and routines, and a limited range of interests, somewhat erratic behavior, self-absorption because they don't interact with people, unusual communication styles, which we definitely see with Mr. Langhorne.

So he substitutes his involvement -- and I'm certainly not justifying the actions, but he substitutes his involvement because there's no social contact.  He's isolated, and he's withdrawn, and he's maybe erratic or eccentric in his thought processes.  Not psychotic, but not able to understand clearly what's going on around him.

But it serves a need, the hierarchical need in terms of affiliation and social esteem and feeling wanted and feeling like he matters in a world where he hasn't felt like he matters.  So without going into a several-hour-long explanation of Asperger's, I think that's the general issue.

So the way I see it is some of his previous diagnoses fall under what could be called the autism spectrum disorder, and some also fall into the -- the way he self -- the way he self -- portrayed himself and got involved in this.

So I'm not talking about the legal issues. I'm talking about the clinical issues, and I see the Asperger's as playing a part. He certainly hasn't been treated for it. He's getting medication treatment, which is effective because it reduces his anxiety and reduces his depression. Never seen the signs of psychosis in him, either in any formal document or in my interactions with him.

And that's basically how I see him and how it exacerbated the situation and played a role in -- or risk factor in his involvement.

Q.    So let me ask you this follow-up, Dr. Bloomfield. You mentioned earlier on, when you were talking about kind of a drive, that people like Mr. Langhorne or people that may have Asperger's have a, quote, "need to matter" --

A.    Yes.

Q.    -- and that a lot of what drives them is to fulfill that need. And you allude to this, obviously, in your report as well.

A minute ago you were referencing the fact that -- not legal conclusions but clinical conclusions about how he interacted or how he came to interact with certain individuals

in this case.

If you've read the exchanges between the individuals and Mr. Langhorne, do you see some scenarios in there that fit in with his diagnosis where he is -- has this need to matter, and the communications are playing into that?

A.    Yeah, I think they do play into that.  I'm not suggesting that federal authorities knew that he had the Asperger's or knew that they could do that.  But he responded in a way, you know, that made him feel important, self-important.  And as long as he kept feeling self-important, he would go down this rabbit hole and continue.

So the need to feel like he matters, in his particular case, turned out, you know, to be an asocial problematic mattering.

We see it a lot in adolescents.  We see it in kids who'd rather be -- in school who are not too smart, and they'd rather be seen as -- as bad instead of, you know, being called dumb or something like that.

So people with Asperger's, because of their social interactions or lack of social cues, get pushed aside and sometimes made fun of.  Sometimes not, but they get pushed aside, and they don't feel like they're very important and they don't matter.

So when someone pays attention to them and, you know, provides reinforcing statements and comments, they -- they

continue -- they become more and more attached to the activities and to the people.

And so I'm not suggesting that federal agents or federal authorities said, "Oh, this guy has Asperger's. We're going to -- we're going to take advantage of him." No, I'm not saying that. But it fits -- but it fits how he perceives the world, not necessarily how they perceive the world.

So he perceives the world as people are paying attention to him. They're rewarding him. They're thinking he has something, you know, to offer, even though it's a -- even though he will acknowledge that it's something negative to offer, but he has something to offer.

And so he starts feeling better about himself, feels good about himself, and it reinforces him, gives him some esteem, gives him a feeling of self-actualization. And it gives him a feeling of social connectedness, which he doesn't have because most of his social connectedness is virtual and online.

Q.   So if he was -- if he was being engaged or if he was having conversations with somebody, and that individual was telling him, you know, "You're the expert," or, "You're so smart," "You have a lot of information to give," "You know, that's a great point," things of that nature, given the fact that you think, in your opinion, he has Asperger's, does that heighten his response or heighten his desire to continue in

those communications?

A.   Yeah, it reinforces him.  I mean, we talk about -- in psychology we talk about two paradoxical factors, reinforcement and extinction.  So telling someone those things reinforces them.  Not everybody, but somebody who has low self-esteem and who has low social contact, is socially withdrawing, and wants to feel good about themselves, you tell them good things about themselves, and they're going to feel good about themselves.

So, you know, he -- unfortunately this had to do with a, you know, bad circumstance.  But certainly it's a reinforcing -- he feels reinforced by it.  His perception is, "Okay.  Well, I guess I matter.  I guess I'm good.  I guess I can -- I can do something.  I guess I'm important.  People are taking me seriously."

Q.   You indicated that -- again, that -- in your opinion, that Mr. Langhorne likely has Asperger's syndrome, and you talked about the characteristics of that.

One thing that you mentioned when you were discussing the general characteristics is a hyperfocus on interests.

A.   Say that again?

Q.   You indicated that one of the characteristics is a hyperfocus on certain interests.

A.   Yes.

Q.   I guess the question I have for you is, is if somebody has Asperger's, are they likely to become hyperfocused on

something, regardless of what it is?

A.    Something, yeah.  Yes, something.  They become -- they read.  They search the Internet.  They Google.  They get literature.  They try and become as expertise -- as expert as they can, even if it's a false expertise.  So they -- they become focused on what they're getting rewarded for, and they exclude everything else.  So those -- those are the behaviors they engage in.

It's not a full life.  There is treatment.  There's certainly treatment, which he never got.  But he never got diagnosed with it, so you can't fault someone for not providing treatment if they didn't know what the disorder was.

Q.    Let me ask --

A.    But there is treatment available --

Q.    Let me -- let me --

A.    -- for Asperger's.

Q.    -- interject there and ask you a question.

You mentioned he was not diagnosed with this before.

Could you kind of explain to the Court how that may have occurred, as to why you're making this diagnosis now versus when other individuals that may have seen him and, you know, provided diagnoses of schizoaffective disorder, schizophrenia, those things, why they may have not specifically diagnosed him as being on the spectrum?

A.    Sure.  First of all, it's an underdiagnosed disorder.

We're learning more and more about it.  People really have to keep up with it.  Sometimes clinicians don't.

But, you know, the process of diagnosis -- a very smart mentor once explained to me that diagnosing somebody is like looking at Medusa's head with all the snakes.

So you go in to one person, and they look at the anxiety snake, and they say, "Ah, he has anxiety."  And you go to another person, and they look at the trauma snake, and he goes, "Oh, he has trauma."  And so each of these -- each of these snakes get coordinated.  So it's unusual, then, for someone to take all of this information and look at it.

So when I do an evaluation, I -- first of all, I'm more objective.  I'm not interested in treating him, so I don't want to find a diagnosis like anxiety or depression or schizophrenia that I can then treat, because that's one of the main purposes of diagnosis.

I want to find, as a forensic psychologist, an explanation for behavior, so I look at everything.  So when I look at the continuity of care, evaluation where he was evaluated with schizophrenia, they state things that are counter to that evaluation.

I -- I -- they probably saw it.  They probably thought it was a reasonable diagnosis.  They never treated it.  The PSI goes on to say it was never treated there, but they -- they included it as a possibility because -- because that's

what clinicians do.  Nonforensic clinicians do that.  They give a broad range of disorders.

And then so what happens in the forensic area, you look at those disorders and say, "How does this make sense?  He can't have this, this, this, and this."  So he presented differently at different times to different people.

And so then when you look at it as a total, you try -- one tries to find out what -- what disorders encompass all of that, and in my opinion, Asperger's encompasses all of those.

It doesn't make me a better diagnostician.  It just puts me at a different place in the system where I'm looking at -- I'm looking more objectively.

And I'm not looking to what I'm going to do to provide treatment to this person, but I'm looking at how do I try and explain this guy's behavior based upon his psychological makeup or psychological disorder.

And that's -- that's my role.  That's what I do as a forensic psychologist, which is different than the clinical -- a clinical role.

Q.   So --

A.   I don't take fault with the clinicians.  They all came up with diagnoses to try and help him.  But I think overall this is a better understanding of why he acts the way he acts.

Q.   So one of the things that you started to allude to earlier

was -- was about treatment, essentially.

A.    Yeah.

Q.    So somebody with Asperger's -- I mean, I -- correct me if I'm wrong.  There's not a medication that's going to solve that issue; is that accurate?

A.    That's accurate except that often antidepressants and antianxieties are helpful because depression and anxiety go along -- sometimes, not always -- with -- with Asperger's.

        And I believe that the jail's treating him with antianxieties, antidepressants, and he does better with them so -- because it calms him down.  He doesn't feel as depressed.

        So if somebody with Asperger's is calm, they're not anxious.

Q.    So how does one --

A.    You know, anxiety disorder means you're anxious.

Q.    My apologies.  I interrupted you.

        How does one deal with this particular syndrome, then, in the context of making sure that, you know, things don't turn into negative or disruptive types of behavior?  What are the treatment options?  Is it counseling, therapy?

A.    You know, most -- it's cognitive behavioral therapy that's geared towards -- first of all, there's a med- -- there's a psychotropic medication component, antianxiety, antidepressants.

        And then there's group and individual training that

you go through each of these disorders and work with the person in psychoeducation and reward scenarios where they can figure out how to get rewarded for prosocial behavior.

Not everybody with Asperger's engages in asocial behavior.  I want to be clear about that, so -- but if someone does, so the rehabilitation aspect of it is -- the rehabilitation aspect is development of prosocial behaviors and the appropriate behaviors within the context of everyday living, adult daily living.

And that's done through talk counseling, but it also is done through medication, and lastly it's done -- one of the problems -- I don't want to get into disposition issues, but one of the problems with somebody with Asperger's going to a -- look, the federal system has a wonderful program.  It's called Butner.  It's probably one of the best treatment programs in the United States for multiple disorders.

When I worked with U.S. Probation and Pretrial for numbers of years, I actually visited Butner to evaluate somebody.  But it's one of the best treatment facilities in the country for all the -- all kinds of disorders.

So you want to take someone who has Asperger's and is vulnerable to following negative people, as well as following positive people, make sure that they're in a setting where they can receive the prosocial development and not be exposed to asocial development.

So you don't -- so, you know, if -- from a clinical perspective -- I'm not trying to impinge on the legal perspective, but from a clinical perspective, you know, involvement in a therapy program like Butner, where he could get meds for both anxiety/depression, and where he could also get group therapy and individual therapy to deal with the issues is -- is the best rehabilitative disposition.

I know there are issues of punishment and deterrence and -- but the rehabilitative side is definitely accomplished in that kind of setting, and I think it's a great setting.

MR. LEOMBRUNO:  Thank you, Dr. Bloomfield.  I don't have any additional questions at this time, but the Government might.

THE WITNESS:  Okay.

THE COURT:  Cross?

CROSS-EXAMINATION

BY MS. TAYLOR:

Q.   Dr. Bloomfield, did you give any sorts of particular tests or inventories to Mr. Langhorne that led to your diagnosis of ADHD and Asperger's?

A.   No.  The ADHD is by history.  I didn't diagnose him.  I just said that he had ADHD because numerous people have diagnosed him with that, so I did no testing around that.

And Asperger's is typically diagnosed by observation, interaction, and review of records.  There's really no test.

996

94

Q.    And one thing I noted was in the PSR it talked about antisocial personality disorder as being one of the diagnoses Mr. Langhorne represented to have.  Is that -- and that was not addressed in your report.

Was there a reason why that wasn't addressed in your report or your testimony?

A.    Because I didn't see it anyplace.  I think he just told the writer that he had antisocial personality disorder.

But I don't think he understands what that is.  And I -- it's -- I've evaluated so many people in the legal system in the years that somebody mentions it to them, so they say it, when what they really mean is that they're asocial.

That means -- so there's a difference between antisocial personality and asocial personality.  Antisocial personality people engage in extensive criminal behavior, and they have impairments because of it.

Asocial behavior is the social isolation, the withdrawal, and the staying by himself and not -- not interacting with people, not understanding cues.  And so often people get told, "Well, you're asocial," and they take it to mean antisocial.

So I didn't mention it because it was mentioned in the PSR, but I didn't see it in any -- I didn't see a clinical -- I didn't see anybody clinically diagnose him with it, and I don't think he has it.  So -- but nonetheless, he --

I think what -- this is recall, which may not be the best at this time.

In the PSR -- the PSI or PSR said that he reported that he had it, and so it's -- you know, it's self-reported, the diagnosis. And it has all its own issues with it, but -- that's why I didn't mention it, and I don't think it's accurate.

Q.    And in your review you saw that Mr. Langhorne had been an adherent of ISIS since at least 2014, correct?

A.    Could you -- yeah. Could you -- I missed one word in there. I'm sorry. But I -- that he -- yes, since 2014.

Q.    That he's been a follower of ISIS since at least 2014?

A.    That's what the -- some of the information I read said, yes.

Q.    And through that time period from 2014 through at least the end of 2019 -- I mean, you read the communications in the chat -- right? -- the NokiaX chat that was attached to the PSR?

A.    Yes.

Q.    And you saw where he talked about how he has a personal philosophy -- and I'm paraphrasing here, but that his personal philosophy is that it's not justified to kill women, children, and civilians, but he preferred to target, with his terroristic acts, people in the government, people in the military who had acted against -- acted against the Islamic world and things like that.

Did you see that in the chats?

A.    I seem to recall it.  Again, I'm -- this is just recall at this point.  Yeah.

Q.    And does that not strike you as antisocial?

A.    Antisocial is acting-out behavior, not thoughts, not opinions, not perceptions, not attitudes.  If he went out and did all of that continuously for five years, then I would reconsider --

Q.    Is it normal to have --

A.    -- the --

Q.    Is it normal to have --

A.    You know, if --

Q.    I apologize.  I didn't mean to interrupt you.

A.    That's all right.  I'm used to it.

Q.    Is it normal or typical for people to have and express those sorts of thoughts about causing harm to particular groups of people?

A.    I don't know the answer totally to that question, but he's not normal.  He has Asperger's, and he falls on the autism spectrum disorder continuum.  So normal is a funny word.

Q.    Okay.  Well, let's --

A.    He has impairments, and he has a disorder, and so his thinking is distorted.

Q.    What about -- let's just talk just about people who have Asperger's or are on the autism spectrum.

Is it typical for them to spend a lot of time ideating about how to maim and kill other human beings?

A.   No.

Q.   Okay.  How many of -- or proportionally, do you know how many people with autism or Asperger's end up adopting an Islamic extremist ideology?

A.   No.  But there is -- but I did read -- have read that there was -- it was inconclusive.  The United Kingdom did some research on people with Asperger's being targeted for recruitment.  That's not the same kind of thing that happened here, but being recruited by Islamic organizations.

So the research thought that they were going to -- that they could show that people with Asperger's were easily -- more eas- -- easier to target for recruitment, and they -- they had some tentative -- tentative findings.

But it was the only study that I ever found, and I found it way before this.  But it was the only study that I have seen that said that, and no one's picked it up since then.  And I'm not a researcher, so I -- I don't know why no one's picked it up.

But you're -- it's a good question that you ask, because it has -- it has -- it obviously has significance both legally and clinically.

But -- so a couple of researchers at a university in United Kingdom thought it was reasonable to look at it because

they had a number of people who were recruited and then prosecuted and then found to have Asperger's.  So they thought there was a high enough number, which I think -- you know, I don't remember what the number was but enough to trigger some research, but it was inconclusive.

Q.   And I believe that you testified on direct that you felt that autism spectrum disorders were underdiagnosed in society; is that correct?

A.   Underdiagnosed in adults, yes.

Q.   And approximately what portion of the population would you -- would you estimate should have a diagnosis of some level of autism spectrum disorder?

A.   I -- I don't know.  I don't have -- I don't have that number readily at hand.

Q.   Is it less than 50 percent?

A.   I don't know.  I really have no -- I can't give you -- I'd be making it up.  I have no basis, scientific basis.  I assure you there's a number, but I don't have it.  I'm sure the DSN has the number --

Q.   And you don't --

A.   -- but I don't have it readily at hand, and I didn't look it up.

Q.   And you also don't know what portion of people who are diagnosed with autism spectrum disorders end up adopting an Islamic extremist ideology?

A.    Well, I -- right.  I don't --

Q.    Okay.

A.    -- of course.  I'm sure it's --

Q.    Because they could also --

A.    I'm sure it's a --

Q.    They could also be like --

A.    -- small percentage because I'm sure that -- I'm sorry.

Q.    They could --

A.    I believe we're both talking.  I'll stop.

Q.    They could also have an unusual interest in, like, french fries or something, right?

A.    I wouldn't trivialize it like that, no.

Q.    I mean, I know someone who did, so I'm not trying to trivialize it.

      But what I'm saying is --

A.    Okay.

Q.    -- that there are -- there are other -- other focuses of sort of obsessive thinking that are not harmful.  Is that fair to say?

A.    Absolutely, yes.

Q.    Okay.  So it's not inevitable that somebody who's on the autism spectrum is going to adopt or choose or be -- however they end up with their particular area of unusual interest, it's not inevitably going to be something that is -- involves --

A.    No, and I agree with you totally.  And I think I said it a couple of times, that it's -- you know, there's no direct link between Asperger's and criminal behavior, Asperger's and terrorism, or -- there's no -- there's risk factors, which I laid out earlier when Mr. Leombruno asked me some questions about it.

And what I -- and I said specifically there's no -- there's no definitive link between Asperger's and terrorism, but there are risk factors that they fall prey to.

So yes, so what you're saying is accurate.  Most people with Asperger's don't engage in terrorism, I would imagine, because the large -- because the number of people who engage in terrorism is probably, you know, a small percentage of the population in general.

But I would never label -- I would never suggest that people with ASD or Asperger's are likely to become terrorists or engage in terrorist or criminal activity.

There are risk factors, which I specifically laid out in direct examination and tried to make your point that there's no direct link -- I said it.  It's not an -- it's not an insanity defense.  There's no direct link between the behavior and the criminal activity that can -- that is substantive.

But it exists, and it impacts his thought process, his thinking, his interactions, and how he does something.  And that's just what I'm trying to present, is what in his mental

health makeup factored into these behaviors.

Q.   And did you discuss with Mr. Langhorne how he became radicalized, whether somebody recruited him into this extremist thinking or whether he self-radicalized?

A.   I actually didn't, no.

Q.   So you don't know whether somebody recruited him or targeted him due to -- due to what you view as a potential predisposition?

A.   That's correct.  I don't.

Q.   And -- and you stated, I believe, in your report that he expressed remorse; is that correct?

A.   He's what?

Q.   He expressed remorse?

A.   Oh, expressed remorse.  Yeah.  I'm sorry.  I'm a little hard of hearing.

Q.   How did he do that?

A.   Yeah, he expressed remorse for what he did.  He said he was -- he shouldn't have done it.  It wasn't a good thing to do, and he got caught up in it.

Q.   Did you discuss with Mr. Langhorne whether he still is a follower of ISIS or any other Islamic extremist ideology?

A.   I didn't, no.

Q.   Do you feel that that would be relevant to his risk of reoffending?

A.   Do I feel that -- risk of reoffending.

I don't know.  I didn't ask.  I guess -- I guess I didn't, but maybe it is.

Q.   Well --

A.   I don't know.

Q.   -- I'm asking --

A.   I --

Q.   -- just a more --

A.   I just don't know.

Q.   -- general question.

Would the fact -- whether he continues to believe in Islamic extremist ideology or whether he's now rejected it, do you feel that that is pertinent to whether he is a risk of reoffending?

A.   I think what's pertinent in terms of his reoffending is treatment for his disorder so that he could make clear decisions.

He hasn't had treatment for the disorder, so his thought process -- although not psychotic, his thought process is still impaired and that there needs to be, in addition to the psychotropics that he's getting, individual and group treatment so he could discuss these issues and sort out what makes sense and what doesn't make sense.

I don't know.  I think there are people who have, you know, beliefs, Muslim beliefs, that are not members of ISIS --

Q.   Right.

A.    -- but I --

Q.    And that's -- that's not what I'm talking about.

A.    So that's what I think.

Q.    I'm --

A.    I think that -- I think the -- I think the treatment issue is the issue, not what he currently thinks, necessarily.

Q.    And I'm not asking you whether he's still a Muslim or not. What I'm asking is whether it would be pertinent if he continues to -- to believe in extremist ideology.

A.    Sure.

Q.    Okay.  And you talked a little bit as well about the need to fit in as being sort of a risk factor for people who are on the autism spectrum, correct?

A.    Yes.

Q.    And when you were reviewing the chats between Mr. Langhorne and the undercover, I assume that you saw -- it starts on about page 15 -- where Mr. Langhorne repeatedly tells the undercover essentially, "We're not going to ask any" -- "We're not going to know each other's names or what each other do or anything like that," right?

A.    I recall that, yeah.

Q.    So he was not trying to make a connection on a personal level with the UCE.  Is that fair to say?

A.    No, because he can't make connections on a personal level with individual people because he has Asperger's.  If he could,

he'd probably say, "Let's go out for a coffee," or, "Why don't you come visit me," or, "Why don't we have a smoke together."

But he says, "I don't want to know you.  I don't want to know you because that freaks me out too much, to know you."

Q.   So --

A.   Now, you could also interpret it that it was some, you know, ploy, but I don't know.  From a clinical perspective, that's what makes sense to me.

From a legal perspective, there may be other answers that people could come up with that have validity.  But he doesn't want friends.  He wants to be treated well.  He doesn't know how to have friends.  He doesn't know social interaction, social context.

And he has underdeveloped social skills, and he has tremendous problems expressing feelings, emotions, and connections.  So I think -- you know, I take that as a symptom of his disorder.  So it could be taken another way, but that's how I take it.

Q.   I have in my notes from your direct that your testimony was that because of his being on the autism spectrum, that he has an increased need for connection and to matter to other people.

A.   That he has a need for it, but he doesn't have the ability to do it.  He --

Q.   So how does he express --

A.    He needs --

Q.    -- that need and how does it --

A.    He needs --

Q.    -- impact on --

A.    He's limited -- I'm sorry.  What?

Q.    Then how is he -- how is he expressing that need, and how is it being met here?

A.    It's not being -- it's -- what's being met is people -- that he feels like he matters, like he's important.  The social impairment needs -- needs treatment.  He doesn't know how to react to all of that.  He doesn't know what that means.  He doesn't know how to develop that, and uh -- uh ...

        MS. TAYLOR:  I don't have any other questions, Your Honor.

        THE COURT:  Redirect?

        MR. LEOMBRUNO:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. LEOMBRUNO:

Q.    Dr. Bloomfield, I think some of the questions we're asking, why would somebody not try to befriend or make a more personal connection with people that they're seeking affirmation from or people that are making them more -- feel more important, as you've opined in this case?  Can you --

A.    He doesn't have --

Q.    -- correlate those?

A.    -- the skills to do it.

Q.    I'm sorry?

A.    He doesn't have the skills to do it.  He'd like to be able to do it, but he doesn't have the skills to do it.

Q.    So when you were questioned on cross-examination about, you know, him interacting with other people to gain a feeling of importance, again, those are characteristics that you see in Asperger's syndrome.

A.    I didn't say that he does it to get that way.  I'm saying that when it happens, it affirms or reinforces what -- what he does, and it reinforces continuous behavior.

He doesn't start to seek out -- "I'm going to go seek out affirmation from this person."  It happens, and he feels good about it.  You know, he feels good.  He feels like he matters, so he continues doing stuff that makes him feel good.

He doesn't have the skills to develop social -- if he had the skills to develop social interaction, he might never -- maybe never would be here.  Maybe.  I don't know.

But -- so you can't -- you can't try and -- you can't try to make someone with a disorder behave as if they don't have a disorder.  That's why they have a disorder, because there are impairments.  That's the definition of a disorder.

So to say that he should have been social and made contact with the undercover agents, yeah, sure, he should have.  But if he could have, then he wouldn't have had this disorder,

wouldn't have had these impairments.

So you're asking him to do something he can't do. Logically, does it -- common sense, yeah, it makes a lot of sense. "A guy's talking to me. He's treating me nice. He's helping me. He's encouraging me. Maybe I'll become his buddy. Maybe I'll become his friend. Maybe we'll have a tea together or a coffee together." But he doesn't have those skills, so it's all internal for him.

And he has an internal life, and it gets reinforced that he matters now. Something matters and he's being treated as if something matters.

Q.   So in --  in your --

A.   You know, I'd like to tell you that, yeah, it makes a lot of sense, and he should have become friends with this guy, but that's not the way it goes.

Q.   So in your opinion, do forums like the Internet, with its anonymity or potential for anonymity, provide essentially a ripe environment for these types of encounters to occur?

A.   Yes.

Q.   You were asked on cross-examination about the term "rehabilitation."

Now, I did not ask you anything about rehabilitation on direct examination. I think my questions were about treatment for this underlying condition, for Asperger's.

A.   Yes.

Q.    And to be clear, you are not making an opinion or you have
not made an opinion that there's rehabilitation -- or you're
not opining about rehabilitation in the context of, you know,
turning away from Islam or radical ideas.  Is that --

A.    Oh, no, no, no.  I'm talking about clinical
rehabilitation.

Q.    Okay.

A.    Treatment is rehabilitation.  Those are synonymous words
in the treatment world --

Q.    Okay.

A.    -- treatment, rehabilitation, recovery.  It has nothing to
do with Islam or ISIS.

Q.    Okay.

A.    It has to do with his disorder.

      And then -- and then you would think without the
disorder, none of these other negative things would happen.

Q.    And you indicated that although there is no medical in the
terms of medication, you know, to treat Asperger's, that it can
help with other related symptoms.  You mentioned
anxiety/depression, I think, if I recall.

A.    Yes.

Q.    Those are things that --

A.    I mentioned specifically anxiety and depression, because
feeling the way he feels in the world, most people are going to
feel anxious.  Now, he doesn't know how to interpret anxiety

because he doesn't know how to express his feelings, so it becomes a moot point.

And so the temporary use of antianxieties and antidepressants to ameliorate his emotional basis is very -- will be very helpful in the treatment, the individual and group treatment, down the road.

Q.   And from -- from your understanding, from what you've reviewed and your interactions with Mr. Langhorne, for the past two years and seven-some months of incarceration, he has been receiving medical treatment for those other related issues.

A.   Yes.  Yeah.

Q.   Okay.

A.   And it's helped him.  He's -- he can communicate.  He understands more what's going on.  He has a better sense of the world.  It still doesn't -- it doesn't cure the Asperger's, but it takes care of the comorbid situations that occur with the Asperger's.

And that's -- you have to get through -- you have to get -- one has to get through the anxiety and depression to be able to then benefit from the -- what I call rehabilitation; you can call it treatment -- of the -- the process, the cognitive behavioral process, of understanding himself, understanding how he -- better ways of reacting, how -- how certain circumstances -- hypothetical situations would create this kind of reaction versus this negative kind of reaction,

and those kinds of things.

Q.    And I wonder if you could comment on any thoughts you have with regard to prolonged incarceration in the context of treatment for Asperger's.

A.    My -- my fear about incarceration in a -- in a prison is that, you know, he's -- because he has not received the treatment yet, he'll be more vulnerable to negative -- we see that he was vulnerable -- I think we saw that he was vulnerable to what appeared to be negative forces.

He'll be more vulnerable to negative forces.  He'll be targeted.  You've got to -- you have -- so instead of having an undercover agent, you now have psychopaths, antisocial people, and people who are looking for people to groom into victimization.  And so he's an ideal candidate for all of that prison stuff.

It depends on what level of prison.  I'm somewhat familiar with the federal system, having worked with probation and pretrial.  So, you know, camp is better than a medium. It's certainly better than a max.  But -- and so I don't know where he would go, but, you know, being placed in a -- so prolonged -- he's likely to become reinforced to really bad stuff.

MR. LEOMBRUNO:  Thank you, Dr. Bloomfield.  I don't have anything further.

THE WITNESS:  Thank you.

THE COURT:  Anything else?

MS. TAYLOR:  I have nothing else, Your Honor.

THE COURT:  Okay.  Thank you.

Call your next witness.

THE WITNESS:  Am I excused, Judge Schlesinger?

THE COURT:  As far as I'm concerned.

THE WITNESS:  Okay.

THE COURT:  Thank you.

THE WITNESS:  Thank you.  Appreciate it.  I'm going to hang up.

MR. LEOMBRUNO:  Judge, I have a very short witness, Denise Sandberg.

THE COURT:  Take as long as you want.  We have the whole day.

MR. LEOMBRUNO:  I appreciate that, Judge, but nonetheless, this witness will not be lengthy.

So Denise Sandberg, who's a family friend, she's present in the courtroom, if I could have her come up.

Ma'am, could you introduce yourself to the Court, please?

MS. SANDBERG:  My name is Denise Sandberg.

MR. LEOMBRUNO:  Okay.  And, Ms. Sandberg, where do you currently live?

MS. SANDBERG:  St. Augustine.

MR. LEOMBRUNO:  Okay.  And you've been called

today -- or I should say you volunteered to come speak about Mr. Langhorne and on his behalf to Judge Schlesinger.

Could you briefly describe for the Court how you know Mr. Langhorne.

MS. SANDBERG:  He was introduced to me through a friend of my son.

MR. LEOMBRUNO:  Okay.  And what's your relationship with him like?  Describe that to the Court.

MS. SANDBERG:  Friends, mom, substitute mom maybe. Give him rides, have him over for dinner.

MR. LEOMBRUNO:  Okay.  And this is mainly when he was residing in Florida?

MS. SANDBERG:  Yes, uh-huh.

MR. LEOMBRUNO:  Okay.  And he's obviously from, originally, another state.

MS. SANDBERG:  Virginia, yes.

MR. LEOMBRUNO:  Okay.  But you knew him when he came to Florida?

MS. SANDBERG:  Yes.  Well, he was living in New York, and he came to visit us in Florida twice.

MR. LEOMBRUNO:  Okay.  You have probably a bit of a unique perspective because you've -- well, let me ask you this.

Have you had a chance to interact with Mr. Langhorne since he's been incarcerated?

MS. SANDBERG:  Yes.

MR. LEOMBRUNO:  And describe for the Court how those interactions --

MS. TAYLOR:  Your Honor?

THE COURT:  Yes.

Just a second.

MS. TAYLOR:  I anticipated that this witness was just going to be making sort of a character statement, and it seems like we're going into factual things.  And if that -- if she's a fact witness, I would suggest that she should be on the stand and sworn.

THE COURT:  That would be fine.

Come on up.

MR. LEOMBRUNO:  Judge, and I can -- I can cut through this.  I was just trying to establish that she'd kind of experienced him beforehand and afterwards, so she could certainly -- I mean, we can swear her if we need to.

THE COURT:  Sure.  Let's do that if she's going to talk about her contact with him over a period of time.

COURTROOM DEPUTY:  Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth --

THE WITNESS:  Yes.

COURTROOM DEPUTY: -- so help you God?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Please state your name and spell

your last name for the record.

THE WITNESS:  Denise Sandberg, S-a-n-d-b-e-r-g.

MR. LEOMBRUNO:  And for efficiency, you want her on the stand?

THE COURT:  Sure.

DENISE SANDBERG, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LEOMBRUNO:

Q.   If you could just fold that paper in half and keep that.

A.   (Complies.)

Q.   Thank you.

So, Ms. Sandberg, again, in the way of questioning, obviously you talked about how you knew Mr. Langhorne before he was incarcerated.  And I was just asking you if you had the chance to interact with him since he's been incarcerated.

A.   Yes, I have.

Q.   Okay.  And primarily is that through phone conversations?

A.   Yes, video visits --

Q.   So he's --

A.   -- phone conversations.

Q.   So he's able to videoconference with you over the phone from the jail?

A.   Yes.

Q.   Okay.  How many times would you say you've conversed with him?

A.    Six times maybe.

Q.    Okay.  Could you briefly describe for the Court kind of some things that you saw in Mr. Langhorne prior to being incarcerated as far as his behavior, attitude, demeanor, things like that?

A.    Uh-huh.  He always had trouble keeping a job.  We had many discussions about that.  I have written some things, but I don't know if you just --

Q.    We'll get to that in a second.

A.    Okay.  He had trouble with friendships, making friendships, keeping friendships.

Q.    Okay.  And since you've had a chance to -- and let me ask you this.

        Were you aware of whether or not he was being treated by medication for any conditions that he may have had?

A.    I knew that he was trying to get help.  I would give him rides sometimes to a -- to a -- it was a clinic, to meet with a counselor.

Q.    Okay.  And obviously you've had a chance to, as you indicated, over the years, have some communications with Mr. Langhorne.

        How does he present to you now?

A.    Differently.

Q.    How so?

A.    I feel like he's more mature, maybe more clearheaded --

Q.    Okay.

A.    -- remorseful.

Q.    Okay.

MR. LEOMBRUNO:  Judge, those are the only questions I was going to have.  I know she prepared a statement, so I --

THE COURT:  Sure.

MR. LEOMBRUNO:  I would tender her for cross, then she can read the statement.  However the Court wants to proceed.

THE COURT:  Do you want to read the statement?

THE WITNESS:  Yes, sir.

Do I speak with you?

Judge Schlesinger, after knowing Romeo for over eight years, I know him to be a kind and caring person.  My family and I have spent holidays with him, had many meals together.  He has helped us move and stayed with us at our home.

Romeo has told me about his mother and parts of his childhood, which explain some of his difficulties.  He struggled to keep a job, would embellish his qualifications, talk too much, and try quickly to be friends with other workers.  He seemed to want to impress people and be liked.

At times Romeo would get into situations and not think of the consequences.  I once received a phone call from Romeo, and he was at a restaurant and the police asked him to leave.  He wanted to write a Google review and started taking

photos of the place, and the staff called the police. It didn't occur to him how his actions might appear to others.

Knowing Romeo's struggles with mental issues, he was trying to address them. I only know Romeo to be a peaceful and considerate person.

Since speaking with Romeo in jail, I hear a difference in his frame of mind, and he sounds more mature, realizing he needs to take more charge of his life, stay on his medication, and possibly help others stay out of the same situation.

He seemed constantly to be looking for something or someone before, but now he conveys a healthy confidence. He seems to have more awareness now of his issues and how to make changes so as not to repeat the same mistakes.

I have never seen Romeo be violent or even lose his temper. He has a sense of humor and laughs things off.

He has prayed in our presence and observed Ramadan each year. We have discussed religion, and he has never expressed any extreme views or thoughts. He has said, and I strongly believe, that he has changed, that he wants to stay away from any type of trouble in the future.

Thank you, Judge.

THE COURT: Cross?

CROSS-EXAMINATION

BY MS. TAYLOR:

Q.   Ms. Sandberg, I'm not sure how much of the proceedings before your testimony you had an opportunity to observe.

Have you been here since the beginning?

A.   I have.

Q.   Okay.  So, I mean, you've -- so you've heard some of the things that we've been discussing, Mr. Leombruno and I, in terms of the statements that Mr. Langhorne was making in 2018/2019 --

A.   Yes.

Q.   -- about what his intentions were and what he wanted to do, correct?

A.   Yes.

Q.   Did he ever discuss any of that with you?

A.   No.

Q.   Was it a surprise to you that he was having those discussions?

A.   It was.

Q.   Were you aware at any point that Mr. Langhorne had even an interest in ISIS?

A.   I had been visited by the FBI twice to ask me about Mr. Langhorne, so I knew there was something.

THE COURT:  Was that after he was arrested?

THE WITNESS:  Prior to -- oh, once before and once after.

BY MS. TAYLOR:

Q.   Okay.  But Mr. Langhorne himself never had any of those discussions with you?

A.   No.

Q.   Okay.  When -- I think you stated in your statement that you felt that he was interested in helping others stay out of the same situation.

A.   Yes.

Q.   Can you elaborate on why you think that?

A.   The last few months he's been speaking about a program in New York where he would go speak to others -- I don't recall the name of it, but would go speak to others, as I referred to, to not -- to not get in the same situation that he was.

Q.   Meaning don't go to jail or don't follow an extremist ideology, if you know?

A.   Don't follow extremist ideology.

Q.   Do you have any indication that he's rejected that ideology?

A.   Not outright saying it, but just from him saying that he made a mistake, and he knows that he did something wrong.

Q.   Okay.  So he hasn't told -- he -- okay.

So you're inferring that from some of the things that he's said.

A.   Well, for what he's in trouble, in jail for, yes.

Q.   Okay.

MS. TAYLOR:  I don't have any other questions, Your

Honor.

THE COURT:  Any redirect?

MR. LEOMBRUNO:  No, Your Honor.

THE COURT:  You may step down.  Thank you.

THE WITNESS:  Thank you.

MR. LEOMBRUNO:  Thank you, Ms. Sandberg.

Judge, before we proceed with argument, my client has a statement.

THE COURT:  Sure.

THE DEFENDANT:  Can I ask you to give me a moment?  I'm a little nervous.

THE COURT:  Nothing to be nervous about.  I'm here to listen.

THE DEFENDANT:  Thank you.

Good morning, Your Honor.  I would like to begin by first apologizing to the Court, to my community, and to my family.  I acted in a selfish and repugnant matter.  I was brazen, callous, and unstable.  The choices I made and the actions I took were wrong, period.  I'm repulsed by my behavior, and I offer my most sincere apologies for my actions.  I'm sorry.

I never belonged in the ISIS community.  I should have accepted that after retracting my pledge in 2014 and was banned from several chat rooms in 2018.  Through that time I longed to be accepted.  I craved attention and validation from

any source that would offer it.  I was immature, naive, and childish.

In the nearly three years since my incarceration, I've grown immensely, sought mental health treatment, and have been making efforts to make amends for my shameful crime.  I'm done seeking self-worth from the validation of others.  I refuse to be subjected to hateful ideology or be engaged in or with communities that espouse violence.

I never espoused a belief commonly held by ISIS supporters that killing civilians is justifiable, nor will I ever.  I've never wanted anyone to be harmed by my choices. I'm a good person who unfortunately was manipulated and fell prey to my own insecurities that allowed me to be in the position I am in now.

Moving forward I would like to join DEEP so I can make amends for my conduct.  DEEP is a counterterrorist prevention program.  It stands for Disruption and Early Engagement Program.

My previous volunteer history with Healing Strides, an equestrian-based therapy center for the disabled community and youth, as well as my time working for the 501(c)(3) organization of the New York Comic Con and the ACE, which is the Albuquerque equivalent -- due to my exposure to echo chambers and propaganda, I can provide a perfect counterargument to those who abide by hateful ideologies.

I've grown and evolved beyond it though [verbatim] the time I've spent incarcerated, and I want to find a platform to prevent people from becoming radicalized or falling victim to themselves.

Next I would like to say, despite whatever the prosecutor may say, I'm a very patriotic and proud American.  I spent four years in JROTC, like my brother who I encouraged to join the military and now proudly serves in the Navy.  I've voted in nearly every election I could, and have always championed our freedoms.  I apologize for failing to live up to what was expected of me as a good civilian.

My future will be composed of speaking out against hate and warped perceptions of Islam, going to video game tournaments, and living a peaceful life, assisting others whenever and wherever I can.

I realize these goals might sound lofty, but with your help, Your Honor, I can promote respect for the law, deter others from committing crimes and falling victim to radicalization, assisting others with mental health needs to seek help and realize they aren't alone, and encourage others to value their freedom.

I want the incarceration to afford me the ability to make a positive impact on the lives of others.  And, lastly, I'd just like to ask mercy from the Court, acknowledge my wrongdoing, and fear my plea might not be honored if the

prosecution has their way.

THE COURT:  Thank you.

MR. LEOMBRUNO:  Judge, we have nothing else to offer --

THE COURT:  Okay.

MR. LEOMBRUNO:  -- in forms of mitigation, just argument at this time.

I did want to clarify, though, you've heard both Ms. Sandberg mention a program and then my client mentioned the word DEEP.  Just for clarification, DEEP, as my client just alluded to, stands for Disruption and Early Engagement Program, DEEP.  We've tried to look into this matter about whether or not it's a program that's appropriate, you know, for Mr. Langhorne, you know, what the parameters are for getting into the program, things of that nature.

What I can tell you is, is that it's a program that is designed basically to provide early intervention for those people that might be heading down the path that Mr. Langhorne did.  It tries to deal specifically with, you know, helping these people understand that the ideology can lead to some severe consequences and helping them disengage.

The reason I know about the program, other than my client finding out about it, is I was able to speak -- despite many efforts beforehand, I was only able to speak to a program director last night, you know, after hours.

And there are some complications with the program in the sense that, you know, it's relatively new.  It's not something necessarily that can work with an individual that's receiving a significantly lengthy incarceration sentence because it requires a lot of treatment and therapy and counseling and things of that nature.

But they did indicate that, you know, depending on where he's at in the country, their program may be able to work with him and provide some services.

So I digress, and I can talk more about that later.  But I just wanted to alert the Court what people were talking about when they used the term DEEP.  That's something my client has been looking at for a while, and it operates out of New York.

THE COURT:  You don't know if that's a program that the Bureau of Prisons has.

MR. LEOMBRUNO:  It's -- it's an independent organization.  My -- the lady that runs it, Claire Abraham, she used to help run it out of, I think, the Eastern District of New York as far as the prosecutor's office there.

So it's kind of -- the way she described the program is a lot of times they would partner with law enforcement.  And certain individuals that may be on their radar would kind of be brought to their attention, and they would make some kind of partnership to try to work with that individual.

So it's more about early intervention as opposed to post intervention, but she did indicate that people that would otherwise be qualified for the program -- and I make no representations to the Court that they have qualified Mr. Langhorne.  It was just a general discussion.

But if they evaluated him and he was a fit for the program -- and some of the things that they're looking for are not only the nature of the charges that they're dealing with but other violent incidents in the individual's past.  You know, there's a certain risk level that they have to contend with.  So, you know, the more violent the person, the less likely they'll get in the program.

But it's more about -- it's actually very similar to what Dr. Bloomfield was talking about in the sense of prosocial therapy, providing them opportunities to deal with things in a positive way; ways to, you know, arm themselves so they don't go down a certain, you know, path.  You know, how they can disengage?  You know, she used the term, "We help people disengage, not deradicalize, necessarily."

So in other words, you can't always change someone's fundamental beliefs, but you can help them not act out on them, so to speak.  You know, people may have certain beliefs that they're just not willing to discard, but what they do with those beliefs is something that they can also help with as well through their program.

So it's -- you know, for what it's worth, that's -- I just wanted to provide the Court some context as to what the DEEP program is, since my client has referred to it and also Ms. Sandberg.

Judge, with regard to sentencing, I've made -- and I'm not going to belabor them because I've made the arguments in my sentencing memorandum, and I know the Court's had the benefit of looking at it.

THE COURT:  Yes.

MR. LEOMBRUNO:  But now that the Court has made a finding that the terrorism enhancement applies -- applies to this situation, there are certain things that the Court, I think, has to consider with regard to how it affects his sentence under 3553(a).

The enhancement is brutal.  It provides --

THE COURT:  If you read the cases, that *Suarez* case talks all about --

MR. LEOMBRUNO:  Yeah.

THE COURT:  -- what the Sentencing Commission and Congress have done.

MR. LEOMBRUNO:  It's -- yes.  It's one of those things where it was kind of a one-size-fits-all -- these are my, you know, thoughts on it -- one-size-fits-all type of, you know, legislation.  And, of course, it happens prior to *Booker*. So after *Booker* we have obviously that lineage of cases that

gives the Court some leeway in how they want to deal with these things.

But, you know, the biggest problem -- and the arguments that I made in my sentencing memorandum are no different than arguments that have been made by other defendants facing that enhancement -- is that it does not account in any way, shape, or form for disparity in conduct.

You know, one of the biggest valu- -- one of the most valuable tools of the guidelines is that we have, built into the guidelines, all sorts of departures, whether positive or negative, you know, on the number, based on the actual conduct of the individual.

You know, you traffic in more drugs, your exposure's higher. You know, you're the ringleader, your exposure's higher. You're a -- you know, we have things like safety valve, you know, that deal with individuals that are first-time offenders that we know are not the ringleader of the operation, things of that nature.

So you have all these adjustments within the guidelines that take into account the specific characteristics of the offense.

What we don't have in the terrorism enhancement is any way to do that within the enhancement itself. It's a one-size-fits-all system that, regardless of what you did -- if you sent a birthday card to ISIS with a $5 check in it, you

know, saying, "Happy birthday, ISIS.  Here's $5," you could technically qualify for the enhancement.  And you're subject to the same penalties as somebody who actually went out and built a bomb or trained terrorists or provided support at that type of a level.

So we have to -- and I think the Court has to take in consideration, particularly with 3553, those factors and say, "Well, what are the characteristics of the defendant?  You know, what are the circumstances of the offense?  When we look at these things, you know, what are we dealing with here?  And is a variance appropriate even if the enhancement is applied?"

The other argument that I make in my sentencing memorandum, before I dive deeper into that, is that we have this concept of acceptance of responsibility.  You know, if you are facing a charge and you say, "Listen, I'm going to admit my conduct.  I'm going to aid the prosecution in the sense that I'm not going to make them go to trial.  I'm going to stipulate to the things that have been done, etc.," we value that.  The guidelines value that.

They say, "Look, you're going to get a two-level departure for accepting responsibility.  And if you're above a certain offense level, above 16, we're going to give you another level, potentially, up to three levels for just accepting the responsibility."

And as I said in my sentencing memorandum, that's

a -- that's a significant policy.  You know, we want individuals to be held accountable, and we also want them to want to be held accountable.  And so the guidelines builds in a bit of relief there to say, "Well, look, if you're going to take that step, then yes, we are going to lessen your exposure because you have admitted your wrongdoing.

THE COURT:  Doesn't count here though.

MR. LEOMBRUNO:  Well, that's the problem.  When we have a terrorism enhancement that literally subjects somebody to almost three, four times the amount of punishment that the actual underlying offense does, he essentially gets no reward -- and I don't mean to use the term "reward."  That doesn't make -- he gets no relief through the policy that, you know, we have said is an appropriate and important policy.

THE COURT:  Let me ask you this.

MR. LEOMBRUNO:  Sure.

THE COURT:  If you don't know the answer, I'll see if Ms. Taylor does.

So you get a bump-up 12 levels, and you get your criminal history changed, so it goes to 360 to life.  Here we have a 20-year max because of the statute, so there's basically ten years in there that you don't -- unless the Court's going to deviate from the 20, you lose the three levels that you're talking about.

Do you know, from a factual standpoint, if there was

a different offense -- I don't know what discussions may have taken place between you and the prosecutor.

Do you know if there was another offense that they could have charged him with that would have subjected him to a higher sentence, without this enhancement, that they haven't used and have limited the Court to the 20 years to give you some kind of benefit of what you're after?

MR. LEOMBRUNO:  There is -- I want to make sure I recount the discussions appropriately and correctly, and Ms. Taylor can certainly chime in if I did that.

There was discussion of -- and prior to my involvement with Mr. Langhorne, my representation of him, he was represented by another attorney --

THE COURT:  Right.

MR. LEOMBRUNO:  -- who had to vacate for other reasons.

My understanding is that there was the possibility of a superseding indictment being filed, if he had gone to trial, alleging another offense.  Now, that offense, I suppose, if he was convicted of it, could have been run consecutively, you know, to -- to the 2339B charge.  In other words, there's the possibility of stacking at that point.

THE COURT:  Do you know what the maximum penalty would have been for that offense?

MS. TAYLOR:  Your Honor, there was actually a

superseding indictment that was drafted and approved that would also have added a count for a violation of Title 18, Section 842(p), which is distribution of bomb-making -- information about bomb-making materials.  I believe it carries a 20-year maximum.

So, I mean, that -- that was an essential consideration of the plea agreement and the reason why there's a "no further charges" paragraph in the plea agreement, because we essentially agreed not to bring that superseding indictment which, as the Court knows, that would have been -- resulted in his guideline -- I think that -- that one, that offense is calculated under a different guideline.  So I'm not sure exactly how those two would have interacted with each other ultimately.

But essentially his guidelines would have been at least the 360 to 480.

MR. LEOMBRUNO:  Yeah.  To answer the Court's question, I think we're both saying the same thing.  Yes, there was some discussion about entering a plea and that 14 -- or preventing the Government from filing another -- you know, going to seek another indictment.

Now, of course, you know, they would have to go and seek that, you know.  And would they have obtained it?  I don't know.  You know, that's for a grand jury to decide, but they could certainly have tried to file that.  But because Mr., you

know, Langhorne was willing to resolve this case, you know, that didn't occur.

So, you know, he's accepted his responsibility. You know, the plea agreement -- you know, when you look at his exposure, again, I -- you know, the plea agreement also calls for the fact that he gets acceptance of his responsibility, right? I mean, it's in the plea agreement, that we're saying, "Look, we're still going to value."

So I understand the Court's contention of, "Well, hey, did he already get some kind of benefit by entering the plea agreement because these other charges weren't filed?" I certainly understand that thought process, that sentiment, but also in the plea agreement is that he would get acceptance of responsibility.

So, you know, it's in there in the sense that, hey, both parties agree, and then, you know, the guidelines would agree that this is something of social importance that we want to make -- you know, people make sure they get.

And my only point here is that -- that there's no benefit that -- for accepting responsibility when the enhancement is applied in this way because, again, it just nullifies everything because his guidelines become the statutory max.

The other issue, though, is when we look at 3553(a), you know, the first one, you know, the nature and circumstances

of the offense and the history and characteristics of the defendant -- and the Court can probably tell from my sentencing memorandum, you know, all the mental health reports, the testimony of Dr. Bloomfield, you know, my client's statement, Ms. Sandberg's statement, you know, kind of where this is going.

You have an individual here that has significant underlying mental health issues.  You know, from those that I think have been diagnosed before by other individuals, you have, you know, the ones that I've listed:  schizophrenia, schizoaffective disorder, you know, attention deficit disorder. You've got all of these things that are there.

And I suspect that the Government -- the Government may try to argue, and probably will, and has argued in its PSR objection response letter, that this makes him even more dangerous, that this -- this -- because these things are there, he is more prone to violence, or he's more of a radical, or he's more of a danger to society.

Probably the reason why we had Dr. Bloomfield talk about the things that he did is because I think it's important for the Court to understand what drives, you know, Mr. Langhorne and that it's not this concept of radicalism or extremism; you know, that this is an individual that has needs as a result of his underlying disorder.  And he found an avenue where he can get those needs fulfilled.  He found an avenue

where he can say, "Hey, I'm important."

And when you read the exchanges, Judge -- and I know you have -- between him and the other individuals in the chat rooms and the undercover agent, when you look at those exchanges, he presents, even in writing, in a very odd manner.

Even when he read his statement to the Court, it's delivered in a way that I think is indicative of the types of things that Dr. Bloomfield was talking about.

And so you have an individual that's being told, you know, "You're important.  You're the expert.  I heard you got lots of ideas.  These are great ideas."  And so he's certainly responsible for his own conduct, but I don't think the Court can separate him from his underlying conditions and discount those as to the effect that they had about driving him to continue to participate in these dialogues.

You know, he's in an atmosphere where he gets to maintain his anonymity.  He's online.  He gets to play whatever role he wants to play.  He's -- if Dr. -- if you recall from Dr. Bloomfield's testimony, a lot of times they'll -- he indicates people with Asperger's will research and become either experts or self-believed experts on topics.

A lot of the exchanges, he's spouting off phrases, terminology that makes him sound really important, really knowledgeable.  And he's getting that feedback from the undercover agent.

You know, "Hey, I heard you're the man.  I heard you -- you know how to -- you know, you've got this information.  Let me come to you.  Help -- help -- you know, let me help you make this since you've got, you know, all the information."

And so that -- that process begins to feed off one another, and it goes on and on and on.

You can't separate Mr. Langhorne from his underlying conditions.  I don't mean to suggest to the Court that they are an explanation in the sense of a defense, you know, for what he did.  They're not, and I don't think Dr. Bloomfield suggested that either.

But it certainly helps to understand why would somebody say these things or do these things or interact this way?  You know, why -- why would they engage in these types of communities?  And the Court has, at its fingertips, the type of explanation that can help analyze Mr. Langhorne in the context of 3553(a).

When you look at the circumstances of the offense, I think it's important to note the time -- or I should say the timeline of events.  You've got, in 2018 and '19, Mr. Langhorne in these ISIS-supporter chat rooms talking with individuals. He's espousing ideas.  He says, "I've got these ideas to do this.  I've got these ideas to do that."

Then he's introduced -- and I say introduced.  It's

actually the wrong term.  He is told that somebody -- that he can get in touch with somebody, okay, that -- that may help him produce these videos.

And so the third party doesn't give Mr. Langhorne the undercover's information, okay, and he goes and seeks that individual out.  It's the other way around.  The third party gives Mr. Langhorne's information to the third party, which is ultimately an undercover agent.

And then we have this process of reaching out.  And I won't go through all the details because, again, they're in the sentencing memorandum, or at least the pertinent parts that I feel are relevant to this argument are in there.

You have a situation where they approach him, and they say, "What do you got?  I hear you got, you know, ideas for videos."

And he starts to respond, "Yes."

And the first discussion about videos are about education, you know, educating and reaching out to sisters and brothers in the ummah and all this other stuff.  That conversation eventually evolves into topics of making a TATP video.

And then you have -- what's really important is, again, the interaction between the individual and Mr. Langhorne reads like a prosecutorial checklist.  You know, he doesn't say the word "ISIS."  He doesn't say it.  He doesn't say those

things.

So there's a constant prodding, "Well, you want to" -- you know -- you know, there's a kind -- it's almost like a cat-and-mouse game, you know, where the undercover's trying to get him to say certain things that we know would definitely be, "Okay.  That checks that box.  He knows he's dealing with, you know, a foreign terrorist organization."

Or, "We want him to specifically say target these individ-" -- there's all this pushing, pushing, pushing, and what we see throughout that exchange is a lot of pushback: "I'm not making any videos.  You make the video," you know.

The point where he discusses -- you know, the reason how they get him to say -- "Okay.  Well, how can we support the fact that he knows he's dealing with a terrorist organization?"

They use some of the conversation from the 2018/'19 chat rooms, and then they use the statement from the undercover that he was going away for a while to do some activities for the dawlah, which is commonly associated with ISIS.

And so you have that scenario, and Mr. Langhorne doesn't reject it, doesn't, you know, say, "Oh, my God.  You know, you're doing what?  I don't want any part of this."  He says, "Okay."  And so they go, and they come back.

The other thing important about this timeline is the length of time.  There are moments, there are points in this conversation, where the undercover's, like, checking back in

with Mr. Langhorne.  "Hey, I've got parts of that video that I'm ready to produce."

"Okay."  His responses are, "Okay, neat," you know, things like that.

And so, yes, he does participate when he's asked questions, when he's -- I don't want to use the term solicited, but when they're bringing information to him, when they're bringing portions of the video, they're asking him to comment and he does, but a lot of that is driven by the Government.

Up -- right up and to the point when we get to November, almost ten months after they first reach out to him. The video is -- is produced in its entirety, and he uploads it. And then shortly after that he's -- you know, he's arrested.

So I argued in the sentencing memorandum in reference to this concept of imperfect entrapment.  And I did that because we're not arguing that it's entrapment because if it was entrapment, that would be a defense.  We would have gone to trial.

The concept of imperfect entrapment is one -- and I cite some case law in my sentencing memorandum -- that says it is and can be relevant to the concept of sentencing because we have to look at, again, as 3553(a) says, the nature and circumstances of the offense.  That also includes government conduct or can include government conduct.

You know, and I suspect that, you know, there might

be talk about predisposition.  Okay.  Well, we know if somebody's predisposed to commit a crime, then, you know, you can't really use entrapment as a defense.  We're not using entrapment as a defense.  We're using it as a consideration under 3553(a), that the Government's conduct had a part to play in what happened.

He's admitted his wrongdoing.  He commented on the video.  He provided instruction on what should be in its content.  He did that willingly.  He participated in the exchange, and then he committed the final act of uploading it to BitChute.

But at the same time I have to wonder -- and I think the Court may want to wonder -- what if there wasn't that persistence there?  What if the undercover had not kept coming back to Mr. Langhorne, even after there were months of inactivity or long periods of inactivity?

You know, as I -- as I note the timeline in my sentencing memo, what if that was not there?  You know, so the Government has a part to play.  I'm not suggesting the Government's culpable, but, again, the conduct here is important to understanding how this charge came to be.

So you have a situation where you have an individual with these underlying mental health issues.  He's got Asperger's, according to Dr. Bloomfield.  He's driven by a lot of things, part of which is the need to be affirmed or the need

to be wanted, and he's searching out how to fulfill these things.

He finds some comfort, some acceptance in this online community of ISIS supporters, and he engages, and he likes to pop off as an expert on these topics.

While he's doing that, the Government comes along, gets wind of the fact that he's saying these things online, and they begin to probe. "Talk to me about this. What can you do? Let's do this."

And they continue that encounter, they continue that encounter, they continue that encounter until they got what they needed from him so they could post the video -- or so they can make the arrest after he posts the video.

So I don't think we can separate the Government's conduct either, just like we can't separate his underlying mental health conditions and the fact that he may have Asperger's. We can't separate those things, just like we can't separate the Government's conduct as well.

I think there's -- based on those factors -- significantly, the mental health issues that Dr. Bloomfield talked about -- I think there's significant and fertile ground here for a substantial variance.

And I know it's difficult, and, Judge, that's why you get to be in the position that you are, because you get to make these tough decisions.

I know it's hard to look at this case and say, "Here's a guy that has entered a plea to material support of ISIS and participated in a video to make, you know, explosives or an explosive device, and to look at that scenario and -- with those facts only and that lens only and say, "Why would I give this guy anything less than the guideline recommendation, which is, you know, the statutory max, 20 years?"

The reason for that is, is that courts have, on many occasions, given significant variances for even those with the terrorism enhancement because the one-size-fits-all approach does not always fit the conduct. The conduct here is one that I think warrants a significant variance.

You know, my client and I have had a lot of conversation about if the terrorism enhancement is not applied, what's his exposure. So if the Court had gone through the analysis and agreed with our arguments and said, "Okay, we're not going to apply the terrorist enhancement. We're not going to apply the two-level enhancement for the other factor," he would have been a level 26.

You know, and when you look at that, after accepting responsibility, his guidelines are something like 70 to 87 months, somewhere in that range. And so you look at that and you say, "Here's an individual that's spent almost three years in incarceration, either at the Baker County Jail or the Bradford County Jail -- which are not the best or ideal

situations.

But he's spent almost three years in those environments getting mental health treatment, having a disconnect from the world, in a scenario where he doesn't have access to the Internet, and for all intents and purposes, based on Dr. Bloomfield's observations and Ms. Sandberg's observations in communicating with him, seems to be in a better place; mentally, emotionally seems to be doing much better.

So we look at all that and we say if those enhancements would not have applied, we might have been standing here arguing or asking the Court to put him on supervised release today, you know, that he served a significant amount of time.

And those -- those categories, deterrence, protecting the public from further crimes, things of that -- because of the mitigation in this case, you know, a sentence of supervised release might have been appropriate.

I'm not going to stand here and make that recommendation in light of the enhancement that's been applied, but in talking with my client -- if I could just have one second, Your Honor.

(Pause in proceedings.)

MR. LEOMBRUNO:  Even up until this moment, we're still talking about what recommendation that he may feel is appropriate.  And the recommendation that he wants to give to

the Court, that he's asking me to make to the Court, is not insignificant.  He's asking for essentially a term of 97 months.

That's a lot of years.  It's a lot of years that reflects the seriousness of what he did.  It's a lot of years that provides, I think, deterrence, because what it says to the community, and certainly to Mr. Langhorne, is that, "We don't care what your mitigating factors are.  You're still going to serve significant time, even with those mitigating factors in place, because this is serious business."

But that also serves the other interests; the type of sentence like that serves the other factors that the Court needs to consider in that it's appropriate, given his history and the circumstances of this case.

The other thing I didn't talk about with regard to his history, and the Court's well aware of it reading the PSR, is this is an individual that grew up in rather less than ideal circumstances.

You know, the incident involving his mother getting shot is something that he witnessed; his mother kicking him out of the home repeatedly; his -- him having to spend time in foster care for a little bit because of conditions in the home. And then on top of that, you've got the mental health issues and concerns and possibly on the spectrum as well.

It's no wonder that Mr. Langhorne kind of drifted

around a little bit and maybe found comfort or acceptance in an ideology where he could feel important.

You look at all those factors -- and I know the Court -- in addition to us talking about it in the PSR, but the Court -- you know, you have the stacks of letters that you've received from Mr. Langhorne's mother.

And I don't want to disparage his mother because that's his mother. But at the same time, having looked at the content of those letters, I think the Court can understand maybe the environment that Mr. Langhorne grew up in. You know, it seems readily apparent to me that his mother also has some significant mental health issues and problems of her own.

So you have to roll that up and look at these things, not in isolation but in totality, and say, you know, "What do we do with Mr. Langhorne? What -- what kind of sentence can we give that meets all these statutory criteria and directives: deterrence for the crime, you know, just punishment, protection of the public?"

You know, a term of 97 months, again, is not insignificant. It does give, I think, proper weight to a variance, given the mitigating factors, but still meeting those directives and the other factors of 3553.

Thank you, Your Honor.

THE COURT: Thank you.

It's about 1 o'clock. Why don't we take a 45-minute

break for lunch, and then we'll come back and finish up.  So be back at 1:45.

And I think I have your comment about other potential charges --

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  -- but if you want to start off with that, that would be fine.

Okay.  We'll take 45 minutes.

COURT SECURITY OFFICER:  All rise.

(Recess from 12:59 p.m. until 1:52 p.m.; all parties present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in session.

Please be seated.

THE COURT:  So I understand the manager of Quizno's said, "Thank you for sending everybody over."

You're on.

MS. TAYLOR:  Yes, Your Honor.

I wanted to start by first addressing some of the arguments that Mr. Leombruno made in his -- in his summary.

You know, I agree; we should be thinking about what the conduct is in each individual case.  I mean, that -- and, frankly, that's what Section 3553(a) calls on the Court to do, is think about how severe this conduct is, how much it impacts the community when imposing a sentence.

And he brought up one example of -- of somebody putting a $5 bill or maybe a check for $5 into an envelope and sending it to ISIS, and arguably that's -- that's material support.  And then you compare that to, you know, somebody who actually, you know, bombs the Boston Marathon.

And those two things -- I don't think they would end up the same on the guidelines because probably the Boston Marathon bomber would have a lot of other charges that carry more significant minimums, maximums, and guidelines.  But -- but they kind of fall in the same -- in the same bucket of material support of terrorism.

But when we look at this offense, and we look at what Mr. Langhorne was intending to do, I mean, you can -- you can discount what he actually did by saying, "Well, you know, absent the help of the FBI, he wouldn't have been able to make this video on his own."

That may be true.  Whether ultimately he would have ended up communicating with a legitimate member of ISIS who could provide the same help to him is unknown.  But certainly that's what he was asking for when he reached out in that chat group and said, you know, "I've got" -- essentially, "I've got an idea for ISIS to improve on their videos."

And his intent, as this Court has found, was to -- it was, as Mr. Leombruno said as well, to distribute information.  It was to distribute information about how to make a bomb, how

to do it in such a way that you would not be detected so that you could go on to perform additional attacks and not be held accountable for your actions, and to distribute that information to people who also held, likewise, other extremist ideologies and wished to make attacks on government.

Mr. -- I will say Mr. Langhorne was consistent, you know, throughout our investigation of the case in saying that he personally disagreed with making attacks on civilians.  And he -- I think he makes that statement in some of these chats that we've been talking about here too.

THE COURT:  Yes.

MS. TAYLOR:  So, you know, I think that's a legitimate belief that he held, and he also stated that during his allocution, that that was something that he --

THE COURT:  Well, and in the calculation of the enhancement, though, on the other hand, he did talk directly about things that affect the government.

MS. TAYLOR:  Correct, and bombing -- bombing locations where civilians could be.  I mean, he talked about post offices at night, but he also talked about targeting members of the military who, in his view --

THE COURT:  And government buildings.

MS. TAYLOR:  Yes, and members --

THE COURT:  Post offices.

MS. TAYLOR:  He also talked about power plants, I

believe.  And he had this idea of, you know, impacting infrastructure in a way that would -- although maybe it wouldn't kill innocent civilians, it would certainly cause harm to innocent civilians by removing that infrastructure from the community.

But moreover, what he was intending to do, again, was distribute this information to other extremists who could use it how they deemed.  So regardless of what his personal beliefs are about where the line was that was justifiable in terms of retaliating, that doesn't mean that whoever, you know, other extremist supporter who might view his video and use his ideas to make their own attack would necessarily hold those same beliefs and not use -- not use the information that he disseminated to conduct attacks on civilians.

But even if we're putting aside the civilians versus, you know, what he viewed as justifiable, I mean, even the things that he viewed as justifiable are still terrible and deserving of -- of punishment.

And one thing he said in his allocution that I wrote down is he said he never wanted anyone to be harmed by his choices, and I -- I don't think that's credible.  When you look at what he stated his intent was, how he intended these videos to be used and what he was hoping to accomplish, it's very clear that he intended to harm people with his choices.

And, Your Honor, this isn't something that he just

came upon, you know, suddenly got radicalized, and immediately went to planning this way that he would, you know, conduct jihad.  This was something that he had a long time to think about.

Mr. Langhorne first pledged his allegiance to ISIS in 2014, and at that time he -- he was considering, at least, traveling to the Middle East.  It's not clear exactly what he wanted to do there, but at the time that he had first pledged to ISIS, that was what he wanted to do.  He ultimately did not do that.

And, you know, moving forward through time, according to him, at some point he, you know, disavowed his allegiance to ISIS.  And then later on he reaffirmed and repledged his allegiance to ISIS, and then at some point, you know, obviously began formulating this particular plan.

But he didn't start formulating this plan until late 2018, at least as far as our evidence shows.  So that's four years that he had to think about exactly how he wanted to conduct jihad.

And it's also clear from his statements that he wanted to find a way to do so that would not lead to him being held accountable.  That was, I think, part of why it took him so long to come to settle on a particular idea of how he was going to do it.  And then -- and this is what he settled on and ultimately what has led us here.

So he had a long time to think about it.  He had a long time to consider how his actions might impact the community, to consider how they could impact him.  He actually, at some point in the UCE chat, mentioned specifically, by statutory citation, Section 2339B, I believe, and states that, you know, he doesn't want to be prosecuted under that statute.

He tells the undercover that he doesn't want to learn names, that they're not going to come to an agreement, that he doesn't want to be held accountable for a conspiracy.

So he's clearly doing what he's doing in a very deliberate way and in a careful way because he's aware of what federal law says.  And he's trying his very best to go right up to that line and, if not cross it, at least not cross it in a way that the Government could prove.  And that's -- that's what he did.

This argument that there are -- that there was this -- what Mr. Leombruno has termed "imperfect entrapment" is not borne out by the communications with the undercover.

First off, again, there was nobody that was telling Mr. Langhorne this idea.  The idea was entirely his, something that he came up with and articulated in those chat rooms, which then led to the introduction of the UCE.  So, I mean, as a matter of law, he clearly wouldn't have an entrapment defense because he came up with the idea.

But even this imperfect entrapment idea that

Mr. Leombruno has advanced saying that he was being pressured by the undercover, that the undercover kept coming back to him and badgering him for more information, it's just not in this transcript.

For example, on February 17th, the UCE did -- did first engage Mr. Langhorne. This is in the chats at the bottom of page 18. On that date the UCE did send an initial message to Langhorne -- they had been talking the day before -- and just basically asking him, "How are you? Do you have time to chat for a bit?" and asking Langhorne what he wanted to do.

And ultimately this discussion leads to Langhorne talking about what he wants in these multiple videos that he has in mind. And the UCE did -- did ask him questions and ask him for more information, which ultimately led, starting on page -- it looks like it's page 28 of the undercover chats -- to Langhorne essentially excoriating the UCE and telling him off.

And this is where he -- where Mr. Langhorne tells the Bob and Steve story, where he essentially accuses -- he does accuse the UCE of being an FBI agent over multiple pages of the chats and tells him, "Either you make the video and prove you aren't a fed, or you say whatever you're going to say and don't make the video and prove you are a fed."

And the UCE then responds to him and basically tells Mr. Langhorne, "You have done nothing for the cause but sit on

your computer all day long and come up with crazy stories like the one above.  There is no need for you to flip out and talk for as long as you have.  I have not asked you any specific questions on anything besides what I was told you wanted to talk about, and I agree we are done for now."

And then Mr. Langhorne comes back and asks the UCE more questions about what the UCE has and hasn't done.  And then the conversation ends, so that's from mid February.

And then when you look on the next page -- that's page 37 of the undercover chats -- it's about a month later. The UCE has not responded to Langhorne at all, and Langhorne was the last person to send a message in this chat.  And Mr. Langhorne's the one that reaches out to the UCE on March 19th and states, "Have you completed your task?  I was asked to ask you."

So here is Mr. Langhorne reaching out to the UCE asking, "What's the status?"

The two of them have a little bit of back-and-forth, and then Mr. Langhorne, at the end of this day's chats, states, "Don't forget, yield information is important."  In other words, when he's referring to yield, he's talking about how much explosive material is needed to blow up these particular targets.

THE COURT:  Right.  Didn't he talk before that about whether it would be a tree, a one-story building, or a

two-story building?

MS. TAYLOR:  Yes.  Correct.

THE COURT:  Right.  I think that's on page --

MS. TAYLOR:  So he's reminding --

THE COURT:  Yeah.

MS. TAYLOR:  -- the UCE again that that's what he wants put into the video.

THE COURT:  It was on page 37.

MS. TAYLOR:  Yes, Your Honor.

And then it's about two more -- or a couple more weeks after that where they do get back in -- well, the UCE finally responds to Mr. Langhorne and states he has started working on the video and sends a version of the video.

And then Mr. Langhorne sends several messages responding in an excited way about the video.  He states -- this is on page 39 -- "Perfect.  This should be able to be uploaded to YouTube legally as well."  And then he states, "Because it isn't inherently used for crimes, it should pass off fine."

And, again, he states that -- he states additional things that need to be placed into the video.  He specifies on the next page, "The best result -- the best yield results, in my opinion, are tree trunk, car, 900-square-foot room, half a building, and one full building."

And then he talks about hydrochloric acid and how

he's going to look into the legality some more.

The next part -- the next date that the two of them have a chat is on the bottom of page -- I think it's page 40. The numbers are a little difficult to read, but it's on April 11th.

THE COURT:  Right.

MS. TAYLOR:  And it's, again, Langhorne that starts the conversation:  "And how is it coming along?"

In the next page, April 15th, Langhorne's the first one to send a message to the UC on that day.

So, Your Honor, I'm not going to go through all 86 pages of this -- of this chat between Langhorne and the UCE. But the contention that the UCE was drawing Langhorne out throughout these chats -- I will say in the beginning there was a little bit more of that.

But after Mr. Langhorne told the UCE off and accused him of being an FBI agent -- and that was pretty early on -- the UCE really stood back, and at that point Mr. Langhorne was clearly the driver of these conversations.

He was the one typing most of the words in the chat. He was often the one reaching out to the UCE to ask, "What's the status of my video?"  And he was the one providing all of the ideas for what should go into the video and stating what he expected the video to be used for.

So this idea that somehow he was being led down this

path by the UCE is just not borne out by -- when you look at the black and white of what's actually in their conversations, it just didn't happen.

With regard to acceptance, Your Honor, as we previously discussed, there was -- I had drafted a superseding indictment that would have included a second charge.  It was -- it was fully approved to be presented to a grand jury, and that charge would have been under Section 842(p).

That was explicitly part of the plea negotiations that led to the guilty plea to one count in this case and, again, is the reason why the "no further charges" language was part of the plea agreement, because that was part of the benefit of his bargain.

This argument that he's not getting credit for acceptance is just -- it's really -- it's not compelling in light of the particular facts of this case, which are he not only -- he gets way more than the three levels that he otherwise would get for acceptance.  If he had had to plead guilty or was found guilty of two charges, he would have only gotten three levels.

In fact, by pleading guilty and avoiding -- avoiding a 40-year maximum, he gets credit for -- instead of starting at a level 37, he's effectively at a level 33.  So he gets -- he gets credit for that, because a level 33 is 235 to 293, so that's the highest level at which the 240 comes into play.

THE COURT:  That's --

MS. TAYLOR:  So --

THE COURT:  That's because 240 would be the statutory maximum?

MS. TAYLOR:  Yes, Your Honor.

And so by negotiating to not have that charge, he's -- essentially he's gotten credit for acceptance.  He has substantially reduced the maximum sentence that this Court could impose and substantially reduced his guidelines, which presently -- or would otherwise be 360 to 480 and instead are 240.  So that's a -- even from the bottom end of the guidelines, a 50 -- well, it's a one-third reduction from the bottom of his guidelines by entering into this plea agreement.

So, yes, while the three points kind of become irrelevant because of the way the guidelines are calculated, he is getting credit for acceptance of responsibility and is getting credit for the -- is getting the benefit of his bargain in a different way.

Your Honor, another thing that I wanted to bring to the Court's attention is Mr. Langhorne, in his allocution, he's -- you know, he essentially stated that he's -- you know, he's changed his ways.  He doesn't adhere to this ideology anymore, that he wants to help other people who may be going down that path to make different choices than he did.

Whether that's true or not, really only Mr. Langhorne

knows.  I will say, Your Honor, in May of 2020, Mr. Langhorne did send a letter to my office in which he stated that he -- he said, "Look at my charge and know without doubt that I have claimed innocence of that charge.  But I swear to you on my soul, and by he who will judge us all, gladly and without delay, the very second I am free from this or any facility I am being held or will be held at, you will know without doubt that I will no longer be a patriot of that country," referring to the United States, "but an open enemy until my death."

Your Honor, this letter was written six months after Mr. Langhorne had been in custody.  It wasn't right after he was arrested.  It was something that was written after he had had some time to come to a realization about the wrongness of his actions.  And yet this is what his mindset was at least six months after being arrested and realizing that he may be held accountable for -- for what he did in this case.

It's disturbing and troubling.  And, again, it's impossible to know whether, between, you know, May of 2020 and now, Mr. Langhorne truly has turned over a leaf and rethought his ways.  But his history shows that he adhered to the ISIS philosophy, at least in large part, from 2014 at least until 2019.  And at least until middle 2020, he was still declaring himself, the moment he was released, that he would be an enemy of the United States.

In terms of Mr. Langhorne's personal history and

characteristics and looking at his -- looking at his criminal history, there's not much of it, but what is there is concerning.

And in particular paragraph 50, there's a 2011 aggravated battery charge for which it looks like he was adjudicated guilty of a lesser charge, which is battery against a household member.  But initially he was charged with aggravated battery and two counts of false imprisonment.

And the narrative, which is undisputed, states that Mr. Langhorne attacked two individuals, one of which was his girlfriend, because he believed they were sexually involved. It says, "His attack was geared toward the second individual, but when his girlfriend attempted to intervene, Langhorne struck her on the head several times.

"At one point Langhorne pinned both victims to a bed and choked the second victim, preventing his escape. Eventually he allowed both to stand up but not before forcing his elbow into the girlfriend's jaw.

"When interviewed by police, the defendant admitted to attacking the second person but claimed not to be able to fully remember the incident."

So this is concerning conduct because it's -- it's person-on-person violence.  It's somewhat old, although it's eight years, approximately, before -- before he engaged in the conduct at issue here and only a few years before he first

pledged his allegiance to ISIS.

But it's concerning in that it was a -- from the description, it was a prolonged physical altercation that he engaged in, both with a domestic partner and with a third party, and that involved pretty significant physical violence on Mr. Langhorne's part.  So that is concerning.

And, Your Honor, I would also just point the Court to -- well, you know, so he's a natural Criminal History Category II based on his -- the number of points.  But, of course, it's the judgment of the Sentencing Commission that he be designated a criminal history category of VI due to the terrorism enhancement.

And I would submit to the Court that that is legitimate, that it reflects on the likelihood that Mr. Langhorne will reoffend.  Because this isn't a crime -- the crime that he's here for is not a crime that -- it's a crime that was brought on by his adhering to this particular ideology, which he adhered to for a long period of time.

I thought it was interesting in Dr. Bloomfield's testimony that he didn't even ask Mr. Langhorne whether he still adheres to that ideology, nor did he -- nor did he really seem to think that it had any pertinence to Mr. Langhorne's risk to reoffend.

I think it's highly pertinent to his risk to reoffend, whether he still believes in that ideology, whether

he still has that desire that drove him to commit this crime. That desire to do something on behalf of ISIS, that desire to retaliate against the government, that desire to retaliate against the military, that's highly pertinent to his risk to reoffend, and it's an ideology that he followed for a long period of time.

And I also noticed that in Dr. Bloomfield's testimony, he -- he stated pretty clearly that he did not think that Mr. Langhorne suffered from schizophrenia or schizoaffective disorder.

He stated that his view was that Mr. Langhorne suffers from being on the autism spectrum and then also on ADHD, although to the extent that he was talking about mitigation, I think he was more focused on the impact of being on the autism spectrum.

But being on the autism spectrum, and certainly having Asperger's, which is -- they're the more high-functioning end of being on the autism spectrum.  And Dr. Bloomfield, I think, agreed with this.  It's common in the community.  How common, he couldn't say, but he said that he felt it was underdiagnosed in the community.

And certainly, while there are features of that condition that legitimately could lead someone to being recruited, perhaps, into ISIS, there's no evidence that that's what happened to Mr. Langhorne.

Dr. Bloomfield didn't ask him if he was recruited or any of the circumstances about how he ended up where he is.  So whether Mr. Langhorne radicalized himself or whether he was recruited by someone else -- which I have no evidence that he was.  To the extent that he was not recruited into ISIS, all of that testimony about a person's predisposition to be recruited into criminal activity is pretty much irrelevant.

And so the only part that's really left is, you know, to extent that he was driven by a desire to feel connected to a community or feel that he was doing something important.  You know, people can do things to feel important in a lot of different ways, some of which are positive and some of which are negative and some of which are extremely negative, like attempting to provide material support to ISIS.

But of all of those choices that Mr. Langhorne could have made, that was what he chose.  He chose to be important by taking on a project that he felt would lead him to be somebody who would enable others to conduct more efficiently and without detection terrorist attacks all over the world.  That was what he chose.

So in summary, Your Honor, the United States is asking for this Court to impose the guideline sentence of 20 years.  I would submit to the Court that there is no substantial mitigation in this case and, in fact, that Mr. Langhorne's focus, unnatural focus, on ISIS and terrorism

only actually increases the risk that he will offend again, increases the risk that he will continue to adhere to this ideology, and is aggravating and not mitigating; that there's a need to protect the community from Mr. Langhorne and that the 20 years is the appropriate sentence in this case.

And, Your Honor, I don't -- I often don't address supervised release, but we would also ask the Court to impose a lifetime term of supervised release in this case and also consider imposing some conditions that either eliminate or limit Mr. Langhorne's use of computers, given that he conducted this crime entirely through a computer.

I think that that would be an appropriate condition on him and would also serve to protect the community once he is on supervised release.

THE COURT:  Do you remember how much time that he spent in Butner?

MS. TAYLOR:  I do not, Your Honor.

THE COURT:  Okay.

MS. TAYLOR:  I'm trying to remember if he went to Butner, because Dr. Demery did the evalua- -- oh, he did -- that's right, he did go to Butner, but it was over a medication issue.

It was a fairly long period of time, Your Honor.  I would have to go back through the record to figure it out, unfortunately.  Although I think a lot of that time was in

transport and waiting for a space.

THE COURT:  Okay.  Thank you.

Do you have anything else you want to say?

MS. TAYLOR:  No, Your Honor.

THE COURT:  Okay.  Thank you.

MR. LEOMBRUNO:  Thank you, Your Honor, and I'll try to make my comments brief.  I know it's been a long day.

And for clarification, I don't --

THE COURT:  Well, it's 20 minutes after 2:00.  I think that the lack of money that Congress has given to the Marshals Service, we're still closing at 5 o'clock, so --

MR. LEOMBRUNO:  Yes, sir.

THE COURT:  -- if you want to talk till 5:00, feel free.

MR. LEOMBRUNO:  Your Honor, I wanted to address a few things.  One is since his incarceration, I believe he's only been at Baker or Bradford.  So -- and I know the Court was inquiring about --

THE DEFENDANT:  Butner.

MR. LEOMBRUNO:  -- being in Butner.  So he's -- he's either been at the county facility in Baker or the county facility in Bradford.  And some of that had to do with the discovery issues and things of that nature.  It was easier to get him a laptop.  But, anyway, I digress.

Judge, I wanted to -- one, I wanted to address the

letter that the Government read a portion of, particularly a very small segment of the last page of a 14-page letter.

The reason I bring that up is this is a little bit indicative of kind of what the Government has tried to do throughout this sentencing hearing, and that's, again, to take pieces of information slightly out of context and then use that to bolster an argument that my client's an extremist, that he's dangerous, things of that nature.

The letter that was sent by Mr. Langhorne is 14 pages of discussing an encounter that he had in the facility where he felt he was beat up or injured.  And he's complaining about the lack of investigation, and he's asking for somebody to come in and look into this matter.  He's saying, "I name names."  He's providing information about that.

And on that last page, "This is the America that tortures and dehumanizes, which lets slip away evil men" -- referring to the guards that had done him wrong -- "and evil deeds because the person who was beaten is or was black or Muslim, or was or is being held, you know, pretrial," and that "his guilt need not be proven," and he goes on.

It's the last phrase, the last segment, that the Government chose to focus on, is that somehow relates to -- what he's upset about here is his treatment in the facility. At no point does he say, "I'm going to be an enemy of the state because I love ISIS."  What he's saying is, "If this is how

people are treated in jail, I'm going to be an enemy of the state."

That's the context.  And the Court can receive that, you know, for what it is, but it should not receive it out of context, because at no point is he discussing anything, in 14 pages, other than what was happening to him in the jail.

The other thing to note is that, again, you have an individual with a history of mental illness and a history of not being treated appropriately for mental illness, who's now incarcerated.  And this is written four months, five months roughly --

MS. TAYLOR:  Six months.

MR. LEOMBRUNO:  Six months after his incarceration, because I think he came in at the end of November or December, and this is written the first part of May.

So you have a situation where --

THE COURT:  I think he came into custody November 15th of 2019.

MR. LEOMBRUNO:  I believe that's accurate.  And then this, I believe, is dated 5/9.  So you have that time span, but this is an individual that's still getting back into -- and what do we know about Mr. Langhorne during this time?

There's questions about his competency.  You know, referrals are being done.  So that's really important to consider when addressing what the Government has put before you

as some kind of indication that he loves ISIS, and the second he gets out, he's going to be an enemy of the state.  It's not even remotely close to what's being discussed in this letter.

The other issue is I do take exception a little about the characterization of Dr. Bloomfield's testimony. Dr. Bloomfield was not called as an expert on radicalism.  At no point did I ask him any questions about whether he thought my client was a radical.

The testimony was designed to aid the Court in understanding what could be part motivations for somebody acting out or engaging in this type of behavior.

Dr. Bloomfield, I don't think, said anything that says, "Oh, okay, you know, Asperger's is responsible for him believing in certain things."  I think it dealt to the degree or the pursuit of these types of topics.

So when somebody does make that engagement, "Hey, I'm going to participate in this kind of -- you know, this environment or this ideology," his testimony was more in the sense of, okay, this is how the Asperger's helps drive that or fuel that, you know, not -- not that it's an answer for every single thing.

But, again, this is the problem that I'm having a little bit with the Government's arguments, is they want to just take that and separate it and focus on everything else as if it's irrelevant or it's not important.  If that were the

case then 3553 would say, "No, don't consider, you know, the characteristic of the defendant, you know, or his personal characteristics."

The Court has an obligation to do it, and you can't -- you can't -- this is why I said earlier you can't address Romeo Langhorne without addressing Romeo Langhorne. You can't separate him from these conditions.

The other thing is I don't think -- I think Dr. Bloomfield's comments about it being underdiagnosed -- I know there was questions on cross-examination about, you know, "Well, can you provide a number?"

I don't think he was saying -- I think his comment was in general that people that actually have Asperger's -- a lot of which may not actually get diagnosed.  I mean, it's underdiagnosed.

You know, people are treating other -- he went into the dialogue about, you know, purpose of treatment.  Somebody may say, "Okay.  Well, you have schizoaffective disorders because I'm treating you.  I can give you medication for this." And they may miss the larger picture, and that his lens was much wider because he's not looking at it through the lens of treatment but as just an evaluation.

So, you know, I don't think Dr. Bloomfield's testimony was anything other than to explain to the Court a little bit about who Romeo Langhorne is and why, when we see

this type of engagement, when it's clear explicitly from the text that he thinks he's dealing with an undercover agent, why would he continue to do that.

Why would he continue to say, "I know where the line is. Let's not do anything that's, you know, a 2339B charge. Let's not even approach that." It's because he likes feeling important. He likes confronting the other person, "Ah, I suspect you're an agent, but I know where the line is, and I know what not to cross, and it doesn't matter if you are or you aren't."

All those things are characteristics of what Dr. Bloomfield described, and they're certainly ripe for the Court's consideration in deciding what's an appropriate sentence.

The other thing I would address is -- and I had mentioned this earlier, that, you know, there have been many cases where courts have, even with the terrorism enhancement, provided a variance.

And there is one in particular that's fairly recent, 2020, and that's *Waheba Issa Dais*, and the last name's D-a-i-s. It's out of Wisconsin. And what's interesting about that particular case is that there's -- there's a lot of similarities.

This was an individual that used Facebook to hack -- or hacked Facebook accounts to, you know, pledge allegiance to

ISIS, had given information about how to make ricin, given information about how to make an explosive belt, things of that nature.  And a very similar charge, very similar facts as far as giving information about explosive devices.  The sentence in that case for Ms. Dais was 90 months.

So there's grounds -- when we make the recommendation of 97 months, that's not something that we just pulled out of a hat, that we suggest to the Court, okay, this is some random thing.

That's after careful consideration of other instances where people have been sentenced with similar conduct, calculating all the mitigation that's before the Court with regard to his mental health, you know, things of that nature.

And then to look at that in an entire package and say, "Look, you know, that amount of time, that's a lot of years in prison, and that's his recommendation."

So if the Court wants to know what his feelings are about being an adherent to ISIS -- not from a letter that's describing an attack on him when he was in custody in jail that was written, you know, a while ago.  But if you want to consider where he is now, two years and seven months later as he stands before the Court, he's in a much better position mentally because he's getting treatment for those symptoms, for the anxiety and depression.  He's more mature.  Dr. Bloomfield testified to that.  Mr. Langhorne affirmed that in his

allocution.  Ms. Sandberg said he's thinking more clearly.

You've got three people that have had direct involvement with my client, including, obviously, himself, you know, saying, "Look, I'm different now than I was back then.  I don't support these things anymore.  I have no desire to support these things anymore.  I want to move on with my life."

And the Government would say, "No, no.  You can't look at those things because of a letter he wrote when he was first incarcerated after he believed he had been beat up by the guards."

Judge, I think there's sufficient mitigation here, with a 97-month sentence, that would meet all those criteria, that sends a very strong message that the Court and the Government do not take these situations lightly, that certainly provides deterrence.  Because it's, again, a significant sentence, a significant term, and it demonstrates -- it's his recommendation of 97 months.

If the Court recalls, I had to go confer with him. "What number do you want me to give?"

"97 months."

That's him telling the Court, "I understand that what I did was severe.  I understand I need to be held accountable, and this is an appropriate sentence, that I think is an appropriate sentence."

Thank you, Your Honor.

THE COURT:  Thank you, Your Honor.

Anything else from anybody?

MS. TAYLOR:  Your Honor, Dr. Bloomfield's testimony was he did not ask Mr. Langhorne whether he still adhered to --

THE COURT:  Yes.

MS. TAYLOR:  So to the extent that it's being represented that --

THE COURT:  We don't know.

MS. TAYLOR:  We don't know.  The only one who knows is Mr. Langhorne.

That's all I have, Your Honor.

THE COURT:  Okay.  Let me just take a few minutes and talk to the probation officer.

COURT SECURITY OFFICER:  All rise.

(Recess from 2:30 p.m. until 2:43 p.m.; all parties present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in session.

Please be seated.

THE COURT:  The name of the case is *Concepcion*, C-o-n-c-e-p-t-i-o-n [verbatim], *versus U.S.*  It was decided the 27th of June.  It's No. 20-1650.

Come on back up, Mr. Langhorne.

I've listened to statements that the defendant has made, what the attorneys have said.  I've read the presentence

report, all the other material that I've considered, the plea agreement, sentencing memorandums, the material that was submitted to probation.

I've considered the advisory guidelines, the dictates of Section 3551 and 3553 of Title 18 of the United States Code, and it is the judgment of this Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a period of 240 months, 20 years.

Upon release from imprisonment, the defendant will serve a 15-year term of supervised release.  While on supervised release, the defendant will comply with the mandatory and statutory conditions adopted by the Middle District of Florida, and in addition, the following special conditions:

First, you'll participate in a mental health treatment program, either as an outpatient or an inpatient, and follow your probation officer's instructions regarding the implementation of this court directive.

Further, you'll contribute to the cost of such services an amount that the probation office considers reasonable for mental health treatment services, and that amount will not exceed that cap.

Second of all, you will submit to a search of your person, your residence, your place of business, any storage units under your control, any computers, or vehicles conducted

by the United States probation officer at a reasonable time and in a reasonable manner, based upon a reasonable suspicion of contraband or evidence of a violation of conditions of your release.

And you will inform all other residents of the premises that it may be subject to this search, and failure to submit to a search may be grounds for revocation of your supervision.

The underlying charge is a qualifying felony.  You'll cooperate with your probation officer in the collection of a DNA sample by your probation officer.

The mandatory drug testing provisions of the Violent Crime Control Act are suspended.

Based on your financial status, the Court waives the imposition of any fine.

I think I had said at the beginning that there was no forfeiture, but wasn't there a pistol or a firearm that was seized in this case?

MS. TAYLOR:  It's a cell phone, Your Honor.

MR. LEOMBRUNO:  A phone.

THE COURT:  It's a what?

MS. TAYLOR:  A cell phone.

THE COURT:  Oh, the cell phone.

And is that subject to forfeiture?

MS. TAYLOR:  Yes, Your Honor.

THE COURT:  Oh.

MS. TAYLOR:  Your Honor, would the Court consider, in terms of the search condition, adding -- making it explicit that any computers or cellular telephones are subject to search as well?

THE COURT:  Yes.  Yep.  That's fine.  I'm not going to prohibit him from using the Internet, though, except for illegal purposes.

It's further ordered that the defendant will forfeit a Samsung Galaxy S9, Model SMG960U, Serial No. R38K90B3VAW [verbatim].

It's further ordered that the defendant immediately pay the United States a special assessment in the amount of $100.

I've considered the advisory guidelines and all the factors identified in subparagraphs (1) through (7) of Section 3553(a) of Title 18 of the United States Code, and the Court finds that the sentence imposed is sufficient but not greater than necessary to comply with the statutory purposes of sentencing.

And in actuality, while the Court doesn't know the details of what kind of discussions took place because we don't participate in plea bargaining, I think, from what I have heard and the calculations that would apply, that you got actually a ten-year benefit from entering into the plea agreement.  It may

be even more than ten.

But at least going, from this one charge, from a 360 to a 240, and it could have been --

THE DEFENDANT: Life?

THE COURT: Up to life. But you did very good on that, and that's why I didn't take anything more off from that. That's 120 months' credit where you would have only gotten the three levels on the acceptance of responsibility.

I've accepted the plea agreement because I'm satisfied that the agreement adequately reflects the seriousness of the actual offense behavior, and accepting the plea agreement will not undermine the statutory purposes of sentencing.

I'm going to remand the defendant to the custody of the United States Marshal to await designation by the Bureau of Prisons. And I'm going to recommend to the Bureau of Prisons that the defendant be incarcerated at a facility that can provide a mental health treatment program, either at Butner or some other institution.

Now, to the extent permitted by your plea agreement -- and you know what your plea agreement had -- there are four conditions that says you've given up your right to appeal unless one of those four takes place.

You have to make the decision with respect to whether you've got the right to appeal or not, but my obligation is to

advise you that if you do take an appeal, you have to do so within 14 days of the judgment and sentence, which would be today.

So if you believe you have a right to appeal, if you don't file it within 14 days, you waive and give up your right to appeal.

Do you understand that?

THE DEFENDANT:  Do I have a right to appeal?

THE COURT:  Well, there are four conditions.  One would be if I sentenced you to the statutory -- exceeded the statutory maximum.  No, I didn't do that.

The second one would be whether or not the sentence violates the Eighth Amendment against cruel and unusual punishment.  I don't believe I did that.  You know what some of the other sentences for terrorism are.

The third one would be if the Government takes an appeal.

Is the Government going to take an appeal?

MS. TAYLOR:  I'm not recommending one, Your Honor.

THE COURT:  Okay.  And the fourth one would be if I sentenced you above the guideline calculations, which are the 240, so I didn't.

So you have to be the ultimate decider on that issue, not me.  I'm just warning you about the time limitations.  A lot of people appeal within the time, but the Court of Appeals

says, "Hey, you gave your right up to appeal."

I'll leave that decision up to you, not to me, but I want to make sure you understand the 14-day time limit.

Do you understand that?

THE DEFENDANT:  I understand that, Your Honor.

THE COURT:  And you do have the right to be represented by counsel.  You have court-appointed counsel in this case, and if you decide to take an appeal, he'll continue to represent you at no cost or obligation on your part.

Now, the Court having pronounced sentence, does counsel for the defendant or the Government have any objections to the sentence or the manner in which the Court has pronounced sentence, other than what has previously been said?

MR. LEOMBRUNO:  No objections other than the prior arguments we made.

THE COURT:  Anything from the Government?

MS. TAYLOR:  No objections from the United States, Your Honor.

THE COURT:  Okay.  Good luck to you, Mr. Langhorne.

We'll be in recess.

COURT SECURITY OFFICER:  All rise.

(The proceedings were concluded at 2:53 p.m.)

- - -

CERTIFICATE OF OFFICIAL COURT REPORTER


UNITED STATES DISTRICT COURT )

MIDDLE DISTRICT OF FLORIDA    )


        I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated therein.


        DATED this 14th day of September, 2022.


                        s/Shelli Kozachenko_____
                        Shelli Kozachenko, RPR, CRR, CRC
                        Official Court Reporter